FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 12 2022 ★

BROOKLYN OFFICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

Leticia and Yovany[1],

    Plaintiffs,

v.

The United States of America,

    Defendant

CV 22 - 7527

Case No. _____

GARAUFIS, J.

LEVY, M.J.

### COMPLAINT

1.    Plaintiffs Leticia and her then-fifteen-year-old son, Yovany (together, the "Plaintiffs"), came to the United States as asylum seekers in search of safety. Instead of providing them the refuge they sought, federal agents forcibly separated Yovany from his mother, beginning a 792-day ordeal in which Yovany was placed in foster care and Leticia was unlawfully deported. Although the lasting effects of this family's forced separation may never fully heal, Leticia and Yovany seek justice in the form of damages for their unlawful mistreatment.

2.    Leticia and Yovany fled Guatemala in 2017 to escape persecution and gang violence. Due to the extreme violence suffered by Yovany, U.S. Citizenship and Immigration Services ("USCIS") has granted his application for asylum. Leticia's asylum case is currently ongoing.

3.    As Customs and Border Protection ("CBP") officers were processing Plaintiffs' case, they took Leticia and Yovany to separate holding areas for men and women. Unknown to either Plaintiff, this was the last time that Leticia would see her son for 792 days.

---

[1] Plaintiffs are filing a Motion to Proceed Pseudonymously concurrently with this Complaint.

4.      Compounding the trauma of this surreptitious and pretextual separation, officers of CBP, Immigration and Customs Enforcement ("ICE"), and the Office of Refugee Resettlement ("ORR") did not provide Leticia or Yovany any information about each other's whereabouts or wellbeing.

5.      The trauma of the separation caused Leticia to suffer from facial paralysis, which was left untreated by government officials and detention facility staff despite their recognition that her condition required medical attention.

6.      Despite favorable initial determinations regarding Leticia's asylum claim, officials of the Department of Homeland Security ("DHS") continued to detain her away from her son. Seeing that Leticia was distraught and desperate to secure release from detention for herself and her son, government officials coerced her into accepting a removal order, and she was deported on or around June 18, 2018. A federal judge later determined that her decision to withdraw her applications was not the product of a free and deliberate choice and that her subsequent removal based on the alleged voluntary withdrawal of her asylum claim was therefore unlawful.

7.      Leticia and Yovany were not reunited until January 22, 2020, when Leticia reentered the United States pursuant to a federal court ordering her return. The injuries that Plaintiffs suffered as a result of the deliberate misconduct of federal employees, however, were substantial, and the harm that resulted continues to this day.

## JURISDICTION AND VENUE

8.      This court has jurisdiction over Plaintiffs' claims for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1).

9.      Plaintiffs have exhausted their administrative remedies under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq*. Plaintiffs presented their claims to each of the

relevant agencies of the United States of America more than six months ago. There has been no final disposition of their administrative claims, and Plaintiffs now exercise the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

10.     Plaintiffs are residents of this district. Venue is therefore appropriate under 28 U.S.C. §§ 1391 and 1402(b).

## PARTIES

11.     Plaintiff Leticia is the mother of Plaintiff Yovany.

12.     Yovany is Leticia's son and was fifteen years old when he was separated from his mother by CBP officers.

13.     Leticia and Yovany are domiciled in Brooklyn, New York.

14.     Defendant United States of America (the "United States," "federal government," or the "government") is a proper defendant under the FTCA. *See* 28 U.S.C. §§ 1346(b), 2671, *et seq.* The United States is liable for the personal injuries of Leticia and Yovany caused by the wrongful acts or omissions of its employees, including employees of DHS, DHS's constituent units, CBP, and ICE, and ORR. The employees of these agencies were acting within the scope of their employment under circumstances where the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred. *See* 28 U.S.C. § 1346(b).

## ALLEGATIONS

### I.     The Federal Government Instituted an Unlawful Family Separation Policy

15.     Beginning in July 2017, officials in the El Paso Sector of CBP began piloting a policy of intentionally and forcibly separating asylum-seeking parents from their children after

making immigration arrests near the U.S.-Mexico border.[2] On information and belief, this policy was conceived and directed by federal employees and officials in Washington, DC. Under this policy—which was later expanded and formalized by the Secretary of Homeland Security and Attorney General[3]—the government forcibly separated thousands of asylum-seeking families, taking children as young as four months old from their mothers and fathers.[4]

16.     Federal officials separated these families knowing full well that the government was not prepared to track separations and had no system in place to reunite separated children with their parents.[5]

17.     Now, more than three years since the government ramped up family separations, there are still hundreds of parents and children who remain separated.[6]

18.     The cruelty of this policy and the trauma it inflicted on thousands of families was not an unforeseen or incidental byproduct—it was the government's very goal. Top government officials at the time were well aware that the "zero-tolerance" policy would result in the separation

---

[2] *See* U.S. Dep't of Health and Hum. Servs., Off. of Insp'r Gen., *Separated Children Placed in Office of Refugee Resettlement Care* 3 (Jan. 2019), *available at* https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf ("From July through November 2017, the El Paso sector of Customs and Border Protection (CBP), an agency within DHS, implemented new policies that resulted in 281 individuals in families being separated.").

[3] Caitlin Dickerson, *The Secret History of the U.S. Government's Family Separation Policy*, The Atlantic (Aug. 7, 2022), https://www.theatlantic.com/magazine/archive/2022/09/trump-administration-family-separation-policy-immigration/670604/.

