**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

LETICIA *et al.*,

      Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

      Defendant.

**Case No. 22-cv-7527-NGG-RML**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION TO TRANSFER VENUE OR, IN THE ALTERNATIVE, TO DISMISS**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

I.     The United States Institutes a Family Separation Policy Along the United States-Mexico Border to Deter Central American Migration ................................... 2

II.    The United States Separates and Mistreats Leticia and Yovany ............................. 3

     A.    Federal Officials Separate Leticia and Yovany Without Warning ............. 3

     B.    Federal Officials Subject Leticia and Yovany to Detention Abuse and Separation Trauma ................................................................................ 4

     C.    Leticia Involuntarily Accepts Deportation Out of Desperation to Secure Yovany's Release from Detention ....................................................... 5

     D.    Leticia and Yovany's Separation Ends After Over Two Years; They Are Reunited in New York Where They Still Suffer Emotional and Physical Harm ........................................................................ 6

ARGUMENT .................................................................................................................... 7

I.     The Court Should Deny the United States' Request to Transfer ............................. 7

     A.    Legal Standard ................................................................................................ 7

     B.    Plaintiffs' Choice of Forum Should Not Be Disturbed ................................ 8

     C.    The Convenience of the Parties Weighs Against Transfer ........................... 9

     D.    Transfer to Texas Would Impose Severe Burdens on Leticia and Yovany ......................................................................................................... 10

          i.    *Leticia's Health Problems Militate Strongly Against Transfer* ........................................................................................ 10

          ii.   *Plaintiffs' Expected Witnesses Are Located in New York* ............. 11

     E.    Transfer from New York to Texas Would Only Marginally Reduce the Burden on the United States .................................................................. 12

     F.    The Disparity in the Parties' Means Militates Against Transfer ................ 13

     G.    The Locus of Operative Facts Is Too Diffuse to Favor Transfer ............... 15

     H.    Judicial Economy and the Interests of Justice Also Weigh Against Transfer ......................................................................................... 16

II.    This Court Has Jurisdiction Over Leticia's and Yovany's Action ........................ 17

     C.    The Discretionary Function Exception Does Not Apply ............................ 19

          i.    *The DFE does not apply because the Flores Agreement and federal rules and standards prohibit the United States' conduct* ......................................................................................... 20

       *ii.*     *The DFE does not apply because the United States' misconduct violated the U.S. Constitution* ....................................... 22

               a)     The United States violated Plaintiffs' due process rights .................................................................................. 23

               b)     The United States violated Plaintiffs' right to equal protection ........................................................................ 25

               c)     Plaintiffs need not show the constitutional right was clearly established ............................................................. 25

       *iii.*    *The DFE does not apply because the United States' misconduct was not grounded in policy considerations* ................ 26

    D.     The Due Care Exception Does Not Apply .................................... 27

    E.     The Misconduct of the United States Has Private Analogs in State Tort Law ................................................................................ 29

    F.     The Independent Contractor Exception Is Irrelevant ................................. 31

    G.     The Detention of Goods Exception Does Not Bar Leticia's Conversion Claim ....................................................................... 33

  III.    Leticia and Yovany Adequately Pled Their Claims ................................. 34

    A.     Plaintiffs State a Claim for Intentional Infliction of Emotional Distress ................................................................................. 35

    B.     Plaintiffs State a Claim for Negligence ..................................... 37

    C.     Plaintiffs State a Claim for Abuse of Process ............................. 38

    D.     Plaintiffs State a Claim for Assault and Battery ........................... 39

CONCLUSION ................................................................................ 40

**TABLE OF AUTHORITIES**

*Cases*          <u>Page</u>

*A.E.S.E. v. United States*,
No. 21-CV-0569, 2022 WL 4289930 (D.N.M. Sept. 16, 2022) ........................................ passim

*A.F.P. v. United States*,
No. 21-CV-00780, 2022 WL 2704570 (E.D. Cal. July 12, 2022) .................................... passim

*A.I.I.L. v. Sessions*,
No. CV-19-00481, 2022 WL 992543 (D. Ariz. Mar. 31, 2022) ................................ 20, 27, 36

*A.I.I.L. v. Unknown Parties*,
No. 19-cv-00481 (D. Ariz. Apr. 11, 2023) ............................................................................... 8

*A.P.F. v. United States*,
492 F. Supp. 3d 989 (D. Ariz. 2020) ............................................................................... passim

*Advance Relocation & Storage, Inc. v. Wheaton Van Lines, Inc.*,
No. CV 99-2491, 2000 WL 33155640 (E.D.N.Y. Sep. 15, 2000) .......................................... 10

*Aguilar v. ICE*,
510 F.3d 1 (1st Cir. 2007) ................................................................................................... 36

*Aguilar v. United States*,
No. 16-cv-048, 2017 WL 6034652 (S.D. Tex. Jun. 7, 2017) ............................................... 40

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) ............................................................................................................. 34

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002) ................................................................................................. 15

*Barry v. United States*,
No. 21 Civ. 7684, 2022 WL 4467504 (S.D.N.Y. Sept. 26, 2022) ...................................... 9, 12

*Baubles & Beads v. Louis Vuitton, S.A.*,
766 S.W.2d 377 (Tex. App. 1989) ........................................................................................ 39

*Berkovitz v. United States*,
486 U.S. 531 (1988) ............................................................................................................. 19

*Burgos v. United States*,
No. 16-CV-7091, 2017 WL 2799172 (S.D.N.Y. Jun. 27, 2017) ............................................ 9

*C.D.A. v. United States*,
No. CV 21-469, 2023 WL 2666064 (E.D. Pa. Mar. 28, 2023) ......................................... passim

*C.M. v. United States*,
No. 19-cv-05217, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020) ........................... 20, 27, 31, 37

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016) .................................................................................................. 18

*Caterpillar Inc. v. Williams*,
482 U.S. 386 (1987) ............................................................................................................. 19

*Certain Underwriters at Lloyd's London v. Nat'l R.R. Passenger Corp.*,
No. 14-CV-04717, 2015 WL 1182764 (E.D.N.Y. Mar. 13, 2015) ................................... 12, 17

*City of Watauga v. Gordon*,
434 S.W.3d 586 (Tex. 2014) ................................................................................................ 40

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ............................................................................................................. 24

*Cohen v. United States*,
No. 98-CV-2604, 2004 WL 502924 (E.D.N.Y. Jan. 29, 2004) ................................17

*Conley v. Driver*,
175 S.W.3d 882 (Tex. App. 2005) ........................................................................37

*Cooper v. Trent*,
551 S.W.3d 325 (Tex. App. 2018) .....................................................................31, 32

*Coulthurst v. United States*,
214 F.3d 106 (2d Cir. 2000)..................................................................................19

*Cruz v. Borgenicht*,
No. 14-CV-00679, 2014 WL 3696207 (E.D.N.Y. July 24, 2014) ...........................14

*D.A. v. United States*,
No. 20-cv-03082 (N.D. Ill. Aug. 11, 2022) ...............................................................8

*D.A. v. United States*,
No. EP-22-CV-00295, 2023 WL 2619167 (W.D. Tex. Mar. 23, 2023) .......... passim

*DeMontiney v. Desert Manor Convalescent Ctr. Inc.*,
695 P.2d 255 (Ariz. 1985)...........................................................................30, 31, 37

*D.H. Blair & Co., Inc. v. Gottdiener*,
462 F.3d 95 (2d Cir. 2006)......................................................................................8

*Dillard Dep't Stores, Inc. v. Silva*
106 S.W.3d 789, 797 (Tex. App. 2003) ...................................................................35

*D.J.C.V. v. ICE*,
No. 18 CIV 9115, 2018 WL 10436675 (S.D.N.Y. Oct. 15, 2018) ...........................26

*D.J.C.V. v. United States*,
605 F. Supp. 3d 571 (S.D.N.Y. 2022) .................................................................20, 22

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006) ...............................................................................................18

*Dwyer v. Gen. Motors Corp.*,
853 F. Supp. 690 (S.D.N.Y. 1994) .........................................................................14

*E.L.A. v. United States*,
No. 20-cv-01524, 2022 WL 2046135 (W.D. Wash. June 3, 2022)......................8, 39

*E.R. v. United States*,
No. 13-CV-1241, 2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014).............. 13, 20, 22, 27

*E.S.M. v. United States*,
No. CV-21-00029, 2022 WL 11729644 (D. Ariz. Oct. 20, 2022) .............. 20, 23, 30

*EasyWeb Innovations, LLC v. Facebook, Inc.*,
888 F. Supp. 2d 342 (E.D.N.Y. 2012).....................................................................11

*Eberle v. Adams*,
73 S.W.3d 322 (Tex. App. 2002) ............................................................................29

*Fed. Ins. Co. v. Bax Global Inc.*,
No. 09-CV-2739, 2010 WL 3738033 (E.D.N.Y. Sept. 20, 2010).............................9

*Fisher v. Carrousel Motor Hotel, Inc.*,
424 S.W.2d 627 (Tex. 1967)....................................................................................40

*Flood v. Carlson Rsts., Inc.*,
94 F. Supp. 3d 572 (S.D.N.Y. 2015) ......................................................................10

*Flores v. Reno*,
No. CV 85-4544 (C.D. Cal. Jan. 17, 1997).............................................................20

*Flores v. Rosen*,
    984 F.3d 720 (9th Cir. 2020) ........................................................20, 21

*Flores v. United States*,
    142 F. Supp. 3d 279 (E.D.N.Y. 2015).............................................10

*Ford v. United States*,
    85 F. Supp. 3d 667 (E.D.N.Y. 2015).............................................34, 35

*F.R. v. United States*,
    No. CV-21-00339, 2022 WL 2905040 (D. Ariz. July 22, 2022)............20

*Fuentes-Ortega v. United States*,
    No. CV-22-00449, 2022 WL 16924223 (D. Ariz. Nov. 14, 2022) .........20

*Fuji Photo Film Co. v. Lexar Media, Inc.*,
    415 F. Supp. 2d 370 (S.D.N.Y. 2006).............................................14

*Guccione v. Harrah's Mktg. Servs. Corp.*,
    No. 06 CIV. 4361, 2009 WL 2337995 (S.D.N.Y. July 29, 2009)..........15

*Harris v. Harris Cnty. Hosp. Dist.*,
    557 S.W.2d 353 (Tex. Civ. App. 1977) ...........................................30, 37

*Hatahley v. United States*,
    351 U.S. 173 (1956) .................................................................28, 29

*Hoffmann-La Roche Inc. v. Zeltwanger*,
    144 S.W.3d 438 (Tex. 2004)........................................................37

*Hu v. City of New York*,
    927 F.3d 81 (2d Cir. 2019)..........................................................25, 38

*Hunt v. Baldwin*,
    68 S.W.3d 117 (Tex. App. 2001) ..................................................31, 38

*Indian Towing Co. v. United States*,
    350 U.S. 61 (1955) ...................................................................29

*In re Cuyahoga Equip. Corp.*,
    980 F.2d 110 (2d Cir. 1992)........................................................7

*I.T. v. United States*,
    No. 22-cv-05333 (N.D. Cal. Feb. 24, 2023) ....................................8

*Jacinto-Castanon de Nolasco v. ICE*,
    319 F. Supp. 3d 491 (D.D.C. 2018) ..............................................21

*J.P. v. United States*,
    No. CV-22-00683, 2023 WL 4237331 (D. Ariz. June 28, 2023).........20, 29

*J.R.G. v. United States*,
    22-cv-05183 (N.D. Cal. Apr. 11, 2023) ..........................................8

*K.O. v. United States*,
    No. 20-12015, 2023 WL 131411 (D. Mass. Jan. 9, 2023)................. passim

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021).........................................................35

*Larca v. United States*,
    No. 11 Civ. 3952, 2012 WL 6720910 (S.D.N.Y. Dec. 16, 2012) ........9

*Lavazza Premium Coffees Corp. v. Prime Line Distribs.*,
    575 F. Supp. 3d 445 (S.D.N.Y. 2021)............................................15

*Limone v. United States*,
    579 F.3d 79 (1st Cir. 2009) .........................................................23

*Liranzo v. United States*,
  690 F.3d 78 (2d Cir. 2012)..................................................................29, 30

*Lopez-Flores v. Ibarra*,
  No. 17-CV-00105, 2018 WL 6577955 (S.D. Tex. Mar. 12, 2018) ...........31