[4] Caitlin Dickerson, *The Youngest Child Separated From His Family at the Border Was 4 Months Old*, N.Y. Times (June 16, 2019), https://www.nytimes.com/2019/06/16/us/baby-constantine-romania-migrants.html.

[5] Dep't of Justice, Off. of the Insp'r Gen., *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (Nov. 25, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf.

[6] Dep't of Homeland Sec., *Interagency Task Force on the Reunification of Families Interim Progress Report* 8 (Sept. 30, 2022), *available at* https://www.dhs.gov/sites/default/files/2022-10/22_1026_sec-frtf-interim-progress-report-september-2022-cleared.pdf.

of thousands of children. The ostensible (but unlawful) purpose of the policy was to deter other families from exercising their lawful right to seek asylum in the United States.[7]

19.     When top officials at the Department of Justice voiced their deep concern about separating families, then-Attorney General Jeff Sessions defended the cruel policy by saying, "We need to take away children."[8] He further stated publicly, "[H]opefully people will get the message . . . and not break across the border unlawfully."[9]

20.     Similarly, then-Acting Assistant Secretary of Health and Human Services Steven Wagner told reporters, "We expect that the new [separation] policy will result in a deterrence effect, [and] we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[10]

21.     Even after a federal judge enjoined the family separation policy, concluding that separated parents would likely succeed on their claim that the separations were unconstitutional,[11]

---

[7] Dep't of Justice, Off. of the Insp'r Gen., *Review of the Department of Justice's Planning and Implementation of its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 2, 4 (Jan. 14, 2021), https://oig.justice.gov/reports/review-department-justices-planning-and-implementation-its-zero-tolerance-policy-and-its [hereinafter "DOJ OIG Report"]; Maj. Staff of H.R. Comm. on the Judiciary, *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos* 2 (Oct. 2020), https://judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_policy_tr auma_destruction_and_chaos.pdf?utm_campaign=4526-519; Staff of H.R. Comm. on Oversight & Reform, *Child Separations by the Trump Administration* 2 (July 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-07-2019.%20Immigrant%20Child%20Separations-%20Staff%20Report.pdf.
[8] DOJ OIG Report, *supra* note 4, at 39.
[9] Philip Bump, *Here Are the Administration Officials Who Have Said That Family Separation Is Meant as a Deterrent*, WASH. POST (June 19, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent/.
[10] *Id.*
[11] *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1142–1146, 1149 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019) ("*Ms. L I*").

then-President Trump continued to promote the claimed deterrent purpose of the policy, telling reporters, "If they feel there will be separation, they don't come."[12]

22.     As described below, the unlawful actions of federal agents inflicted devastating physical, mental, and emotional suffering on families, including Leticia and her son.

**II.      Officers Forcibly Separated Leticia from Her Son, Yovany**

23.     Leticia is a 37-year-old indigenous Guatemalan woman who fled persecution and death threats in Guatemala with her son, Yovany. Leticia and Yovany came to the United States seeking safety and asylum, but after they arrived, without warning or explanation, immigration officials separated Leticia and Yovany from each other, causing them both severe emotional distress. Officers detained them separately for months, and Leticia became so depressed and desperate in detention that government officials coerced her into accepting deportation to Guatemala despite her viable asylum claim. Leticia had to make the difficult decision for Yovany to remain in the United States, separated from his mother, so he could stay safe. As a direct consequence of the government's unlawful actions, Leticia and Yovany were separated for 792 days, or 2 years and 2 months, before the government permitted them to be reunited. After reunification, this exceptionally prolonged separation continues to cause deep emotional pain to both Leticia and her son.

24.     Leticia and Yovany entered the United States on or about November 20, 2017, by crossing the Rio Grande. Shortly after crossing the river, they were detained by CBP agents.

25.     Leticia and her son were transported to a CBP facility known as a "*hielera*," or ice box, because of the freezing cold temperatures inside the facility. When Leticia and Yovany

---

[12] David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, REUTERS (Oct. 13, 2018), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.

arrived, immigration officers told them to take off their shoes and sweaters. Yovany was shivering because of how cold it was in the facility. Their clothes were still wet from crossing the river, and the officers did not give them any clothes to change into or allow them to wear their sweaters.

26.     The immigration officers told them to put all of their personal belongings in a bag. Leticia had a notebook with phone numbers and personal and religious items, but the CBP officers said she had to hand over everything. She was forced to put all her belongings in the bag, including her shoelaces. The officers told her that when they left the facility, they would get their belongings back.

27.     Leticia and Yovany were cold, tired, and hungry. After they arrived to the CBP facility, they waited for approximately three hours before receiving food and water.

28.     While they waited, they could see the CBP officers laughing at them and mocking the detainees, but they could not understand what they said because it was in English.

29.     The officers finally told Leticia and her son that they could rest in the early morning hours on or about November 21, 2017. Officers took Leticia to a room for women. Officers took Yovany, who was fifteen years old at the time, to a separate room for men. Leticia had no idea that this would be the last time she would see her son.

30.     In the room Yovany was taken to there was only one bed and it was crowded with other people, including at least one adult. Yovany slept on the floor, but he got up several times because of the cold. CBP officers did not give him anything to cover himself, so he had to cross his arms and hug himself to try to keep warm.

31.     When Leticia went into the small room for women, she saw that it was crowded with women and their young children. She was so exhausted that she collapsed on a mattress on the floor and fell asleep.