*Martinez v. McAleenan*,
  385 F. Supp. 3d 349 (S.D.N.Y. 2019) ....................................................16

*Mazuma Holding Corp. v. Bethke*,
  1 F. Supp. 3d 6 (E.D.N.Y. 2014) ............................................................11

*Molchatsky v. United States*,
  713 F.3d 159 (2d Cir. 2013)................................................ 19, 20, 22, 26

*Moore v. Bushman*,
  559 S.W.3d 645 (Tex. App. 2018) .....................................................38, 39

*Morrison v. Nat'l Australia Bank Ltd.*,
  547 F.3d 167 (2d Cir. 2008)....................................................................18

*Ms. L. v. ICE*,
  302 F. Supp. 3d 1149 (S.D. Cal. 2018) ...................................................26

*Ms. L. v. ICE*,
  403 F. Supp. 3d 853 (S.D. Cal. 2019) ..................................................6, 39

*MVS Int'l Corp. v. Int'l Advert. Sols., LLC*,
  545 S.W.3d 180 (Tex. App. 2017) ..........................................................36

*Myers & Myers, Inc. v. U.S. Postal Serv.*,
  527 F.2d 1252 (2d Cir. 1975) .................................................................22

*Neil Bros. v. World Wide Lines, Inc.*,
  425 F. Supp. 2d 325 (E.D.N.Y. 2006)..................................................14, 34

*New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
  599 F.3d 102 (2d Cir. 2010)......................................................................7

*NGC Worldwide, Inc. v. Siamon*,
  No. 02-CV-1760, 2003 WL 1987001 (D. Conn. Apr. 21, 2003) ...............10

*Nunez Euceda v. United States*,
  No. 20-cv-10793, 2021 WL 4895748 (C.D. Cal. Apr. 27, 2021)............8, 20

*O'Toole v. United States*,
  295 F.3d 1029, 1037 (9th Cir. 2002).......................................................17

*Owen v. City of Independence*,
  445 U.S. 622 (1980) ...............................................................................22

*Pasini v. Gruppo Editoriale, Inc.*,
  No. 21-cv-6697, 2022 WL 1693667 (E.D.N.Y. May 26, 2022)....................8

*Pecorino v. Vutec Corp.*,
  934 F. Supp. 2d 422 (E.D.N.Y. 2012)..................................................16, 17

*Peña Arita v. United States*,
  470 F. Supp. 3d 663 (S.D. Tex. 2020) ....................................................20

*Plyler v. Doe*,
  457 U.S. 202 (1982) ...............................................................................25

*Razi School v. Cissna*,
  519 F. Supp. 3d 144 (E.D.N.Y. 2021)......................................................18

*Rindfleisch v. Gentiva Health Sys., Inc.*,
  752 F. Supp. 2d 246 (E.D.N.Y. 2010).......................................................8

*Rodriguez v. United States*,
    No. 22-CV-02845, 2022 WL 19237182 (C.D. Cal. Dec. 22, 2022) ............................8

*Ryan v. Napier*,
    245 P.3d 230 (Ariz. 2018)............................................................................................38

*S.E.B.M. v. United States*,
    No. 21-CV-00095, 2023 WL 2383784 (D.N.M. Mar. 6, 2023) ..........................passim

*Saint-Guillen v. United States*,
    657 F. Supp. 2d 376 (E.D.N.Y. 2009)........................................................................19

*Scheinbart v. Certain-Teed Prods. Corp.*,
    367 F. Supp. 707 (S.D.N.Y 1973) ..............................................................................12

*Speedfit LLC v. Woodway USA, Inc.*,
    53 F. Supp. 3d 561 (E.D.N.Y. 2014)...........................................................................13

*St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.*,
    193 F.3d 340 (5th Cir. 1999) ................................................................................30, 35

*Stewart Org., Inc. v. Ricoh Corp.*,
    487 U.S. 22 (1988) ........................................................................................................7

*Sunny v. Biden*,
    573 F. Supp. 3d 759 (E.D.N.Y. 2021).........................................................................16

*Triestman v. Fed. Bureau of Prisons*,
    470 F.3d 471 (2d Cir. 2006).........................................................................................22

*Troxel v. Granville*,
    530 U.S. 57 (2000) ......................................................................................................23

*Twyman v. Twyman*,
    855 S.W.2d 619 (Tex. 1993)........................................................................................33

*United States v. Gaubert*,
    499 U.S. 315 (1991) ....................................................................................... 19, 22, 26

*United States v. Muniz*,
    374 U.S. 150 (1963) ....................................................................................................29

*United States v. Olson*,
    546 U.S. 43 (2005) ................................................................................................29, 30

*Usoyan v. Republic of Turkey*,
    6 F.4th 31 (D.C. Cir. 2021).........................................................................................26

*Valmonte v. Bane*,
    18 F.3d 992 (2d Cir. 1994)....................................................................................23, 24

*Vassallo v. Niedermeyer*,
    495 F. Supp. 757 (S.D.N.Y. 1980) .............................................................................10

*Velez v. Levy*,
    401 F.3d 75 (2d Cir. 2005)..........................................................................................24

*W.P.V. v. United States*,
    No. 21 Civ. 4436, 2023 WL 1991426 (S.D.N.Y. Feb. 14, 2023)....................... 8, 9, 12

*Wald v. Bank of Am. Corp.*,
    856 F. Supp. 2d 545 (E.D.N.Y. 2012)..........................................................................8

*Warner Bros. Entm't., Inc. v. Jones*,
    538 S.W.3d 781 (Tex. App. 2017) .........................................................................38, 39

*Welch v. U.S.*,
    409 F.2d 646 (4th Cir. 2005) .......................................................................................27

*Wilbur P.G. v. United States*,
    No. 21-CV-04457, 2022 WL 3024319 (N.D. Cal. May 10, 2022) ................................ 8, 15, 20
*Wright v. Blythe-Nelson*,
    No. 3:99-CV-2522-D, 2004 WL 2870082 (N.D. Tex. Dec. 13, 2004) ...................................37
*Zaltz v. JDATE*,
    952 F. Supp. 2d 439 (E.D.N.Y. 2013) .........................................................................13

**Statutory Authorities**

8 U.S.C. § 1232(b)(3) ..............................................................................................27, 28
28 U.S.C. § 1346(b)(1) ..................................................................................................17
28 U.S.C. § 1404(a) .........................................................................................................7
28 U.S.C. § 2674 ............................................................................................................29
28 U.S.C. § 2680(a) .......................................................................................................27
28 U.S.C. § 2680(c) ..................................................................................................33, 34
Tex. Penal Code § 22.01(a)(3) ......................................................................................40

**Rules and Regulations**

Fed. R. Civ. P. 32 .........................................................................................................13
Fed. R. Civ. P. 45(c)(1)(A) ...........................................................................................12

## PRELIMINARY STATEMENT

Plaintiffs Leticia and her son, Yovany, came to the United States as asylum seekers in search of safety. Instead of providing them refuge, federal agents forcibly separated Yovany from his mother without warning, refused Plaintiffs information about one another for weeks, detained them in squalid conditions, denied them adequate medical care, and coerced Leticia into abandoning her asylum claim. Leticia and Yovany were separated for over two years, and still suffer from the effects of the United States' intentional mistreatment. To redress these harms, Plaintiffs bring claims against the United States under the Federal Tort Claims Act ("FTCA"). Defendant's Motion to Transfer Venue or, in the Alternative, to Dismiss (the "Motion" or "Def. Mot."), attempts to distract the Court from the United States' cruel conduct by mischaracterizing Plaintiffs' claims and ignoring or misstating the relevant legal standards. The Court should deny the Motion in its entirety.

The United States seeks to transfer this case from the Eastern District of New York (Plaintiffs' residence and choice of forum) to the Western District of Texas. Transfer should be denied because the United States has failed to establish, as it must, that the balance of factors is strongly in favor of transfer. To the contrary, transferring this action to Texas would significantly burden Plaintiffs as not only are they and most of their witnesses in New York, but also Leticia recently developed a serious medical issue that interferes with her ability to travel.

The United States also tries to avoid liability for its egregious conduct by arguing that this Court lacks subject matter jurisdiction under various exceptions to the FTCA and that Plaintiffs fail to state claims under state law. These arguments are meritless. First, the discretionary function exception does not apply because (i) federal officials lacked discretion to violate a binding federal settlement agreement, mandatory agency standards, and the U.S. Constitution when they separated

and detained Plaintiffs in the manner they did; and (ii) the tortious conduct at issue is not susceptible to policy analysis. Second, the due care exception offers no shield to liability because no statute or regulation mandated Plaintiffs' separation, and the United States utterly failed to exercise due care in its treatment of Plaintiffs. Third, the United States' argument that there is no private analog for Plaintiffs' negligence and abuse of process claims misstates the issue. Under the FTCA, the United States is liable if private individuals would be liable under "like circumstances," and Plaintiffs' claims are analogous to circumstances in which Texas and Arizona courts have imposed liability on private persons. Fourth, the independent contractor exception is irrelevant, as Plaintiffs allege that U.S. officials committed torts inside private facilities, and the conditions at the private facilities are relevant to assessing Plaintiffs' claims. Fifth, the detention of goods exception does not apply because Leticia's property was not "detained." Finally, Plaintiffs' allegations, which must be taken as true at this stage, support each of the state law torts pled.

Plaintiffs respectfully urge this Court to deny the Motion and join the vast majority of courts—almost twenty to date, *see infra* Argument ("Arg.") Part II.C n.7—that have rejected the United States' motions to dismiss FTCA actions based on federal agents' cruel and intentional separations of children from their parents.

## FACTUAL BACKGROUND

### I. The United States Institutes a Family Separation Policy Along the United States-Mexico Border to Deter Central American Migration

Within months of President Trump's inauguration, federal officials in Washington, D.C. conceived a policy to separate asylum-seeking parents from their children to deter immigration at the U.S.-Mexico border. ECF No. 1 ("Compl.") ¶¶ 15, 18–21, 102. At the direction of these federal officials, the El Paso Sector of Customs and Border Protection ("CBP") implemented this policy (the "El Paso Pilot") in July 2017, and began forcibly separating parents from their children. *Id.* ¶

15. The El Paso Pilot was later formalized and expanded across the Southwest Border by the Secretary of Homeland Security and the Attorney General (together with the El Paso Pilot, the "Family Separation Policy"). *Id*. Under the Family Separation Policy, federal officials tore apart thousands of asylum-seeking families, taking children as young as four months old from their parents. Federal officials separated these families knowing that the United States lacked systems for tracking and reuniting separated families. *Id*. ¶ 16. The United States viewed separating children from their parents as the key tool to deter migrants from crossing the southern border to come to the United States, believing that such cruelty would deter other families from exercising their right to seek asylum. *Id.* ¶¶ 18–21, 102.

## II. The United States Separates and Mistreats Leticia and Yovany

### A. Federal Officials Separate Leticia and Yovany Without Warning

Plaintiff Leticia and her son Yovany are two of many victims of the United States' deliberately cruel Family Separation Policy. Leticia and then-fifteen-year-old Yovany fled persecution and death threats in their native Guatemala and arrived in the United States seeking asylum. *Id*. ¶ 23. Shortly after their arrival on or about November 20, 2017, CBP officers arrested and transported them to a "*hielera*" ("ice box"), a CBP facility named for its freezing temperatures. *Id.* ¶¶ 24–25. Leticia and Yovany were soaking wet and cold from crossing the Rio Grande, but officers took away their sweaters and shoes and did not give them any clothes to protect them from the cold. *Id.* ¶ 25. Leticia and Yovany waited in the freezing cold for about three hours; while they waited, officers laughed at and mocked them and other detainees. *Id.* ¶¶ 27–28.

The following day, CBP officers told Leticia and Yovany they could rest in gender-segregated rooms and then surreptitiously separated the mother and son. *Id.* ¶¶ 3, 29. As they entered the separate rooms for much needed rest, Leticia and Yovany had no idea that this would be the last time they would see each other for over two years. *Id*. A few hours after officers

separated Leticia and Yovany, Leticia tried to find her son, but she was locked inside the room. *Id.* ¶ 32. After an officer told Leticia he did not know where Yovany was, Leticia became distraught; she was shocked, in pain, and began to cry. *Id.* Leticia repeatedly asked officers about her son, but the officers became angry with her and said they did not know what happened to him. *Id.* ¶¶ 32–33.