32.     At around 6 or 7 a.m. the same morning, another woman who was detained woke Leticia up to tell her that immigration officers had taken her son. Leticia tried to leave the room to see where he was, but she was locked inside. She became desperate and started banging on the door. An officer finally opened the door and asked what was going on. She asked him for information about where they had taken Yovany. The officer responded, "I don't know where your son is, I'm just starting my shift." Leticia was shocked and extremely distraught. She had no idea where Yovany was or whether he was safe. She began to cry, and she felt like she would pass out from the pain of being separated from her son.

### III.     Leticia's Detention Abuse and Separation Trauma

#### A.   Immigration Officers Withheld Information about Yovany for Approximately One Month

33.     After Yovany was taken, the officers told Leticia and the other women that it was time to leave. Leticia was still crying because of the separation from her son. She kept asking about Yovany, but the officers became angry and said they did not know what happened to him. They told Leticia and the other women to sign some papers that were in English. None of them had any idea what the papers said. Another woman asked the officials what the papers said, but they answered, "If I explain what they say to all of you I won't finish today. But if you don't want to sign that's fine, go back to where you were [referring to the *hielera*] and get an attorney, and sign when you have an attorney." Another mother said that maybe if they signed, they would be taken to where their children were. Leticia, miserable and distrustful because of her treatment by the officers, but fearful that non-compliance would prolong her separation from Yovany, eventually signed the documents.

34.     Shortly after she signed the documents, immigration officers took Leticia to another detention center, which she believes was the West Texas Detention Facility in Sierra Blanca, Texas, which is operated by the private contractor LaSalle Corrections. As they were leaving the *hielera*, Leticia tried to retrieve her belongings, but was only allowed to take her sweater and her shoes. The officers laughed at her and said that where she was going she would not need them and they would go in the trash anyway. She never saw her belongings again.

35.     Leticia hoped that she would be reunited with Yovany at the next detention center. But when Leticia arrived at the detention center, she saw that her son was not there. She asked the officials present for more information, but no one would tell her where he was. She was devastated and growing more desperate. Leticia cried constantly and was so depressed that she did not eat for around five days.

36.     On or around November 28, 2017, Leticia attended a criminal hearing for the charge of improper entry. The officers at the detention center told her she was going to see a judge, and she thought she would see her son at the court hearing. She entered the courtroom with many other people, handcuffed at her wrists and ankles. She was crying because she did not want her son to see her handcuffed. But then she realized that her son was not there. Having to leave another place without knowing any information about Yovany was very difficult for Leticia, and she grew even more depressed.

37.     The criminal complaint against Leticia was dismissed.

38.     After she was brought before a judge, officials drove Leticia and the other women she was with to a different detention center that was about 3 or 4 hours away through the desert. At that detention center, they waited outside for many hours. At or around 11pm, the officials at that center told them that they could not stay at that detention center because it was full. Leticia

and the other women had to board the bus again and travel back to West Texas Detention Facility in Sierra Blanca, Texas. On the way back to the facility in Sierra Blanca, the bus driver menaced Leticia and the other women. He complained about how long they had waited at the detention center and making the long drive for nothing. He drove so fast and recklessly that all the women in the bus were terrified. They begged him to slow down and be careful, but he did not listen to them. Leticia says that they all were crying and convinced that their bus would crash and that they would be killed.

39.    Eventually, around 12 a.m., the bus made it back to the West Texas Detention Facility in Sierra Blanca. At around 6 a.m., the women were sent to a separate part of the detention center than where they had first been.

40.    At the Sierra Blanca facility, two immigration officers regularly came to the detention center, and each time she saw them Leticia asked them for information about her son. For approximately one month after their separation, all the immigration officers she spoke to refused to give Leticia any information about her son.

41.    Not knowing where Yovany was, or if he was even alive, caused Leticia extreme anxiety, and she cried daily. Leticia calls this period of uncertainty "one month of torture," and believes that not knowing about Yovany's whereabouts or wellbeing significantly increased the trauma and stress of their separation.

42.    After approximately one month of asking at every opportunity about her son's whereabouts, immigration officers finally gave Leticia a list of phone numbers to call to try to find Yovany. When the officials presented her with the list, Leticia told them she had never used a phone before, that she did not have any money, and that she did not know how to make a phone call. The officers responded, "There's always a first time." They then told her that they had already

10

helped her a lot and refused to give her any more assistance. Another woman at the detention center helped her to call the numbers, and Leticia was eventually able to locate Yovany at a detention center in Arizona.

**B. Leticia Suffered from Depression and Facial Paralysis while in Detention**

43.     Leticia suffered from facial paralysis while in detention. She first began suffering from paralysis in or around January 2018. She woke up with a terrible headache and could not leave her cell. She started to feel the pain move from her forehead to her eye and down her face. Her right eye became swollen shut, and she could not see out of it. She could not chew. She felt like her face was twisting and her body was frequently trembling. Leticia believes her facial paralysis was caused by the trauma of separation from her son.

44.     Other women in the detention center became worried for Leticia and told detention center staff she was in need of medical attention. A medical staff member came to examine her in her room. He told her that she was experiencing a headache, that it was not something to be concerned about and that it would get better. The medical staff refused to provide any further examination or care and told Leticia to "use salt water," which is what they frequently told detainees to do to address medical problems.

45.     Leticia's condition did not improve and she continued to suffer from paralysis. A few days later, Leticia went to the medical office in the detention center. A staff member told her that she would have to undergo a blood test. They told her that she might need to see a neurologist for her facial paralysis. But Leticia never received any follow up or additional care.

46.     During her detention at Sierra Blanca, medical staff took Leticia's blood around three times, but they did not give her any further treatment or explain the results from the bloodwork.