**B. Federal Officials Subject Leticia and Yovany to Detention Abuse and Separation Trauma**

After the separation, officers transferred Leticia to another detention center, which she believes was the West Texas Detention Facility. *Id.* ¶¶ 33–34. As she was leaving the *hielera*, Leticia tried to retrieve the personal belongings (a notebook, personal and religious items, sweater, and shoes) CBP took upon her arrival at the facility and promised she would get back upon departure. *Id*. ¶¶ 26, 34. Leticia was only allowed to take her sweater and shoes, however. *Id.* ¶ 34. Officers laughed at Leticia and said that where she was going, she would not need her items and that they would go in the trash. *Id*. The United States never returned Leticia's personal belongings. *Id.*

About a week after Leticia and Yovany's separation, on November 28, 2017, Leticia attended a court hearing where her improper entry criminal complaint was both filed and summarily dismissed. *Id*. ¶¶ 36–37. After the hearing, rather than reunite the mother and son, federal officers returned Leticia to the West Texas Detention Facility. *Id.* ¶¶ 38–42.

During Leticia's detention at the West Texas Detention Facility, two U.S. immigration officers regularly came to the facility. *Id.* ¶ 40. Despite being asked repeatedly, these officers refused to give Leticia information about her son for about one month. *Id.* The lack of information about Yovany's safety and whereabouts caused Leticia such extreme anxiety, trauma, and stress that she suffered from facial paralysis. *Id.* ¶¶ 41, 43. In addition, detention staff mocked Leticia

and subjected her to squalid conditions. *Id.* ¶¶ 49–52. Leticia was also denied adequate medical care. *Id.* ¶¶ 43–48. Federal officers, including Immigration and Customs Enforcement ("ICE") officials, knew that Leticia was suffering from serious medical and psychological conditions, yet they did nothing to provide her with medically necessary treatment. *Id.* ¶ 48.

Finally, after one month in detention, U.S. immigration officers gave Leticia a list of phone numbers to call, and she was able to locate Yovany at a shelter for unaccompanied children in Arizona, where he had been taken a few days after the separation. *Id.* ¶¶ 42, 59. After Yovany was separated from Leticia and transferred to a different state, he faced squalid conditions: his room was freezing, he slept on a cot with no mattress, and he was fed frozen burritos just twice a day. *Id.* ¶¶ 53–57, 60–61. Yovany tried desperately to locate his mother, but CBP officers and shelter staff gave him no information about her whereabouts. *Id.* ¶¶ 53–55, 67. Throughout his time at the shelter, Yovany suffered emotional distress, depression, and severe headaches, but shelter staff repeatedly denied his requests to see a counselor. *Id.* ¶¶ 63–67. Yovany received no information about his mother for about one month, despite his frequent attempts to locate and communicate with her. *Id.* ¶¶ 67–70.

### C. Leticia Involuntarily Accepts Deportation Out of Desperation to Secure Yovany's Release from Detention

Believing she could only help secure Yovany's release from detention if she were no longer in detention, Leticia decided to withdraw her asylum claim. *Id.* ¶ 78. Leticia was deported without her son on June 18, 2018. *Id.* Although Yovany wanted to return home with his mother, he felt he had no choice but to remain in the United States for fear that he would be killed if he returned to Guatemala. *Id.* ¶ 80. After being deported, Leticia was a class member in a lawsuit seeking the right to return to the United States and be reunified with Yovany. *Id.* ¶ 79. In 2019, the U.S. District Court for the Southern District of California concluded that Leticia's decision to accept deportation

and withdraw her asylum claim was "not voluntary," and ordered that she be allowed to return to the United States to pursue her asylum claims. *Id.* ¶¶ 7, 79 (citing *Ms. L. v. ICE*, 403 F. Supp. 3d 853, 862–63 (S.D. Cal. 2019) ("*Ms. L. II*")).

**D. Leticia and Yovany's Separation Ends After Over Two Years; They Are Reunited in New York Where They Still Suffer Emotional and Physical Harm**

Leticia returned to the United States pursuant to the *Ms. L. II* order on January 22, 2020. *Id.* ¶¶ 7, 79. Despite a court order requiring Leticia and Yovany's immediate reunification, the two were not reunited for three weeks following Leticia's arrival.[1] *Id.*; Declaration of Leticia, dated Aug. 2, 2023 ("Let. Dec.") ¶ 3. Their reunion in New York finally ended the United States' over two-years-long separation of their family. Compl. ¶ 29; Let. Dec. ¶ 3. Since being reunited, Leticia and Yovany have lived together in Brooklyn and have built a life here. Let. Dec. ¶¶ 3, 15. Yovany graduated from high school in Brooklyn, just finished his first year at Brooklyn College, and works part-time at a McDonalds in Brooklyn. Declaration of Yovany, dated Aug. 1, 2023 ("Yov. Dec.") ¶¶ 4, 8. Yovany applied for and received asylum in New York, *id.* ¶ 5; Compl. ¶ 81, and Leticia's asylum application is currently pending in New York Immigration Court, Let. Dec. ¶ 5.

Still, Leticia and Yovany have not recovered from their separation and their time in detention. They continue to suffer because of the separation, neglect, and abuse they experienced at the hands of U.S. officials. ███████████████████████████████████████ ████████████████████████████████████████, *see* Declaration of Ming Tanigawa-Lau, dated Aug. 1, 2023 ("Tanig. Dec."), Ex. F, and she continues to experience anxiety, loss of appetite, and difficulty sleeping, Compl. ¶¶ 83–84. Yovany still experiences nightmares, pain, and distress. *Id.* ¶ 85. Additionally, ████████████████████████████████████

---

[1] The Complaint erroneously states that Leticia and Yovany were reunited on January 22, 2020. *See* Compl. ¶ 7. The Complaint also states that Leticia and Yovany were separated for 792 days, *id.* ¶¶ 1, 3, 23, 82; in fact, they were separated for 818 days (November 21, 2017 to February 13, 2020), *see* Let. Dec. ¶ 3.

 Let. Dec. ¶ 6; Tanig. Dec., Exs. A, B. ████

██████████████████████████████████████████

█████████████████████████████ Let. Dec. ¶¶ 6, 7; Tanig. Dec., Exs. A,

B. █████████████████████████████████████ Tanig. Dec., Ex.

A. Leticia's medical insurance is only available to her in New York. *Id.*, Exs. C, E. Leticia is now

unable to work, so the family is reliant on Yovany's McDonalds wages, which are not enough to

cover their rent and bills. Yov. Dec. ¶¶ 8, 9; *id.*, Exs. A–C; Let. Dec. ¶ 10; *id.*, Ex. D.

Leticia's healthcare team, and the family's support system, are in Brooklyn, including their

sponsor, Stephan Shaw, ██████████████████████████. Let. Dec. ¶ 12; Tanig. Dec., Exs.

A, F; Declaration of Stephan Shaw, dated Aug. 1, 2023 ("Shaw Dec.") ¶¶ 3, 9, 11.

## ARGUMENT

### I. The Court Should Deny the United States' Request to Transfer

#### A. Legal Standard

Courts permit transfer of a case to any other district where the case might have been brought

"[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). A

trial court has discretion to transfer a case based "upon notions of convenience and fairness on a

case-by-case basis." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir. 1992) (citing

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). The moving party has the "burden of

making out a strong case for transfer," and must establish by "clear and convincing evidence" that

transfer is appropriate. *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114

(2d Cir. 2010) (internal quotations omitted).

Courts weigh several non-exclusive factors when deciding a motion to transfer, including

(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant

documents and ease of access to sources of proof, (4) the convenience of parties, (5) the locus of

operative facts, (6) the availability of process to compel unwilling witnesses' attendance, and (7) the relative means of the parties. *D.H. Blair & Co., v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006). Courts may also consider (8) the forum's familiarity with governing law and (9) trial efficiency and the interests of justice, based on the totality of the circumstances. *Pasini v. Gruppo Editoriale, Inc.*, No. 21-cv-6697, 2022 WL 1693667, at *3 (E.D.N.Y. May 26, 2022). This Court should join the vast majority of courts that have denied the United States' attempts to transfer venue in FTCA cases involving the Family Separation Policy.[2]

### B. Plaintiffs' Choice of Forum Should Not Be Disturbed

Unless "the balance of the factors is strongly in favor of the [movant]," "[a] plaintiff's choice of forum is generally entitled to considerable weight and should not be disturbed." *Wald v. Bank of Am. Corp.*, 856 F. Supp. 2d 545, 549 (E.D.N.Y. 2012) (internal quotations omitted). The United States attempts to diminish the importance of this factor by alleging that the acts or omissions giving rise to liability did not occur in this District. Def. Mot. 14–15. This argument is factually incorrect and legally incomplete. As described more fully below, *see infra* Arg. Part I.G, the locus of operative facts in this case is diffused across several states and is connected to the Eastern District of New York. Moreover, the cases the United States cites only gave diminished weight to the plaintiff's choice of forum where—unlike here—the plaintiff did not reside in the

---

[2] *See F.C.C. v. United States*, No. 22-cv-05057 (E.D.N.Y.), Jun. 15, 2023 Docket Entry; *J.R.G. v. United States*, 22-cv-05183 (N.D. Cal. Apr. 11, 2023), ECF No. 37; *C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *10 (E.D. Pa. Mar. 28, 2023); *I.T. v. United States*, No. 22-cv-05333 (N.D. Cal. Feb. 24, 2023), ECF No. 30; *K.O. v. United States*, No. 20-12015, 2023 WL 131411, at *3–4 (D. Mass. Jan. 9, 2023); *Rodriguez v. United States*, No. 22-CV-02845, 2022 WL 19237182, at *3–4 (C.D. Cal. Dec. 22, 2022); *A.E.S.E. v. United States*, No. 21-CV-0569, 2022 WL 4289930, at *6–7 (D.N.M. Sept. 16, 2022); *A.F.P. v. United States*, No. 21-CV-00780, 2022 WL 2704570, at *4–9 (E.D. Cal. July 12, 2022); *E.L.A. v. United States*, No. 20-cv-01524, 2022 WL 2046135, at *2–5 (W.D. Wash. June 3, 2022); *Wilbur P.G. v. United States*, No. 21-CV-04457, 2022 WL 3024319, at *3–4 (N.D. Cal. May 10, 2022); *Nunez Euceda v. United States*, No. 20-cv-10793, 2021 WL 4895748, at *4 (C.D. Cal. Apr. 27, 2021). *But see A.I.I.L. v. Unknown Parties*, No. 19-cv-00481 (D. Ariz. Apr. 11, 2023), ECF No. 112; *W.P.V. v. United States*, No. 21 CIV. 4436, 2023 WL 1991426, at *8 (S.D.N.Y. Feb. 14, 2023); *D.A. v. United States*, No. 20-cv-03082 (N.D. Ill. Aug. 11, 2022), ECF No. 85.

district, or key nonparty witnesses or co-defendants were in the transferee district. *See Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 251 (E.D.N.Y. 2010) (plaintiffs resided in Northern District of New York or North Carolina); *W.P.V. v. United States*, No. 21 Civ. 4436, 2023 WL 1991426, at *2 (S.D.N.Y. Feb. 14, 2023) (plaintiffs resided in Honduras and Texas); *Barry v. United States*, No. 21 Civ. 7684, 2022 WL 4467504, at *7 (S.D.N.Y. Sept. 26, 2022) (plaintiff was a full-time student in Massachusetts); *Larca v. United States*, No. 11 Civ. 3952, 2012 WL 6720910, at *3 (S.D.N.Y. Dec. 16, 2012) (co-defendant plausibly alleged that personal jurisdiction in this district is lacking); *Burgos v. United States*, No. 16-CV-7091, 2017 WL 2799172, at *2–3 (S.D.N.Y. June 27, 2017) (key witnesses outside of district were not government employees). Permitting a plaintiff to bring suit in the district of their residence is especially important in FTCA cases because the venue statute "reflects a policy choice Congress made to not force individuals to travel outside their home district to bring FTCA suits." *K.O. v. United States*, No. 20-12015, 2023 WL 131411, at *3 (D. Mass. Jan. 9, 2023). Plaintiffs' choice of forum is thus entitled to considerable weight.