47.     Leticia also felt overwhelmed by depression at the West Texas Detention Facility and asked the nurses there for help. She had trouble sleeping, was constantly crying, and lacked hope to continue fighting her case. Each day she felt that that she was going to die if she was forced to stay in detention. She asked to see a psychologist to help with the depression and anxiety. Some medical officials told Leticia they would refer her for psychological support, but Leticia never received any psychological services.

48.     Leticia made every effort to alert officials at the facility of her need for medical and psychological care. On information and belief, government officials, including ICE officials, had knowledge of Leticia's medical and psychological needs, but did not provide her with medically necessary treatment.

49.     Leticia also suffered from abuse and ridicule by the officials at the detention facility. The officials frequently mocked and laughed at her and the other detainees, but she could not understand them because they spoke in English. For instance, a guard who delivered her meals would hold the tray of food above Leticia's head to try to make her jump for the food.

50.     Conditions in the detention center were also unsanitary and degrading. Drinking water was not always available to detainees, and as a result, Leticia often had to drink from bathroom sinks. The water tasted very chlorinated and caused Leticia stomach pain and made her nauseated. The food provided was also of very poor quality and often made Leticia nauseated and sick to her stomach. Oftentimes, meals such as scrambled eggs were undercooked. Other times, the food was burnt. However, the detention staff told the women that if they did not eat, they would be sent to the "*calabozo*"—a small dark room in solitary confinement used for punishment. Leticia had seen the *calabozo* and one time heard a man screaming to be let out of it. She feared being

12

sent there and also worried that if she were put in the *calabozo*, she might miss a court hearing. Because of this, Leticia forced herself to eat out of fear.

51.     The detention center also lacked proper supplies for personal hygiene. They frequently ran out of supplies such as soap and toothpaste. The feminine hygiene products that the staff provided were extremely thin and inadequate. Leticia and the other women often stained their uniforms and bedsheets and had to wash them by hand using the small amount of body soap they had. The constant deprivation of proper hygiene supplies was extremely dehumanizing for Leticia and the other women in the detention center.

52.     The women in the center would tell officials about the problems with the water and food. Despite being alerted to these issues, they made no improvements and the conditions remained the same throughout Leticia's detention.

## IV.     Yovany's Detention and Separation Trauma

### A. Yovany Was Taken to a Different Detention Center

53.     While Leticia was being held in squalid and abusive detention conditions, Yovany was transferred to separate facilities, and initially given no information about what had happened to his mother.

54.     Yovany describes the day of their separation as the worst day of his life. Like his mother, he received no warning or explanation before he was separated from her. At around 5 am, when the CBP agents woke him up in the *hielera* to move him, he thought his mother was going to be moved as well and that they would see each other again soon. As he was leaving the holding cell, he tried to find her. He asked other detainees if they had seen her, but no one had, and officials refused to answer his questions about her whereabouts.

13

55.     The officers took Yovany to a different detention center, where he was put in a room with four or five other people. When officers brought him to the room, Yovany asked about his mother again, but no one would give him any information. After barely sleeping the night before, Yovany was very tired and fell asleep. Yovany remained in this facility for around two or three days. During this time, Yovany asked every officer he could where his mom was. The officials either did not respond or told him they did not know.

56.     The conditions in the detention center were bitter and unsanitary. The room was kept at a freezing temperature. He slept on a small cot that did not have a mattress. The bathroom was a small section of the room with a toilet that did not have a door. Instead, a wall divided the toilet from the rest of the room. If someone stood up, they could see the person using the bathroom next to them.

57.     Officials only gave Yovany food twice a day, serving burritos at both meals. The burritos were prepackaged and still frozen, making them hard to eat.

58.     He received clothes to change for the first time before he boarded the plane.

**B. Yovany was then Transferred to a Shelter for Unaccompanied Children in Mesa, Arizona**

59.     Yovany was then taken to Casa Kokopelli, a shelter for unaccompanied children in Mesa, Arizona operated by Southwest Key.

60.     The conditions at Casa Kokopelli were unsanitary and harsh. The temperature was kept extremely low, and Yovany and other children detained frequently complained that they were cold to officials, but they did not raise the temperature.

61.     During mealtimes, Yovany had to wait with other kids for enough staff to take them to the bathroom. He experienced long, uncomfortable wait times before he was able to use the bathroom. The bathrooms were also unsanitary and not adequately cleaned.

14

62.     Shortly after he arrived at the shelter, Yovany realized that his mother was not there, and he began to experience more extreme anxiety and depression.

63.     Yovany continued to experience emotional distress and depression throughout his time at Casa Kokopelli, but he was not given adequate care. He would often ask to speak to his counselor when he felt distressed, but staff would respond that the counselor was busy and unavailable.

64.     Yovany had constant nightmares while at Casa Kokopelli. He dreamed that an officer was waking him up in the detention center to tell him that his mother was not there. When he felt staff nearby, he often jumped up out of fear and was unable to sleep. Because of this, Yovany was frequently tired, but staff would not let him sleep during the day.

65.     Yovany also noticed his hands began to shake and he could not stop them. He sometimes could not eat because his hands shook too much.

66.     One night, Yovany began experiencing terrible pain in his head. He told staff about his headache, but they told him he had to wait until the morning to see a doctor. He begged them to take him to the doctor, but they did not let him go. His head continued hurt the next day, and he asked to see the doctor again. The staff still refused to take him to the doctor, and Yovany never received any medical treatment for his severe headaches.