### C.  The Convenience of the Parties Weighs Against Transfer

Transferring this action to Texas would significantly burden Leticia, Yovany, and their witnesses for a comparatively small reduction in inconvenience to the United States. "When assessing the convenience of witnesses, a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum. Instead, the court must qualitatively evaluate the *materiality* of the testimony that the witnesses may provide." *Fed. Ins. Co. v. Bax Glob. Inc.*, No. 09-CV-2739, 2010 WL 3738033, at *5 (E.D.N.Y. Sept. 20, 2010) (internal quotations omitted). Defendant attempts to manufacture an inconvenience for itself by pointing to a roster of ten purportedly significant witnesses who reside in various states. This argument ignores the fact that Leticia and Yovany are the most material

witnesses in this case and would face substantial burdens if forced to bring their claims in Texas. Further, there are several key witnesses in New York who would be burdened by any transfer.

### D. Transfer to Texas Would Impose Severe Burdens on Leticia and Yovany

The motion to transfer should be denied because a transfer "would merely shift the inconvenience of litigating in a particular forum from [the United States] to [Plaintiffs]," which "does not weigh in favor of transfer[.]" *Advance Relocation & Storage, Inc. v. Wheaton Van Lines, Inc.*, No. CV 99-2491, 2000 WL 33155640, at *5 (E.D.N.Y. Sep. 15, 2000). Indeed, not only are Plaintiffs and most of their witnesses in New York, but Leticia has a serious health issue that prevents her from traveling. *See* Tanig. Dec., Ex. A. As such, Defendant cannot prove that the original forum is inconvenient for it and that Plaintiffs would not be substantially inconvenienced by a transfer. *See Flood v. Carlson Rests., Inc.*, 94 F. Supp. 3d 572, 578 (S.D.N.Y. 2015).

#### i. Leticia's Health Problems Militate Strongly Against Transfer

"The health concerns of a party or witness can be an important factor in the determination of whether a § 1404(a) transfer is proper." *NGC Worldwide, Inc. v. Siamon*, No. 02-CV-1760, 2003 WL 1987001, at *2 (D. Conn. Apr. 21, 2003). Courts disfavor transfer where it would "shift the burden of convenience from the government to a plaintiff of limited means who find[s] travel difficult because of her medical problems." *Flores v. United States*, 142 F. Supp. 3d 279, 288 (E.D.N.Y. 2015); *see also Vassallo v. Niedermeyer*, 495 F. Supp. 757, 759-60 (S.D.N.Y. 1980) (transfer was not warranted, even where nonparty witnesses could not be compelled to appear and would not do so voluntarily, because plaintiff's "substantial medical problems" weighed heavily against transfer); *Siamon*, 2003 WL 1987001, at *2 (granting transfer in converse situation, where the defendant was the party with health concerns).

For Leticia, travel would not merely be inconvenient—it would be dangerous to her health and █████████████████████    ███████████████████████

██████████████ Let. Dec. ¶ 6; Tanig. Dec., Ex. A. ██████████████████████████

█████████████████████████████████████████ and her doctor has stated she is unable to

travel. Let. Dec. ¶¶ 6–9; Tanig. Dec., Exs. A, B. If any trip to Texas required more than one day

outside of New York, █████████████████████████████████████████████████

███████████ and would have to pay out-of-pocket as her insurance is restricted to New York

providers. *See* Let. Dec. ¶ 9; Tanig. Dec., Exs. C, E.

ii.     *Plaintiffs' Expected Witnesses Are Located in New York*

Transfer is inappropriate because multiple witnesses based in New York will be called to

testify to Leticia's and Yovany's prolonged separation and the lasting harms it caused. The United

States is simply wrong that "there appear to be few, if any, witnesses located in New York." Def.

Mot. 13. Leticia and Yovany are key witnesses; Leticia and Yovany's sponsor, Stephan Shaw,

lives in Brooklyn, ██████████████████████, and can speak to the lasting harm the United

States' conduct caused Plaintiffs, Shaw Dec. ¶¶ 3–11; and ████████████████████████

███████████████████████████ *see* Tanig. Dec., Exs. A, B, and may be called to testify to

the injuries Defendant caused Leticia and Yovany. Further, ████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████ *Id.*, Ex. F.  Transfer would

require ██████ and Leticia's doctors to travel to Texas, inconveniencing not only them but also

their patients. The certainty that Plaintiffs will call material witnesses located in this district thus

weighs against transfer. *See Mazuma Holding Corp. v. Bethke*, 1 F. Supp. 3d 6, 30 (E.D.N.Y. 2014)

(weighing presence of plaintiffs' witnesses in New York against transfer); *EasyWeb Innovations,*

*LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 352 (E.D.N.Y. 2012) (factor is neutral where

defendant's ultimate number of witnesses in transferee district and materiality of their testimony

was unclear and it was possible that plaintiff would call additional witnesses that would be inconvenienced by transfer).[3]

### E. Transfer from New York to Texas Would Only Marginally Reduce the Burden on the United States

The United States argues that transfer to Texas would allow it to avoid substantial inconvenience. This argument fails for three reasons.

First, the United States has control over most of its witnesses, so it can ensure they appear in this District. The witnesses Defendant identified are all federal employees, and "it is assumed that the government can require their participation whenever the case is tried." *Flores*, 142 F. Supp. 3d at 287 (citing *Certain Underwriters at Lloyd's London v. Nat'l R.R. Passenger Corp.*, No. 14-CV-04717, 2015 WL 1182764, at *3 (E.D.N.Y. Mar. 13, 2015)). Notably, only *half* of the prospective witnesses Defendant identifies live in its preferred district, whereas others live in California and Montana.[4] *See* Davies Decl. ¶ 17. Regardless of where these witnesses reside, though, the United States may compel its employees to testify, and videorecorded depositions or live video testimony may be used if travel to New York is too burdensome. *See Flores*, 142 F. Supp. 3d at 287–88 (noting that the United States could rely on its witnesses' video-recorded depositions, or arrange to have them testify by live video, if travel for trial was too burdensome).

Second, transfer to the Western District of Texas would not reduce the logistical burden on the United States as to nonparty witnesses, as many of them work and reside more than 100 miles outside the Western District of Texas and thus cannot be compelled to that district. Fed. R. Civ. P.

---

[3] While the convenience of expert witnesses has been held to be of limited importance, *Scheinbart v. Certain-Teed Prods. Corp.*, 367 F. Supp. 707, 709–10 (S.D.N.Y. 1973), Leticia's evaluating and treating physicians would be offered as fact witnesses testifying to the contemporaneous impacts of the separation on Leticia's mental health and the lasting physical and mental harms she suffered as a result.

[4] The cases the United States cites were transferred in part because all or almost all federal employee witnesses lived in the transferee district. *See Barry*, 2022 WL 4467504, at *6; *see also W.P.V.*, 2023 WL 1991426, at *4.

45(c)(1)(A). For instance, any employees of Casa Kokopelli, the U.S. Office of Refugee Resettlement ("ORR") funded shelter in Arizona where Yovany was held, De La Cruz Decl. ¶ 3, and Plaintiffs' nonparty witnesses in New York are outside the subpoena power of the Texas courts.

Third, the United States fails to identify any witnesses who may refuse to testify if this Court retains this case. And "[w]ithout the identification [of] a witness who would be unwilling to testify in the Eastern District of New York, [the availability of process] factor does not favor transfer." *Speedfit LLC v. Woodway USA, Inc.*, 53 F. Supp. 3d 561, 577 (E.D.N.Y. 2014); *see also Ruiz ex rel E.R. v. United States*, No. 13-CV-1241, 2014 WL 4662241, at *12 (E.D.N.Y. Sept. 18, 2014) (availability of process factor neutral where "[n]either party has provided any affidavits stating that any prospective non-party witnesses would not appear" whether or not the case was transferred). The United States speculates that federal employee witnesses "could in the future" leave government service and no longer be compelled to attend trial. Def. Mot. 15. But these employees "could in the future" just as easily be stationed outside of Texas or move more than 100 miles out of the Western District of Texas. The Court should not transfer venue based on speculation about the potential future career paths of unnamed witnesses who are, at present, within Defendant's control. And while the United States may offer deposition testimony for any witness who is unable to attend trial, *see* Fed. R. Civ. P. 32, Leticia and Yovany "would be expected to sit at counsel table and consult in person during the trial," *Flores*, 142 F. Supp. 3d at 288, and should not be deprived of that opportunity. This factor thus weighs against transfer.

### F. The Disparity in the Parties' Means Militates Against Transfer

"Where a disparity exists between the means of the parties . . . the court may consider the relative means of the parties in determining where a case should proceed," *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 463 (E.D.N.Y. 2013) (internal quotations omitted), and the United States has

significantly greater means than Plaintiffs. *See Dwyer v. Gen. Motors Corp.*, 853 F. Supp. 690, 693–94 (S.D.N.Y. 1994) (denying transfer where, among other things, "[p]laintiffs are individuals who are suing a large corporation which possesses considerably greater financial assets"); *cf. Cruz v. Borgenicht*, No. 14-CV-00679, 2014 WL 3696207, at *4 (E.D.N.Y. July 24, 2014) (denying transfer based on the "physical and financial hardship" it would impose on plaintiffs). Leticia and Yovany are indigent and traveling to Texas would be "unduly burdensome to [their] finances," *Neil Bros. v. World Wide Lines, Inc.*, 425 F. Supp. 325, 331 (E.D.N.Y. 2006) (internal quotations omitted) (explaining that a party arguing against transfer because of inadequate means must offer documentation showing transfer would be unduly burdensome); *see* Yov. Dec. ¶ 8; *id.*, Exs. B, C; Let. Dec. ¶ 10; *id.*, Ex. D. Yovany supports himself and Leticia through his work at McDonalds, where he is an hourly employee and receives no paid vacation time. Yov. Dec. ¶¶ 8, 10. Traveling to Texas would deprive Yovany (and, by extension, Leticia) of precious income and could jeopardize his employment altogether. *See id.* ¶ 10. Further, if required to travel, Plaintiffs would be forced to bear out-of-pocket costs including for medical care, as Leticia's insurance is only accepted in New York. *See* Tanig. Dec., Exs. C, E.

Surprisingly, the United States points to the fact that Plaintiffs have obtained pro bono counsel—another fact indicating their indigency—to argue this factor favors transfer; however, "the convenience of counsel is not an appropriate factor to consider on a motion to transfer." *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 374 (S.D.N.Y. 2006) (internal quotations omitted). Because transfer would "shift the burden of convenience from the government to a plaintiff of limited means who find[s] travel difficult because of her medical problems," *Flores*, 142 F. Supp. 3d at 288, this Court should not disrupt Plaintiffs' choice of venue in their home state.

### G.  The Locus of Operative Facts Is Too Diffuse to Favor Transfer

The "locus of facts" also does not favor transfer because the key events in this case occurred across several states, including New York. And even if the United States inflicted some of its most traumatic and discrete injuries on Plaintiffs in Texas, that is not sufficient reason to permit Defendant to override Leticia and Yovany's choice of forum. That Defendant's expected witnesses and documentary evidence are located elsewhere "provide[s] . . . only weak support [for a transfer] . . . because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Lavazza Premium Coffees Corp. v. Prime Line Distribs.*, 575 F. Supp. 3d 445, 466 (S.D.N.Y. 2021) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002)).

"To determine where the locus of operative facts lies, courts look to the site of events from which the claim arises." *Guccione v. Harrah's Mktg. Servs. Corp.*, No. 06 CIV. 4361, 2009 WL 2337995, at *8 (S.D.N.Y. July 29, 2009) (internal quotations omitted). Leticia's and Yovany's claims arise from more than the moment of their forcible separation at the border; in fact, the "events from which the claim arises" occurred throughout the nation. Leticia and Yovany were harmed by a policy of intentionally and forcibly separating asylum-seeking parents from their children that was conceived and directed by federal employees in Washington, D.C. as early as July 2017—months before Leticia and Yovany first entered the United States. Compl. ¶¶ 15–21, 24.[5] The United States' argument that Texas is the "locus of operative facts" ignores the national policy at the root of this action. *See, e.g.*, *Wilbur P.G. v. United States*, No. 21-CV-04457, 2022 WL 3024319, at *4 (N.D. Cal. May 10, 2022) (declining to transfer family separation case despite

---

[5] The United States notes that the policy was first formally announced in April of 2018. Def. Mot. 6. This announcement has no bearing on when the policy was first designed and tested, nor on whether federal officers and employees in Washington, D.C. were involved in initial design and implementation. *See* Compl. ¶ 15. Discovery will be required to evaluate the extent of these officers' and employees' involvement during 2017.

a "substantial portion" of the conduct occurring in the potential transferee district because "conduct also occurred in other states, as this was a national policy"). As other courts addressing the consequences of the Zero-Tolerance policy have noted, "this was not a local issue . . . [t]hese were federal personnel implementing federal policy." *K.O.*, 2023 WL 131411, at *4.