67.     Although he frequently asked for information about his mother after the separation, no one gave Yovany any information about his mother's whereabouts for about one month. He was extremely anxious and scared during this time. He did not know why he had been separated from his mother, where she was, why staff would not tell him why they had been separated, or if he would ever see her again.

68.     While other children at Casa Kokopelli were sometimes able to make phone calls to their family members, during this time staff did not call Yovany's name or give him any opportunity to make a call.

69.     Yovany asked staff why they never called his name to use the phone. Staff members told him he had to talk to his social worker because they did not have a phone number for his mother. But his social worker said that he did not know his mother's number either and told him, "How am I supposed to know where your mother was? Why don't you know where she is?" For about a month, despite his repeated requests for help, no one would assist Yovany in locating his mother.

70.     Finally, the staff at the shelter told Yovany his mother had been located in a detention center. They helped Yovany call his mother and they learned each other's whereabouts for the first time in about a month.

71.     Yovany cried the first time he talked to his mother because he did not where she was or what had happened to her. He asked her if she was being treated well. She said she was fine, but Yovany could tell from the sound of her voice that she was not well.

72.     Yovany worried about his mother constantly. He frequently could not sleep or eat because he was anxious about his mother's wellbeing in detention and whether she was getting enough to eat.

73.     Yovany was not able to regularly talk to his mother. His social worker coordinated the calls with his mother, but he told Yovany that he had many cases and he could not focus on Yovany's case. Often, Yovany would ask to speak with his mother on a Monday and his social worker would say he could call her on Friday. But sometimes the social worker would not call his mother on the scheduled day, and Yovany would have to wait another week to speak with her.

**V. Leticia Accepted Deportation Out of Desperation and to Help Her Son Secure Release from Detention**

74.     After finally being able to speak to Yovany, Leticia was very worried about him because he was still being detained in the shelter. Staff at the shelter asked her if they could send Yovany to stay with anyone, like a family member in the United States. But Leticia did not know anyone in the United States who could take Yovany.

75.     From her conversations with officials, Leticia understood that as long as she was in detention and no one else was able to take him, Yovany would also remain in detention. She felt desperate and distraught that her son was in a detention shelter suffering and that she could not help him.

76.     Leticia had a Credible Fear Interview ("CFI") in detention on or around January 17, 2018. She felt uncomfortable and very nervous during the interview. Despite suffering from the conditions of her detention, her depression, and the anxiety caused by her treatment, Leticia was nevertheless given a positive CFI determination, and found by an asylum officer to have a credible fear of returning to her home country. However, a few days after she received her positive CFI, an immigration officer told Leticia that she would still not be released and reunited with her son. Instead, the officer said that Leticia would be detained by the Department of Homeland Security until there had been a final administrative determination in her case, which she understood could take months or even years.

77.     At a hearing in the detained immigration court on around May 23, 2018, the Immigration Judge ("IJ") scheduled another hearing for Leticia to present her full asylum case in October 2018, which would have been nearly a year after she was separated from her son. Leticia felt she could not wait until October for her next hearing or force herself and her son to continue to suffer in detention for many more months awaiting the hearing. She was distraught due to the

ongoing separation from her son while in detention, which affected her mental and physical health. Leticia hoped that she could help her son secure release from the shelter for unaccompanied children if she were no longer in detention herself.

78.     Because she believed that it was the only way to get herself and her son out of detention, Leticia decided to accept deportation and informed the IJ at the hearing on or about May 23, 2018. Immigration officials deported Leticia, without her son, on around June 18, 2018.

79.     After being deported, Leticia later was a class member in a lawsuit seeking the right to return to the United States and be reunified with her son. In 2019, The U.S. District Court for the Southern District of California considered the circumstances of Leticia's decision to accept deportation—including the abrupt and prolonged separation from her son, her facial paralysis and depression, the period during which she had no information about where her son was, and the resurfacing of her past trauma—and concluded that "[t]he evidence presented clearly warrants a finding that [Leticia]'s[13] withdrawal of her claims was not voluntary." *Ms. L v. ICE*, 403 F. Supp. 3d 853, 862–63 (S.D. Cal. 2019) ("*Ms. L II*").

**VI. Leticia and Yovany were Separated for 792 days, Causing Severe Emotional Distress**

80.     As a result of Leticia's decision to accept deportation, Yovany was released from detention and placed in foster care. Leticia gave her son the option of whether to return to Guatemala with her or stay in the United States without her. Yovany decided to stay in the United States due to his fear that he would be killed if he returned to Guatemala. Yovany had been threatened in Guatemala at knifepoint, and he feared for his life if he had been forced to return to Guatemala. Yovany felt very depressed when he made this decision. He wanted to go back with him mother, but he felt he had no choice and had to remain in the United States for his own safety.

---

[13] Leticia is identified as B.L.S.P. in the *Ms. L* order.

81.     Ultimately, U.S. Citizenship and Immigration Services granted asylum to Yovany on account of his well-founded fear of persecution in Guatemala.

82.     While staying in the United States protected Yovany from the immediate threat to his life he would have faced if he returned to Guatemala, he was forced to live apart from his mother for 792 days. He missed her terribly during this time and suffered from extreme anxiety and depression. He was scared for his mom and worried about her safety in Guatemala. Yovany feared he would never see his mother again and that she might be killed in Guatemala. He frequently cried because he had no hope his mother would be able to come back to the United States after she had been deported. He believed that he would be forced to be on his own until he turned eighteen, and he did not know what was going to happen to him with his mother gone.

83.     Leticia also suffered from extreme anxiety and depression during the prolonged separation. She feared for her own safety in Guatemala and worried about her son's well-being in foster care in the United States.