More particularly, the acts and omissions that led to Plaintiffs' separation did not only happen in Texas. Almost immediately after his separation from his mother, Yovany was moved to Arizona, where he was held in substandard conditions and deprived of adequate medical and psychological care as well as information about and contact with his mother. Compl. ¶¶ 59–73. Despite a court order for their reunification, Leticia and Yovany were separated for an additional twenty-two days while Leticia was residing in New York, Let. Dec. ¶ 3, where she experienced "irreparable harms that stem from being unlawfully separated from family." *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 371 (S.D.N.Y. 2019); *see also Sunny v. Biden*, 573 F. Supp. 3d 759, 769 (E.D.N.Y. 2021) ("Courts, including district courts within this Circuit, have recognized family separation as a form of injury."). And Plaintiffs were reunited at LaGuardia Airport in New York in February 2020 and have lived in Brooklyn ever since. Let. Dec. ¶ 3.

Even if Texas were the "locus of operative facts," that would be "insufficient to disturb the Plaintiffs' choice of forum," when other factors weigh so heavily against transfer. *Pecorino v. Vutec Corp.*, 934 F. Supp. 2d 422, 444 (E.D.N.Y. 2012) (out-of-state locus of facts "insufficient to disturb the Plaintiffs' choice of forum" where, among other things, "Plaintiffs have limited relative means").

### H. Judicial Economy and the Interests of Justice Also Weigh Against Transfer

The United States' remaining arguments primarily concern the burden on this Court and the interests of justice. Even if these factors weighed strongly in favor of transfer (they do not), none outweigh the significant burden that transfer would impose on Leticia and Yovany.

First, to the extent this case involves questions of Texas law, this court is "capable of applying the law of other states." *Certain Underwriters*, 2015 WL 1182764, at *5 (internal quotations omitted). Indeed, where, as here, "an action does not involve complex questions" courts in this district "accord little weight to this factor on a motion to transfer." *Flores*, 142 F. Supp. 3d at 290 (internal quotations omitted); *see id.* ("Plaintiff's state law tort claims, which sound in common law negligence, are not complex."). Second, Defendant's observation that this case is "still in its early stages," Def. Mot. 17, is, at most, a neutral consideration—nearly all transfer motions are made at the outset of the case, and courts do not transfer cases simply because they are at an early stage. Rather, for the reasons already stated concerning the substantial burden of transfer on Plaintiffs, judicial economy and the interests of justice favor permitting Plaintiffs to litigate this matter in the district of their residence.

## II.     This Court Has Jurisdiction Over Leticia's and Yovany's Action

### A.  Legal Standards

Plaintiffs' claims arise under the FTCA, which expressly waives the United States' sovereign immunity where the United States, "if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA's waiver of sovereign immunity has exceptions. *Id.* § 2680. These "exceptions should be read narrowly," because the FTCA is "a remedial statute." *Cohen v. United States*, No. 98-CV-2604, 2004 WL 502924, at *7 (E.D.N.Y. Jan. 29, 2004) (quoting *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002)). As the Supreme Court has repeatedly emphasized, the "general rule that a waiver of the Government's sovereign immunity will be strictly construed . . . in favor of the sovereign" is "unhelpful in the FTCA context, where unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the

statute, which waives the Government's immunity from suit in sweeping language." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 492 (2006) (internal citations and quotations omitted).

"When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint . . . the plaintiff has no evidentiary burden. The task of the district court is to determine whether the [complaint] allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal citation and quotations omitted). The United States concedes that it is making a facial challenge. *See* Def. Mot. 18.[6] In evaluating this facial challenge, the Court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff[s]," acknowledging that "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Razi School v. Cissna*, 519 F. Supp. 3d 144, 148 (E.D.N.Y. 2021) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

### B. The United States Mischaracterizes Leticia's and Yovany's Allegations

The United States' arguments for dismissal suffer from a common defect: they are not directed at the claims the Plaintiffs have actually pled. The United States mischaracterizes the mistreatment Plaintiffs suffered as "referring Leticia for prosecution for unlawful entry, detaining her pending the resolution of her immigration court proceedings," "day-to-day management and operational decisions in detention facilities," and "transfer[ring] Yovany to ORR custody." Def. Mot. 20, 29. But Plaintiffs do not contend that it is inherently tortious for the United States to enforce its laws, make prosecutorial decisions, transfer custody of unaccompanied children in detention, or decide where to house detainees. Rather, Plaintiffs allege that U.S. officials engaged

---

[6] None of the evidence the United States submitted goes to jurisdictional issues. *See generally* Def. Mot. 17–40.

in specific, tortious conduct by (1) forcibly separating them without warning or explanation; (2) refusing Plaintiffs' communication or information about each other's whereabouts for weeks; (3) denying them adequate medical care; (4) detaining them in unsafe, squalid conditions; (5) coercing them to abandon their asylum claims; and (6) prolonging their separation for over two years; all with the intent to harm migrant families and ultimately deter migration from Central America. Compl. ¶¶ 18–85. This distinction is crucial. Plaintiffs are the "masters of the complaint" and can pursue the theory of liability they deem is best. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 396 (1987). Defendant cannot mold Plaintiffs' allegations and claims to fit its preferred defenses. *See, e.g.*, *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996–97 (D. Ariz. 2020) ("reject[ing] the United States' re-categorization of Plaintiffs' factual allegations as standalone claims").

### C. The Discretionary Function Exception Does Not Apply

The discretionary function exception ("DFE") bars FTCA claims based on actions by federal employees that (1) involve an element of judgment or choice and (2) are based on public policy considerations. *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988). Both conditions must be satisfied for the exception to apply. *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000). Neither condition is satisfied here.

While the plaintiff bears the initial burden to state a claim that is not barred by the DFE, *Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013) (per curiam), the burden then "shifts to the government to *prove* that the exception applies," *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 n.5 (E.D.N.Y. 2009). Plaintiffs sufficiently alleged that federal officials' conduct violated numerous government directives, including the *Flores* Agreement, agency detention standards, and the U.S. Constitution. Moreover, the challenged conduct is not susceptible to policy analysis. This Court should join the majority of courts that have rejected Defendant's invocation

of DFE in cases involving the separation of immigrant families and deny Defendant's motion to dismiss.[7]

       i.    *The DFE does not apply because the* Flores *Agreement and federal rules and standards prohibit the United States' conduct*

The United States' harsh and deliberately cruel treatment of Plaintiffs violated long-standing, mandatory obligations imposed by the *Flores* Agreement and the U.S. Department of Homeland Security's ("DHS") detention standards.

The *Flores* class litigation resulted in a settlement agreement that imposes specific, mandatory duties upon the United States. *See Flores v. Reno*, No. CV 85-4544 (C.D. Cal. Jan. 17, 1997) ("*Flores* Agreement"), available at ACLU, https://www.aclu.org/legal-document/flores-v-meese-stipulated-settlement-agreement-plus-extension-settlement (last visited Aug. 2, 2023); *Ruiz*, 2014 WL 4662241, at *7 (noting the *Flores* Agreement "is binding on" DHS and CBP). These include standards for the treatment of minors while in federal custody as well as Defendant's duty to "make and record the prompt and continuous efforts on its part toward . . . the release of the minor," *Flores v. Rosen*, 984 F.3d 720, 738 (9th Cir. 2020) (quoting *Flores* Agreement ¶ 18). Specifically, the *Flores* Agreement requires that immigration officers treat minors with dignity and respect and hold them in facilities that provide access to food and drinking water, toilets, medical assistance, adequate temperature control and ventilation, and contact with family members

---

[7] *See D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 592–93 (S.D.N.Y. 2022); *A.P.F.*, 492 F. Supp. 3d at 996–97; *J.P. v. United States*, No. CV-22-00683, 2023 WL 4237331, at *8–9 (D. Ariz. June 28, 2023); *C.M. v. United States*, No. 21-CV-0234, 2022 WL 3261612, at *43 (W.D. Tex. May 4, 2023); *C.D.A.*, 2023 WL 2666064, at *14–15; *D.A. v. United States*, No. EP-22-CV-00295, 2023 WL 2619167, at *8–10 (W.D. Tex. Mar. 23, 2023); *I.T.*, No. 22-cv-05333, ECF No. 30 at 10–13; *K.O.*, 2023 WL 131411, at *9; *Fuentes-Ortega v. United States*, No. CV-22-00449, 2022 WL 16924223, at *3 (D. Ariz. Nov. 14, 2022); *E.C.B. v. United States*, No. CV-22-00915, ECF No. 24 at 11–12 (D. Ariz. Nov. 8, 2022); *E.S.M. v. United States*, No. CV-21-00029, 2022 WL 11729644, at *4–5 (D. Ariz. Oct. 20, 2022); *A.E.S.E.*, 2022 WL 4289930, at *9–13; *F.R. v. United States*, No. CV-21-00339, 2022 WL 2905040, at *5 (D. Ariz. July 22, 2022); *A.F.P.*, 2022 WL 2704570, at *12–14; *Wilbur P.G.*, 2022 WL 3024319, at *4–5; *Nunez Euceda*, 2021 WL 4895748, at *3; *A.I.I.L. v. Sessions*, No. CV-19-00481, 2022 WL 992543, at *3–4 (D. Ariz. Mar. 31, 2022); *C.M. v. United States*, No. 19-cv-05217, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020); *but see S.E.B.M. v. United States*, No. 21-CV-00095, 2023 WL 2383784, at *14 (D.N.M. Mar. 6, 2023); *Peña Arita v. United States*, 470 F. Supp. 3d 663, 692 (S.D. Tex. 2020).

who were arrested with the minor. *Flores* Agreement ¶¶ 11, 12. Here, federal officers violated these standards when, *inter alia*, they denied Yovany adequate access to food, failed to provide him adequate medical care, subjected him to frigid temperatures, refused to put him in contact with Leticia for weeks, and prolonged his separation from Leticia. Compl. ¶ 90.

Federal officers also violated standards governing detention of migrants and requiring agents to maintain family unity "absent a legal requirement or an articulable safety concern." *Id*. ¶¶ 91–97 (quoting CBP's National Standards on Transport, Escort, Detention and Search ("TEDS") § 1.9). TEDS sets forth "explicit minimal requirements regarding the conditions under which detainees may be held." *A.E.S.E. v. United States*, No. 21-CV-0569, 2022 WL 4289930, at *10 (D.N.M. Sept. 16, 2022). Federal officials failed to comply with these minimal requirements by holding Plaintiffs in freezing, squalid conditions; failing to adequately document their separation; denying them adequate medical care; and treating Plaintiffs with gross disrespect. *See* TEDS §§ 1.4, 4.3, 4.7, 5.1, 5.6; Compl. ¶¶ 53, 55–60, 92–97. The United States also violated National Detention Standards when it deliberately ignored Leticia's medical needs and failed to provide her with necessary off-site medical treatment during her detention at the *West Texas Detention Facility. See Compl.* ¶ 97 (citing *INS Detention Standard: Medical Care* 1–2 (Sept. 20, 2000)). TEDS also provides that "[g]enerally, family units with juveniles should not be separated," but when it is "necessary" to do so, officers "must follow their operational office's policies and procedures and appropriate legal requirements." TEDS § 4.3. "[N]othing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective." *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018). Because no legal requirement, safety concern, or security concern required separating Leticia and Yovany—nor

keeping them separated after Leticia's criminal charges were dismissed and she was returned to immigration detention—federal officers violated this standard.