84.     To this day, Leticia continues to experience symptoms related to her detention and separation from her son, and she has been diagnosed with Major Depressive Disorder. She often feels depressed and anxious and has no appetite. The sight of food frequently makes her feel nauseated. She has extreme difficulty sleeping and relies on medication prescribed to her by her psychologist in order to sleep at night.

85.     Yovany also continues to experience symptoms related to his detention and separation from his mother. His hands shake while he performs everyday tasks, like working at his part-time job, talking to his mother, or resting in his room. He has frequent recurring nightmares about being separated from Leticia. Whenever his mother comes to wake him up, Yovany still wakes up suddenly in a panic, thinking she is an immigration officer coming to tell him that they

had been separated. He continues to feel a deep pain as a result of the separation. Although Yovany

was separated from his mother four years ago and he has since been granted asylum, he still fears

that the U.S. government will somehow separate them again.

**VII. The Government's Separation of Yovany from His Mother and its Mistreatment of Them Both Were Unlawful, Violated Numerous Non-Discretionary Obligations, and Was Done in an Effort to Coerce Them Into Abandoning Their Legitimate Immigration Claims**

86.    Under long-standing legal obligations, imposed by regulations and by consent

decree, the federal agents who took custody of Leticia and Yovany subjected them to harsh and

deliberately cruel treatment, separated mother and son without any legitimate basis, and violated

multiple non-discretionary duties that were designed to protect families and particularly children

like Yovany.

> A.    *The separation and mistreatment of Plaintiffs violated ORR, DHS, and their agents' non-discretionary obligations to Yovany under the* Flores *consent decree.*

87.    Among other things, ORR, DHS, and their agents have a well-established legal

obligation to ensure the humane treatment of minors held in immigration custody. The *Flores* class

action litigation, brought on behalf of minor children held in immigration detention, began in 1985

and resulted in a 1997 consent decree that remains binding on the United States. *See Flores v.

Sessions*, 862 F.3d 863, 869 (9th Cir. 2017) (recognizing that the *Flores* decree continues to govern

those agencies that now carry out the functions of the former INS, including DHS and ORR). The

decree also significantly limits the circumstances, duration, and manner of immigration detention

of minor children, and requires ORR, DHS, and their agents to prioritize the prompt release of

detained minors.

88.    The *Flores* consent decree applies to minors, like Yovany, who arrived in the

United States to seek asylum with their parents. *See Flores v. Lynch*, 828 F.3d 898, 907-08 (9th

Cir. 2016) (holding that the *Flores* decree "unambiguously applies to accompanied minors"); *see also Bunikyte ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.").

89.     The *Flores* consent decree created standards for the treatment of minors while in federal custody and recognizes the vulnerability of immigrant children detained without a parent or other legal guardian. The *Flores* consent decree includes a requirement that immigration officers hold minor children in facilities that provide (1) access to food and drinking water; (2) medical assistance in the event of emergencies; (3) toilets and sinks; (4) adequate temperature control and ventilation; (5) adequate supervision to protect minors from others; (6) separation from unrelated adults whenever possible; and (7) contact with family members who were arrested with the minor.

90.     ORR, DHS, and their agents violated these *Flores* standards through the numerous forms of harsh and inexcusable treatment to which they subjected Yovany, as discussed above. *Cf. Ruiz ex rel. E.R. v. United States*, No. 13-cv-1241 KAM SMG, 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014) (finding that violation of *Flores* standards can give rise to liability under the FTCA); *A.E.S.E. v. United States*, No. 21-cv-0569 RB-GBW, 2022 WL 4289930 (D.N.M. Sept. 16, 2022) (same). Specifically, they (1) denied Yovany adequate access to food, frequently leaving him hungry; (2) failed to provide adequate medical assistance for conditions that he reported; (3) detained him in areas without adequate access to toilet facilities, causing him to go to the bathroom without privacy; (4) subjected him to freezing cold temperatures in more than one facility; (5) unnecessarily detained him in a cell with an unrelated adult; and (6) made no efforts to put him in contact with his mother, Leticia, for approximately a month, instead asking him, "Why don't you know where she is?".

        B.  *The separation and treatment of Plaintiffs violated DHS's and its agents' non-discretionary obligations to Plaintiffs under various applicable regulations and other rules and standards.*

91.     Section 1.9 of the "General Standards" of CBP's National Standards on Transport, Escort, Detention and Search ("TEDS")[14] states that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." TEDS at 4. Section 4.3 of the TEDS on "General Detention Procedures" states that "[g]enerally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow their operational office's policies and procedures and appropriate legal requirements." TEDS at 15; *see also* TEDS at 22 (stating the same requirements in Section 5.6 on "Detention"). Because no legal requirement, safety concern, or security concern required separating Leticia and Yovany, DHS officers violated this standard by separating them. Indeed, in *Jacinto-Castanon de Notasco. v. ICE*, Judge Friedman addressed the family separation practices that Leticia and Yovany were subjected to and concluded that "nothing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective." 319 F. Supp. 3d 491, 502 (D.D.C. 2018).

---

[14] CBP issued the National Standards on Transport, Escort, Detention and Search (TEDS) in October of 2015, and CBP officers were required to abide by these standards during the period of Plaintiffs' separation and detention. *See* Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search 2015 *available at* https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search (last visited June 18, 2021).