Federal officers have no discretion to disregard the *Flores* Agreement's and federal standards' "clear directive[s]" relating to the detention, treatment, and release of minors in CBP custody. *Ruiz*, 2014 WL 4662241 at *8 (first prong of DFE did not apply because officers failed to follow *Flores* Agreement and CBP policies); *see also A.E.S.E.*, 2022 WL 4289930, at *11 (in family separation case, "[i]t was not within the officers' discretion to deny Plaintiffs . . . basic requirements in light of the TEDS Standards and the *Flores* Agreement"). Officers' repeated violations of these mandatory requirements, therefore, render the DFE inapplicable here.[8]

> ## ii. The DFE does not apply because the United States' misconduct violated the U.S. Constitution

More fundamentally, the United States' forcible, cruel, and prolonged separation of Plaintiffs cannot qualify as discretionary because Plaintiffs have plausibly alleged that this conduct violated the U.S. Constitution. Compl. ¶¶ 98–105. Federal officers have "no 'discretion' to violate the Federal Constitution; its dictates are absolute and imperative." *Owen v. City of Independence*, 445 U.S. 622, 649 (1980). The Second Circuit (along with the majority of courts of appeals) has squarely held that under the DFE, "a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority." *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) (citations omitted); *see also D.J.C.V. v. United*

---

[8] Plaintiffs' challenges to the conditions of their confinement are not "[b]arred by the DFE." Def. Mot. 24–25. There is no categorical bar to challenging conditions of confinement, and courts regularly decline to apply the DFE to nondiscretionary conduct of federal employees responsible for the custody of detained individuals. *See, e.g., Ruiz*, 2014 WL 4662241, at *8 (refusing to apply DFE in case involving conditions-related provisions of *Flores* Agreement); *A.E.S.E.*, 2022 WL 4289930, at *10–11 (same where *Flores* Agreement and TEDS applied); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475–76 (2d Cir. 2006) (denying motion to dismiss and finding jurisdiction over FTCA action alleging prison guards "failed to patrol . . . out of laziness or inattentiveness"). There is no special rubric to determine whether the DFE applies in a custodial setting; the Court should evaluate Plaintiffs' allegations under *Gaubert* and conclude the DFE does not apply to Defendant's tortious conduct.

*States*, 605 F. Supp. 3d 571, 591 (S.D.N.Y. 2022) (collecting cases). Defendant urges the Court to disregard this well-settled precedent and contends Plaintiffs failed to allege violations of their constitutional rights with specificity. Def. Mot. 25–29. These arguments are unavailing. As discussed below, Plaintiffs have alleged plausible violations of the Due Process and Equal Protection Clauses of the Constitution; the DFE, therefore, cannot shield Defendant from its agents' unconstitutional conduct.[9]

### a) *The United States violated Plaintiffs' due process rights*

"[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality op.). The United States separated Leticia and Yovany without warning and with no regard to their right to family integrity, violating their rights to procedural and substantive due process.

The United States violates procedural due process when it interferes with a liberty interest without constitutionally adequate procedures. *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994). Because "[t]he right to family integrity is unquestionably a fundamental liberty interest," before the United States can separate a family, parents are entitled to a hearing unless there is some defined emergency circumstance. *D.J.C.V.*, 605 F. Supp. 3d at 591–93 (collecting cases). Here, Leticia and Yovany were separated without explanation or any opportunity to challenge the separation; no emergency warranted their initial separation nor their prolonged separation after Defendant dismissed Leticia's criminal case. These allegations sufficiently state a plausible

---

[9] To the extent Defendant suggests Plaintiffs have alleged "constitutional tort claim[s]," Def. Mot. 25, Defendant is incorrect. Plaintiffs have asserted state tort law claims and alleged that federal officials' tortious conduct violated the Constitution. Courts have easily understood this distinction. *See, e.g., Limone v. United States*, 579 F.3d 79, 102 n.13 (1st Cir. 2009) ("we do not view the FBI's constitutional transgressions as corresponding to the plaintiffs' causes of action. . . but rather, as negating the [DFE]"); *E.S.M.*, 2022 WL 11729644, at *2 (rejecting the United States' attempt to recast plaintiffs' claims based on actions of individual government employees as "systemic" constitutional torts "against the Government writ large"); *C.D.A.*, 2023 WL 2666064, at *17 (same).

violation of Plaintiffs' procedural due process rights. *See id.* (United States plausibly violated plaintiffs' procedural due process right to family integrity where plaintiffs alleged they were separated without any opportunity to be heard and no emergency warranted plaintiffs' immediate separation); *D.A. v. United States*, No. EP-22-CV-00295, 2023 WL 2619167, at *9 (W.D. Tex. Mar. 23, 2023) (same).

The United States violates the substantive due process right to family integrity when its conduct is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). The allegations here easily meet this standard. After Plaintiffs arrived in the United States seeking asylum, federal agents forcibly separated them without warning, preventing them from saying goodbye; refused them information and communication with each other for about one month; and prolonged their separation for over two years—all with the purpose of causing them harm, coercing them to abandon their asylum claims, and deterring future migration. *See* Compl. ¶¶ 1, 2, 15–73. Upon considering these practices, the court in *Ms. L. v. ICE* held that

> [a] practice of this sort implemented in this way is likely to be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience . . . interferes with rights implicit in the concept of ordered liberty, . . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency.

310 F. Supp. 3d 1133, 1144–46 (S.D. Cal. 2018) ("*Ms. L. I*") (internal citations and quotations omitted); *see also D.J.C.V.*, 605 F. Supp. 3d at 593–94 (declining to apply DFE because separation under Family Separation Policy violated substantive due process); *D.A.*, 2023 WL 2619167, at *9 (same); *A.P.F.*, 492 F. Supp. 3d at 996 (same).

*b) The United States violated Plaintiffs' right to equal protection*

Plaintiffs have also pled that federal agents' actions violated their constitutional right to equal protection under the law, Compl. ¶¶ 102–03, which has long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," even those not lawfully present, *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (emphasis removed). To state an equal protection claim based on selective enforcement, a plaintiff must establish that she was selectively treated compared with others similarly situated, and the treatment was motivated by an intention to discriminate on the basis of impermissible considerations such as race, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure. *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019). Plaintiffs have alleged that federal officers separated them and other families entering the United States from only the southwestern border, Compl. ¶ 15, where "practically all the illegal border crossings . . . are by Latino, Spanish-speaking migrants, but the same cannot be said for the northern border," *D.A.*, 2023 WL 2619167, at *7. Plaintiffs also allege that federal agents' actions were motivated by discriminatory animus toward Latino immigrants of Central American origin to deter them from pursuing legitimate asylum claims and from coming to the United States generally. Compl. ¶¶ 102–03. Taking these factual allegations as true, federal agents' actions constitute a clear equal protection violation. *See D.A.*, 2023 WL 2619167, at *7–8 (Family Separation Policy "plausibly amounted to selective prosecution motivated by discriminatory animus against Latino immigrants").

*c) Plaintiffs need not show the constitutional right was clearly established*

The United States urges this Court to create new law by holding that the federal government has discretion to violate a person's constitutional right unless that right was "clearly established" when the violation occurred. Def. Mot. 27. Courts apply that standard when considering qualified immunity defenses on behalf of individual defendants, not when assessing whether the United

States may be held liable under the FTCA, and the Southern District of New York swiftly rejected Defendant's argument to the contrary in an analogous FTCA case. *See D.J.C.V.*, 605 F. Supp. 3d at 597. This Court should do the same. In any case, Plaintiffs' rights to family integrity and equal protection *were* clearly established long before their separation. *See supra* Arg. Part II.C.ii (a) & (b).

   iii. *The DFE does not apply because the United States' misconduct was not grounded in policy considerations*

  Even if the United States' conduct was discretionary (it was not), Defendant has failed to show Plaintiffs' forcible, prolonged separation was "grounded in social, economic, [or] political policy." *Gaubert*, 499 U.S. at 335 (internal quotations omitted). The "cruelty of the separation of a parent and child by the government" is only justified "in the most dreadful circumstances," such as when the parent is "unwilling or unfit" to care for the child—circumstances not present here. *D.J.C.V. v. ICE*, No. 18 CIV. 9115, 2018 WL 10436675, at *1 (S.D.N.Y. Oct. 15, 2018); *see also Jacinto-Castanon*, 319 F. Supp. at 502 ("nothing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective"). Instead, Defendant's conduct in separating families was "emblematic of the exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective." *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1167 (S.D. Cal. 2018) (internal quotations omitted).

  In addition, regardless of whether the decision to separate Plaintiffs was grounded in legitimate policy interests, the DFE does not shield the United States from much of the conduct alleged in the complaint. *See, e.g.*, *Usoyan v. Republic of Turkey*, 6 F.4th 31, 46 (D.C. Cir. 2021) (discrete injury-causing actions can be "sufficiently separable from protected discretionary decisions to make the [DFE] inapplicable" (internal quotations omitted)). For instance, in *Ruiz*,

this Court assessed CBP's treatment of a minor in detention and determined that officers' conduct could not "be said to be susceptible to policy analysis" because it could not "discern how deciding to wait fourteen hours before contacting E.R.'s parents and to only provide the child with a cookie and a soda over twenty hours could constitute a considered judgment grounded in social, economic, or political policies." *Ruiz*, 2014 WL 4662241, at *8. Likewise, officers' discrete treatment of Plaintiffs while in detention were not policy decisions, and the DFE does not apply.

### D.  The Due Care Exception Does Not Apply

The due care exception ("DCE") to the FTCA bars claims "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). This exception applies if (1) a statute or regulation requires a course of action and, if so, (2) the federal employee exercised due care in following such requirements. *D.J.C.V.*, 605 F. Supp. 3d at 589 (quoting *Welch v. U.S*., 409 F.2d 646, 652 (4th Cir. 2005)). The United States cannot satisfy either condition.

As nearly every court to address the question in the context of the Family Separation Policy has held, Defendant fails the first prong as it can identify no statute or regulation that mandated Leticia's and Yovany's separation and attendant mistreatment. *See, e.g.*, *C.M. v. United States*, No. 19-CV-05217, 2020 WL 1698191, at *3 (D. Ariz. Mar. 30, 2023) ("The United States cites no statute or regulation mandating the separation of Plaintiffs upon their entry into the country"); *A.E.S.E.*, 2022 WL 4289930, at *14 (same); *A.P.F.*, 492 F. Supp. 3d at 995–96 (same); *D.J.C.V.*, 605 F. Supp. 3d at 598 (same); *A.I.I.L. v. Sessions*, No. CV-19-00481, 2022 WL 992543, at *5 (D. Ariz. Mar. 31, 2022) (same); *but see S.E.B.M.*, 2023 WL 2383784, at *15–16.

Instead, the United States mischaracterizes Plaintiffs' claims as challenging "Yovany's transfer to ORR custody," Def. Mot. 30, and argues that the Trafficking Victims Protection Reauthorization Act ("TVPRA") required his transfer, *id.* (citing 8 U.S.C. § 1232(b)(3)). The

TVPRA sets a deadline by which the federal government must transfer unaccompanied children to ORR custody. But Yovany was not unaccompanied—he arrived in the United States with his mother. The United States admits it used its "discretion" to deem Yovany "unaccompanied," conceding that no statute or regulation required such designation. And even if the "TVPRA might mandate a transfer to ORR after that initial separation, . . . the government cannot hide behind the DCE when it triggers a statutory scheme with conduct not mandated by the statute." *K.O.*, 2023 WL 131411, at *6. Moreover, nothing in the TVPRA permits, let alone mandates, separating families and denying communication or the relay of information about a parent's whereabouts to a child. *See id.*

The United States relies on an outlier case to argue that the DCE should apply. *See* Def. Mot. 31 (citing *S.E.B.M.*, 2023 WL 2383784, at *15–16 (finding DCE applicable because child was separated from her father pursuant to his criminal prosecution and detention awaiting deportation)). First, unlike the parent in *S.E.B.M.*, Leticia was never convicted of or sentenced to a crime. Compl. ¶ 37. Leticia's criminal charge was filed and dismissed the same day (one week after the separation), and she was returned to immigration custody pending her asylum application, not her deportation. *Id.* ¶¶ 29, 36, 37, 76, 77. Second, the decision to prosecute Leticia was not statutorily mandated. Thus, Yovany became "unaccompanied only because of the Government's fulfillment of its zero-tolerance policy" rather than pursuant to a statute or regulation. *C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *15 (E.D. Pa. Mar. 28, 2023).