92.    Moreover, TEDS requires that "[i]n circumstances where family units must be separated due to different immigration dispositions, such separation much be documented in the appropriate electronic system(s) of record." TEDS at 15, 22.[15] Federal agents failed to document the separation of Leticia and Yovany, causing a subsequent month-long period in which they were unable to communicate with each other or confirm their family member's safety and well-being. Morever, federal agents represented to Leticia that it was "not their job" to keep track of Yovany's whereabouts after separating them and refused to give her any information about him for approximately a month, thereby cruelly causing her additional trauma and stress.

93.    In addition, as part of the separation of Leticia and Yovany, federal agents subjected Leticia and Yovany to harsh and deliberately cruel treatment, as discussed above, that violated numerous mandatory, non-discretionary obligations the agents were required to follow.

94.    For example, DHS agents' treatment of Plaintiffs while in the *hielera* violated CBP's internal policies and standards requiring that temperatures in holding centers be kept "within a reasonable and comfortable range." TEDS at 16. Section 4.7 of the TEDS, on "Hold Room Standards," states, "*Under no circumstances will officers/agents use temperature controls in a punitive manner*." TEDS at 16 (emphasis added). By subjecting Plaintiffs to freezing cold temperatures deliberately in the *hielera*, CBP officers violated this TEDS standard, as well as obligations under the *Flores* consent decree.

---

[15] *See also* John Sandweg, *Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities* 1 (Aug. 23, 2013), *available at* https://www.immigrantdefenseproject.org/wp-content/uploads/2013-ICE-Parental-Interests-Directive.pdf ("Parental Interests Directive") ("ICE will maintain a comprehensive process for identifying, placing, monitoring, accommodating, and removing alien parents or legal guardians of minor children while safeguarding their parental rights.")

95.     DHS agents' treatment of Plaintiff Leticia further violated Section 1.2 of the

TEDS on "Integrity and Professionalism," which states that states that "CBP employees must

speak and act with the utmost integrity and professionalism. CBP employees must conduct

themselves in a manner that reflects positively on CBP at all times." TEDS at 4. Section 1.4, on

"Non-Discriminatory Policy," also states that "CBP employees must treat all individuals with

dignity and respect." *Id*. DHS agents violated these policies and standards by taunting Leticia with

her food by holding it above her head, and by teasing and casting dirty looks at Leticia and Yovany.

96.     Federal agents also violated mandatory, non-discretionary obligations in

deliberately ignoring Leticia's obvious medical needs. Although she reported multiple medical

conditions to staff members, and was told she should receive follow-up care for her condition of

facial paralysis, she never received that care or the results of the multiple blood tests to which she

was subjected.

97.     The National Detention Standards[16] governing the conditions at the West Texas

Detention Facility require that "[a]ll detainees shall have access to medical services that promote

detainee health and general well-being." *INS Detention Standard: Medical Care* 1 (Sept. 20, 2000),

*available at* https://www.ice.gov/doclib/dro/detention-standards/pdf/medical.pdf. Specifically, in

the case of any "disagreement on the type or extent of treatment that is medically necessary," the

National Detention Standards assign ICE[17] the responsibility to make such a determination. *Id.* at

2. ICE failed to provide Leticia with necessary off-site treatment for her identified medical and

---

[16] In 2000, the Immigration and Naturalization Service (INS) established the National Detention Standards (NDS) for detention facilities, which apply to ICE's Intergovernmental Service Agreement facilities, including the West Texas Detention Facility. *See* U.S. Immigr. & Customs Enf't, *ICE Detention Standards*, https://www.ice.gov/factsheets/facilities-pbnds (Nov. 9, 2021).

[17] INS's detention authorities and responsibilities were transferred to ICE in 2002. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (2002).

psychological needs during her time in immigration detention at Sierra Blanca. In doing so, ICE and its officers violated their non-discretionary duties to provide medically necessary health services.

### C. *The separation of Leticia and Yovany violated their constitutional rights.*

98.    More fundamentally, the intentional implementation of the family separation policy against Leticia and Yovany violated their constitutional rights. *See, e.g., C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020) (finding plaintiffs in similar family separation case had "plausibly alleged that the government's separation of their families violated their constitutional rights").

99.    First, the implementation of the separation policy violated their constitutional right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, *see, e.g., Quilloin v. Walcott*, 434 U.S. 246 (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is constitutionally important for children to remain with their parents. *See Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."). These constitutional protections extend to citizens and non-citizens alike, including when confined by the government. *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018).

100.    Second, in tearing Yovany from Leticia, sending them hundreds of miles apart, refusing to timely inform Yovany and Leticia of each other's whereabouts or well-being, depriving them of any regular or meaningful opportunities for communication with one another, failing to have any system for tracking the child or ensuring family reunification, coercing Leticia to accept

deportation, and engaging in inordinate delays in reuniting them, federal agents also violated Plaintiffs' substantive due process rights.

101.    Indeed, in *Ms. L v. ICE*, the district court concluded that the family separation practice Yovany and Leticia were subjected to likely violated parents' and children's substantive due process rights. *See* 310 F. Supp. 3d 1133, 1144–46 (S.D. Cal. 2018) ("*Ms. L I*") ("A practice of this sort implemented in this way is likely to be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience . . . interferes with rights implicit in the concept of ordered liberty, . . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency.'") (internal citations, quotations, and alterations omitted); *see also Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 502 ("[N]othing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective.").

102.    Third, the separation and mistreatment of Yovany and Leticia additionally violated Plaintiffs' constitutional right to equal protection because it was motivated by discriminatory animus towards Latino immigrants of Central American origin. DHS agents targeted Central American asylum seekers in particular for separation and harsh treatment as a means of deterring them from pursuing legitimate immigration claims and deterring Central American families from seeking asylum in the United States.