Furthermore, even if a statute or regulation mandated Defendant's conduct, the DCE applies only if federal officers also exercise due care, which "implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956). The United States does not even try to argue that its agents exercised due care here, nor can it. Federal agents

deliberately traumatized Plaintiffs, kept them in squalid conditions, separated them without warning or explanation, denied them access to information and communication, failed to provide them with medically necessary treatment, and coerced Leticia into giving up her asylum claim. *See* Compl. ¶¶ 23–73. These allegations demonstrate federal officers failed to exhibit even a "minimal concern" for Plaintiffs' rights. *Hatahley*, 351 U.S. at 181; *see also J.P. v. United States*, No. CV-22-00683, 2023 WL 4237331, at *11 (D. Ariz. June 28, 2023) (finding DCE inapplicable even assuming the TVPRA prescribed a course of action because Plaintiffs plausibly alleged that the officers who detained and separated them did not act with due care).

### E. The Misconduct of the United States Has Private Analogs in State Tort Law

The FTCA imposes liability on the United States when "a private individual under like circumstances would be liable under state law." *United States v. Muniz*, 374 U.S. 150, 153 (1963); *see also* 28 U.S.C. § 2674. The words "like circumstances" do not mean "the *same circumstances*," as given the unique nature of governmental action, courts must "look further afield" to find analogous torts relating to the government activity at issue. *United States v. Olson*, 546 U.S. 43, 46 (2005) (quoting *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955)); *see also Liranzo v. United States*, 690 F.3d 78, 87–89 (2d Cir. 2012) (discussing the Supreme Court's "broad[]" view of the private analog requirement). Under this standard, Plaintiffs' negligence and abuse of process claims satisfy the private analog requirement.[10]

The United States asserts there is no private analog to the "federal government's responsibility for initiating removal proceedings" and "effectuating related detention." Def. Mot. 34. This argument is at odds with the Supreme Court's mandate to "look further afield" for

---

[10] Defendant does not argue that Plaintiffs' IIED, assault and battery, or conversion claims lack a private analog, *see* Def. Mot. 33–35, nor can they, because such private analogs plainly exist. *See, e.g.*, *Eberle v. Adams*, 73 S.W.3d 322, 336–37 (Tex. App. 2002) (upholding a jury award for IIED for the unlawful separation of a child from its parent).

analogous torts relating to the government activity at issue. *Olson*, 546 U.S. at 46; *see also Liranzo*, 690 F.3d at 94 ("To say that the challenged action is one that only the federal government does in fact perform does not necessarily mean that no private analogue exists."). That Plaintiffs were in immigration detention does not preclude finding a private analog, *see Liranzo*, 690 F.3d at 97, nor does it give the United States "carte blanche to commit torts against migrants in its custody," *E.S.M. v. United States*, No. CV-21-00029, 2022 WL 11729644, at *3 (D. Ariz. Oct. 20, 2022) (finding private analogs in family separation case because "the conduct for which Defendant is being sued in this case, while related to conduct only the Government may perform, is not beyond the scope of state tort law"). In relevant part, Plaintiffs seek recovery for federal officers' failure to provide them adequate care, including medical care and safe living conditions, and abuse of the legal process in pursuit of the ulterior purpose of coercing Plaintiffs to abandon their asylum claims and deterring migration to the United States. Because a private individual could be held liable for such harms, so too can the United States.

In Texas and Arizona (where Plaintiffs were detained), individuals and private entities tasked with the care of persons in their custody may be held liable for negligence if they breach their duty of care.[11] *See, e.g.*, *St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.*, 193 F.3d 340 (5th Cir. 1999) (describing verdict against private nursing home for negligent acts of its employees); *Harris v. Harris Cnty. Hosp. Dist.*, 557 S.W.2d 353, 355 (Tex. Civ. App. 1977) (hospital has duty to "provide for the care and protection of its patients"); *DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 695 P.2d 255, 260 (Ariz. 1985) (duty owed where a person takes the custody of another under circumstances such as to deprive the other of his normal opportunities

---

[11] Defendant cites *S.E.B.M.*, Def. Mot. 31, but that case is inapposite. There, the court held plaintiff's negligence claim had no private analog because she did not allege Defendant "failed to attend to her physical health or provide her with appropriate medical care" or that "she was physically unsafe." 2023 WL 2383784, at *9. Plaintiffs' Complaint contains ample allegations of federal officers' medical neglect and failure to provide safe, adequate living conditions.

for protection). "Federal immigration officials, too, are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care." *C.M.*, 2020 WL 1698191, at \*2. When federal officials breach that duty, they may be held liable for negligence under the FTCA. *See id.* (finding private analog for negligence claim brought under FTCA); *C.M. v. United States*, No. 21-CV-0234, 2023 WL 3261612, at \*47 (W.D. Tex. May 4, 2023) (finding private analog for negligence under Texas law as immigration officials owe similar duty of care as private nursing home personnel); *Lopez-Flores v. Ibarra*, No. 17-CV-00105, 2018 WL 6577955, at \*3 (S.D. Tex. Mar. 12, 2018) (finding private analog under Texas law for negligence resulting in wrongful detention and deportation).

Texas permits abuse of process claims where a private person, as well as a public employee, engages in "the malicious use or misapplication of process in order to accomplish an ulterior purpose." *Hunt v. Baldwin*, 68 S.W.3d 117, 130 (Tex. App. 2001) (defining abuse of process in action brought by debtor against creditors, a lawyer, and law firms); *see also Cooper v. Trent*, 551 S.W.3d 325, 333–34 (Tex. App. 2018) (concluding that an abuse of process claim based on allegations of prosecutor's pre-trial misconduct could proceed). Plaintiffs' abuse of process claim, therefore, has a private analog. *See A.F.P. v. United States*, No. 21-CV-00780, 2022 WL 2704570, at \*10 (E.D. Cal. July 12, 2022) (finding private analog under Texas law for abuse of process claim where plaintiffs alleged the government's "ulterior purpose [was] deterring other asylum seekers from entering the United States"). Because Texas and Arizona law satisfy the broad private analog inquiry required by the FTCA, Defendant's motion to dismiss on this basis should be denied.

## F.  The Independent Contractor Exception Is Irrelevant

The Court should disregard Defendant's independent contractor argument, as that exception is irrelevant here. Plaintiffs allege that *government officials* engaged in a years-long course of conduct designed to inflict maximum trauma on Leticia and Yovany, *see*, *e.g.*, Compl.

¶¶ 1–7, 15–23, and that *government officials* breached their own duties to provide for Leticia's and Yovany's protection and care while they were in federal custody, *see*, *e.g.*, *id*. ¶¶ 24–33. Defendant's contention that claims premised on "conduct . . . that allegedly occurred at privately run detention facilities . . . are barred," Def. Mot. 32, overstates the applicability of the independent contractor exception in three key respects.

First, Plaintiffs allege that federal officials engaged in tortious conduct while physically located in private facilities, including withholding from Leticia information regarding the whereabouts of her son, Compl. ¶ 40, deliberately ignoring Leticia's medical needs and refusing to give her necessary care, *id*. ¶¶ 48, 97, and coercing Leticia into accepting deportation, *id*. ¶¶ 74–79. The suggestion that such actions of federal employees are immunized from suit simply because they "occurred *at* privately run detention facilities," Def. Mot. 32 (emphasis added), improperly focuses on the location of the action, rather than what matters: the identity of the actor.

Second, the Complaint alleges that the United States reserves for itself certain authorities and duties with respect to the treatment of detainees at privately run facilities, and that such authorities were abused and duties breached. Compl. ¶¶ 87–90 (discussing Defendant's obligations under the *Flores* Agreement); *id*. ¶¶ 91–95 (discussing CBP's responsibility under TEDS); *id*. ¶¶ 96–97 (discussing ICE's duty to provide medically necessary treatment). The United States retains these obligations even when detainees are held in private facilities, so it cannot hide behind the independent contractor exception to avoid liability here.

Third, the conditions at the West Texas Detention Facility and Casa Kokopelli are relevant to assessing both the elements of the torts committed by government actors and the damages caused by federal employees' wrongful actions, regardless of who owns and runs the facilities. For example, the Complaint alleges that federal officials used the threat of Leticia's and Yovany's

continued separate detention to coerce Leticia into accepting a removal order. Compl. ¶¶ 6, 74–79. Officials' knowledge of the squalid conditions at its contractors' facilities renders their threats of continued detention all the more extreme and outrageous. *See* Restatement (Second) of Torts ("Restatement")[12] § 46 cmt. e, illus. 6 (1965) (school official's threat to send student to prison among facts making him liable for IIED). Similarly, federal officials' knowledge of Leticia's and Yovany's medical and psychological needs bears directly on the extreme and outrageous character of their conduct. *See id.* cmt. f ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."). At a minimum, even if federal employees did not themselves cause the miserable conditions at private facilities here, the harms Plaintiffs experienced at these facilities are relevant to the damages that were directly and proximately caused by Defendant's separation of plaintiffs and federal officials' other tortious actions. *See A.P.F.*, 492 F. Supp. 3d at 997–98 (independent contractor exception inapplicable to claims that separated children were abused in contractor-operated foster care because the harms were traceable to the family separation policy); *A.F.P.*, 2022 WL 2704570, at *18 (independent contractor exception inapplicable to claim that "the government's conduct of forcibly separating plaintiffs was a direct and proximate cause of the harm suffered by plaintiff" at a contractor-operated shelter).

### G. The Detention of Goods Exception Does Not Bar Leticia's Conversion Claim

The immunity of the United States from "[a]ny claim arising in respect of . . . the detention of any goods, merchandise, or other property," 28 U.S.C. § 2680(c), does not bar Leticia's conversion claim because her property was not detained, but rather surrendered to be held in trust

---

[12] Texas has "adopt[ed] the tort of intentional infliction of emotional distress as set out in § 46(1) of the Restatement (Second) of Torts." *Twyman v. Twyman*, 855 S.W.2d 619, 622 (Tex. 1993).

pending her release from immigration detention. The Supreme Court's most recent decision addressing the detention of goods exception reserved the question of whether the government's possession of a prisoner's personal property is a "detention" of that property. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218 n.2 (2008). In dissent, however, four Justices reached this issue and found that "[a] prisoner's voluntary decision to deliver property for transfer to another facility, for example, bears a greater similarity to a 'bailment'—the delivery of personal property after being held by the prison in trust . . . than to a 'detention.'" *Id*. at 236 (Kennedy, J., dissenting).

The United States' possession of Leticia's personal items is analogous to Justice Kennedy's "bailment" scenario: Leticia relinquished her property to CBP officers believing it would be kept safely and returned upon her release. Compl. ¶ 26. Indeed, CBP policy differentiates between "detainees' personal property" discovered during apprehension or processing which must be "safeguarded" and "itemized" and property that is "contraband" or otherwise subject to "seizure."[13] *See* TEDS § 7.1. This Court should adopt Justice Kennedy's interpretation of the statutory term "detention" and hold that Defendant is not immune from Leticia's claim that federal officials unlawfully converted her personal property after it was placed in their trust.

## III.    Leticia and Yovany Adequately Pled Their Claims

Defendant's argument that Plaintiffs have failed to state claims fares no better. In evaluating the government's motion, the Court must construe Plaintiffs' complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in the Plaintiffs' favor. *See, e.g.*, *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013). The Court must also consider the complaint in its entirety, asking whether "there is a permissible relevant inference from *all* of the facts alleged, taken collectively, not whether an

---

[13] The government's principal authority, *Ford v. United States*, is distinguishable because the property in that case was "seized," *i.e.*, detained. 85 F. Supp. 3d 667, 671 (E.D.N.Y. 2015).

inference is permissible based on any individual allegation, scrutinized in isolation." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (internal quotations omitted). Under this standard, Plaintiffs have sufficiently alleged claims for intentional infliction of emotional distress (IIED), negligence, abuse of process, and assault and battery under Texas law.[14]

### A. Plaintiffs State a Claim for Intentional Infliction of Emotional Distress

In challenging Plaintiffs' IIED claim, the United States erroneously argues that its actions are not "extreme or outrageous." Def. Mot. 36–37. Contrary to Defendant's assertions, Plaintiffs do not challenge the authority of the United States to enforce federal law or limit the alleged tortious conduct to the discrete act of separation. Instead, Plaintiffs contend that the United States inflicted upon them severe trauma by forcibly separating them—and keeping them separated *for over two years*—under a Family Separation Policy designed to cause maximum harm to migrant families and ultimately deter migration from Central America. *See supra* Arg. Part II.B.