103.    As with the fundamental right to family integrity, the constitutional right to equal protection under the law and to freedom from invidious discrimination by the government on the basis of race or national origin has long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," even those not lawfully present. *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (emphasis removed).

26

104.    Fourth, and relatedly, DHS agents also separated Yovany and Leticia and subjected them to harsh and deliberately cruel treatment in order to impede their meritorious cases for immigration protection in the United States, and thereby violated Plaintiffs' procedural due process rights.

105.    On more than one occasion immigration officers pressured Leticia to sign away her rights and agree to be deported to Guatemala. Using family separation to threaten and coerce asylum seekers into giving up their immigration claims violates non-discretionary regulations and directives applicable to DHS and violates Plaintiffs' procedural due process rights. *See* 8 C.F.R. § 1003.25(b) (requiring that waiver of rights in conjunction with a stipulated order of removal be voluntary, knowing, and intelligent); *see also Ms. L II*, 403 F. Supp. 3d at 861–68 (finding that for a number of parents, including Leticia specifically, the coercion of family separation rendered their decisions to withdraw applications for admission involuntary).

## CLAIMS FOR RELIEF

### COUNT I
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

106.    The other paragraphs of this complaint are incorporated as if set forth here.

107.    By engaging in the acts described in this Complaint, including but not limited to unlawfully separating Leticia from Yovany for over two years, preventing them from communicating with each other after separation, coercing Leticia to accept deportation, creating exceptionally harsh conditions of detention, engaging in insulting and taunting behavior in the midst of Leticia and Yovany's distress, denying Leticia medical treatment, and prolonging Leticia and Yovany's separation after Leticia's unlawful deportation, the federal employees and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless

disregard of the probability of causing, Plaintiffs Leticia and Yovany to suffer severe emotional distress.

108.    As a direct and proximate result of that conduct, Leticia and Yovany suffered, and continue to suffer, severe emotional distress.

109.    Under the Federal Tort Claims Act, the United States is liable to Leticia and Yovany for intentional infliction of emotional distress.

## COUNT II
## NEGLIGENCE

110.    The other paragraphs of this complaint are incorporated as if set forth here.

111.    The federal employees and officials referenced above had a duty to Plaintiffs Leticia and Yovany to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

112.    The federal employees and officials referenced above also had a duty to Plaintiffs Leticia and Yovany to adhere to the *Flores* consent decree, TEDS, the Parental Interests Directive, and the National Detention Standards.

113.    By engaging in the acts alleged herein, including but not limited to detaining Leticia and Yovany separately without maintaining records that would enable them to contact each other and failing to treat Letica's facial paralysis and Plaintiffs' other medical and psychological conditions, the federal officers referenced above failed to act with ordinary care and breached their duty of care and other duties owed to Leticia and Yovany.

114.    As a direct and proximate result of the referenced conduct, Leticia and Yovany suffered substantial damages.

115.    Under the Federal Tort Claims Act, the United States is liable to Leticia and Yovany for negligence.

## COUNT III
## ABUSE OF PROCESS

116.      The other paragraphs of this complaint are incorporated as if set forth here.

117.      The federal employees and officials referenced above abused legal process within their control for the unlawful purposes of traumatizing Plaintiffs Leticia and Yovany, attempting to coerce Plaintiffs to abandon their lawful claims to asylum, and to deter future migrants from seeking refuge in the United States.

118.      Leticia and Yovany were injured by this misconduct, as described herein.

119.      Under the Federal Tort Claims Act, the United States is liable to Leticia and Yovany for abuse of process.

## COUNT IV
## ASSAULT AND BATTERY

120.      The other paragraphs of this complaint are incorporated as if set forth here.

121.      By engaging in the acts described above, including but not limited to subjecting Leticia and Yovany to freezing cold temperatures without providing them dry clothes or other means of keeping warm, federal employees acted intentionally to cause (and in doing so, did cause) harmful or offensive contacts with Plaintiffs Leticia and Yovany.

122.      Through that intentional conduct, federal employees caused Leticia and Yovany substantial physical and mental harm.

123.      Under the Federal Tort Claims Act, the United States is liable to Leticia and Yovany for assault and battery.

## COUNT V
## CONVERSION

124.      The other paragraphs of this complaint are incorporated as if set forth here.

125.     Plaintiff Leticia had a legal right to the personal property described in this complaint.

126.     Federal employees intentionally interfered with that right.

127.     The actions of the federal employees proximately caused Leticia to lose her property.

128.     Under the Federal Tort Claims Act, the United States is liable to Leticia for conversion.

## PRAYER FOR RELIEF

Plaintiffs respectfully demand as follows:

(1) Compensatory damages;

(2) Costs; and

(3) Such other and further relief as the Court may deem just and appropriate.

*       *       *

Dated: December 12, 2022

Zachary Manfredi*
Bradley Jenkins*
Ming Tanigawa-Lau*
Cristina Moreno*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S., #84810
New York, NY 10003-1502
(646) 937-0368
zachary.manfredi@asylumadvocacy.org
bradley.jenkins@asylumadvocacy.org
ming.tanigawa-lau@asylumadvocacy.org
cristina.moreno@asylumadvocacy.org

* *Motion for admission* pro hac vice
*forthcoming*

Respectfully submitted,

Alex Spiro
Dennis Hranitzky
Zane Muller
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
alexspiro@quinnemanuel.com
dennishranitzky@quinnemanuel.com
zanemuller@quinnemanuel.com

*Attorneys for Plaintiffs*