Specifically, federal officers separated Leticia and Yovany surreptitiously, preventing them from saying goodbye; refused to inform them where the other had been taken; denied them the ability to communicate for about one month; and kept them separated for over two years; all with the purpose of causing them harm and deterring future migration.[15] Compl. ¶¶ 15–21, 29–36, 40–42, 53–55, 67–69. The trauma of this forcible separation and the uncertainty about her son's whereabouts caused Leticia such extreme distress that she suffered from facial paralysis. *Id*. ¶¶ 41,

---

[14] The United States did not move to dismiss Leticia's conversion claim for failure to state a claim.

[15] Defendant cites *Dillard Dep't Stores, Inc. v. Silva* to argue that "enforcement of federal immigration law does not constitute extreme or outrageous conduct, even when it results in the separation of a parent from her child." Def. Mot. 36 (citing 106 S.W.3d 789, 797 (Tex. App. 2003)). *Dillard* is inapposite—there, the court held that despite a plaintiff's allegations that defendant knew of his innocence, its decision to initiate criminal proceedings was not "outrageous" because it had probable cause to do so. *Id.* Here, Leticia does not challenge the United States' authority to initiate criminal proceedings; the extreme and outrageous conduct alleged includes the numerous acts of cruelty that attended her prosecution, many of which occurred after Leticia's criminal matter was dismissed.

43–52. These actions also caused, and still cause, Plaintiffs pain, extreme anxiety, trauma, stress, difficulty sleeping, and depression. *Id.* ¶¶ 32–36, 41, 54, 62–64, 72, 82–85.

This conduct is undeniably "extreme" and "outrageous." *See D.J.C.V.*, 605 F. Supp. 3d at 601 (allegations that the government separated a parent from a child, barred the two from communicating, and did so in a way calculated to cause maximum distress were "extreme and outrageous"); *A.I.I.L.*, 2022 WL 992543, at *7 ("[A] jury could find the Government's [enforcement of the family separation policy] extreme and outrageous"). Indeed, Judge Sabraw found that the family separation Plaintiffs experienced was likely "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience . . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency." *Ms. L. I*, 310 F. Supp. 3d at 1145–46 (internal citations, quotations, and alterations omitted). This Court should follow suit and join the courts applying Texas law in other family separation cases that have allowed IIED claims to proceed. *See C.D.A.*, 2023 WL 2666064, at *22; *D.A.*, 2023 WL 2619167, at *16.

The United States' argument that Plaintiffs cannot maintain an IIED claim because "the risk of interference with the parent-child relationship is inherent to immigration detention" is far too sweeping. Def. Mot. 36–37. This case is not one where interference with the family relationship was "*incidental* to the government's legitimate interest" in immigration enforcement. *Aguilar v. ICE*, 510 F.3d 1, 22 (1st Cir. 2007) (emphasis added). Plaintiffs allege at length that interference with their family relationship was *the goal*. As the authorities in above paragraph indicate, when faced with these kinds of facts, courts readily allow IIED claims to proceed. And even if the Court concludes "reasonable minds could differ" on whether the United States' conduct as alleged was sufficiently extreme or outrageous, the issue must proceed to discovery and be submitted to the trier of fact. *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 203 (Tex. App. 2017).

Finally, Plaintiffs can sustain their IIED claim because it is independent from their other claims. Defendant's contention that Plaintiffs' IIED claim cannot lie simply because they allege other torts against the United States flatly misstates Texas law. *See* Def. Mot. 37–38. In Texas, a plaintiff may proceed with a claim for IIED where she proffers facts that are not "coterminous" with another statutory or common law claim. *Wright v. Blythe-Nelson*, No. 3:99-CV-2522-D, 2004 WL 2870082, at *3 (N.D. Tex. Dec. 13, 2004); *see also Conley v. Driver*, 175 S.W.3d 882, 888 (Tex. App. 2005) (affirming damages award for IIED for abusive actions "which were separate and apart from [the defendant's] assaultive behavior"). Likewise, Plaintiffs' IIED claim stems from the intentional forced and prolonged separation by the United States. The facts that support this claim are distinct from those underlying Plaintiffs' other torts, *see infra* Arg. Part III.B–D, and the United States' "unusual" conduct cannot be redressed by any other tort, *see Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004).

### B. Plaintiffs State a Claim for Negligence

This Court should join numerous other courts in family separation cases that have rejected Defendant's boilerplate attempt to dismiss plaintiffs' negligence claim, because "[f]ederal immigration officials, like employees at a private facility for the mentally impaired tasked with the care and custody of facility residents, . . . 'are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care.'" *A.F.P.*, 2022 WL 2704570, at *10 (quoting *C.M.*, 2020 WL 1698191, at *2); *see also C.M.*, 2023 WL 3261612, at *47.

Plaintiffs do not allege that the United States had a duty to "keep them together." Def. Mot. 38. Rather, they allege that the United States owed them the well-established duty that individuals and entities owe to persons in their custody. *See, e.g.*, *Harris*, 557 S.W.2d at 355 (hospital has duty to "provide for the care and protection of its patients"); *DeMontiney*, 695 P.2d at 260 (duty owed where a person "takes the custody of another under circumstances such as to deprive the other of

his normal opportunities for protection" (quoting Restatement § 314A)). This includes a duty to provide appropriate medical care. *D.A.*, 2023 WL 2619167, at *13. Plaintiffs allege that the United States breached its duty of care by failing to provide adequate care, including medical care, to Leticia and Yovany at the facilities where they were detained, and that such breach caused their physical and emotional injuries. *See* Compl. ¶¶ 43–52, 56–58, 60–66, 111–13. These allegations are sufficient to survive a motion to dismiss.[16]

### C. Plaintiffs State a Claim for Abuse of Process

Under Texas law, abuse of process "is the malicious use or misapplication of process in order to accomplish an ulterior purpose." *Moore v. Bushman*, 559 S.W.3d 645, 652 (Tex. App. 2018). The United States argues that Plaintiffs have not stated a claim for abuse of process because they did not allege that federal agents "made an illegal, improper, or perverted use of [] process, a use neither warranted nor authorized by the process." Def. Mot. 40 (quoting *Hunt*, 68 S.W.3d at 129). Plaintiffs, however, have alleged such facts.

The United States' detention of Plaintiffs, and the institution of criminal and immigration proceedings against Leticia, constitute process. *See Warner Bros. Entm't., Inc. v. Jones*, 538 S.W.3d 781, 816 (Tex. App. 2017) (finding "process" commences with the judicial process, including lawful arrest). Plaintiffs do not challenge the government's authority to apply criminal law to Leticia or immigration law to Plaintiffs. Rather, Plaintiffs allege that federal agents engaged in an "illegal, improper, or perverted use of the process," *Hunt*, 68 S.W.3d at 129, when officers designated Yovany as an unaccompanied child even though he was detained with his mother; refused to reunite Plaintiffs after Leticia's criminal charges were dismissed; and attempted to

---

[16] Defendant's argument that Arizona law does not allow a negligence claim for the same conduct that would constitute battery is a red herring. Def. Mot. 38. Yovany has plausibly pled a negligence claim based on "conduct that is independent of the intentional use of force." *Ryan v. Napier*, 245 P.3d 230, 239 (Ariz. 2018)); *see* Compl. ¶¶ 56–58, 60–66, 111–13.

coerce Plaintiffs into abandoning their asylum claims. Compl. ¶¶ 29, 35–37, 75, 78–79. Plaintiffs also allege the United States misused the unaccompanied child designation for the ulterior purpose of separating Leticia and Yovany to deter other Central American families from migrating to the United States. *Id.* ¶¶ 18–21, 102. Criminal and immigration processes were not designed to achieve these ends. *See Baubles & Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377, 379 (Tex. App. 1989) ("[P]rocess must have been used to accomplish an end which is beyond the purview of the process and which compels a party to do a collateral thing which he could not be compelled to do.").

Furthermore, federal officers' malicious use of process was successful in achieving its "ulterior purpose," *Moore*, 559 S.W.3d at 653—a point that the United States concedes, Def. Mot. 40—as Leticia abandoned her asylum claim and accepted deportation, Compl. ¶ 78. The coercive nature of federal officials' use of process was so evident that a federal court concluded "[t]he evidence presented clearly warrants a finding that [Leticia]'s withdrawal of her claims was not voluntary." *Id.* ¶ 79 (quoting *Ms. L. II*, 403 F. Supp. 3d at 862–63); *see also Baubles & Beads*, 766 S.W.2d at 379. These facts are sufficient to sustain an abuse of process claim at this stage.[17] *See D.A.*, 2023 WL 2619167 at *17 (finding abuse of process where plaintiffs alleged process was used to "coerce them into giving up their legitimate immigration claims" and "driven by discriminatory animus toward Central Americans").

### D. Plaintiffs State a Claim for Assault and Battery

Plaintiffs have adequately alleged that federal officers "intentionally or knowingly cause[d] physical contact with [them] when [they knew] or should [have] reasonably believe[d] that

---

[17] *E.L.A.* does not help the United States, *see* Def. Mot. 40, as there the court dismissed plaintiffs' abuse of process claim because plaintiffs failed to allege that the United States made an "illegal, improper, or perverted use of the process," *E.L.A.*, 2022 WL 2046135, at * 6. Here, Plaintiffs have made such allegations.

[Plaintiffs would] regard the contact as offensive or provocative." Tex. Penal Code § 22.01(a)(3).[18] Federal officers intentionally subjected Plaintiffs to freezing temperatures inside the CBP facility even though they were soaking wet and shivering from the cold. Compl. ¶ 25. Federal officers refused to provide Plaintiffs with dry clothing to withstand this cold; took away their sweaters so they had no means of keeping warm; and kept them in the freezing *hielera* for hours. *Id.* ¶¶ 25, 27.

To constitute an actionable battery, "[a]ll that is necessary is that the actor intend to cause the other, directly or indirectly, to come in contact with a foreign substance in a manner which the other will reasonably regard as offensive."[19] Restatement § 18 cmt. c. To illustrate, the Restatement explains that if an actor soils a towel and gives it to another with the expectation that she will smear her face with it and she does, the actor "is liable [for battery] as fully as though he had directly thrown the filth in the other's face or had otherwise smeared [her] face with it." *Id.* Similarly, federal officers' conduct here was as if they had thrown cold water on Plaintiffs before forcing them into the freezing facility. Officers knew Plaintiffs were wet, yet they still caused them to come into harmful or offensive contact with icy temperatures and deliberately impeded them from protecting themselves.[20] At this stage, these allegations are sufficient to support a battery claim.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Transfer Venue, or in the Alternative, Motion to Dismiss in its entirety.

---

[18] Texas courts use the same elements for assault and battery in both civil and criminal cases. *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 & n.2 (Tex. 2014).

[19] Texas courts follow and rely on the Restatement when evaluating tort claims, including those for battery. *See, e.g.*, *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 629–30 (Tex. 1967) (relying on Restatement §§ 18, 19 for the legal standard of battery).

[20] Defendant's argument principally relies on *Aguilar v. United States*, No. 16-cv-048, 2017 WL 6034652 (S.D. Tex. Jun. 7, 2017). However, *Aguilar*'s bare conclusion that "cold air" is an "element[] too far removed from reasonable assault and battery claims", *id.* at *5, is not a persuasive interpretation of the Restatement's discussion concerning contact with a foreign substance. Moreover, it does not appear that the *Aguilar* court was confronted with the considerably more extreme facts pled by Plaintiffs with respect to enduring the cold for hours while still in wet clothing. *See* Compl. ¶¶ 25, 27, 30.

Dated:          August 3, 2023


Alex Spiro                                              /s/Bradley Jenkins
Dennis Hranitzky                                    Bradley Jenkins*
Zane Muller                                            Zachary Manfredi*
QUINN EMANUEL URQUHART & SULLIVAN,      Ming Tanigawa-Lau*
LLP                                                         Jessica Hanson*
51 Madison Avenue, 22nd Floor                Marcela Johnson*
New York, NY 10010                              ASYLUM SEEKER ADVOCACY PROJECT
(212) 849-7000                                       228 Park Ave. S., #84810
alexspiro@quinnemanuel.com                New York, NY 10003-1502
dennishranitzky@quinnemanuel.com      (646) 937-0368
zanemuller@quinnemanuel.com             bradley.jenkins@asylumadvocacy.org
                                                            zachary.manfredi@asylumadvocacy.org
                                                            ming.tanigawa-lau@asylumadvocacy.org
                                                            jessica.hanson@asylumadvocacy.org
                                                            marcela.johnson@asylumadvocacy.org

                                                            * Admitted pro hac vice

Attorneys for Plaintiffs