UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LETICIA AND YOVANY,

                Plaintiffs,

-against-

UNITED STATES OF AMERICA,

                Defendant.

**MEMORANDUM & ORDER**
**22-CV-7527 (NGG) (RJL)**

NICHOLAS G. GARAUFIS, United States District Judge.

Leticia and her son Yovany[1] ("Plaintiffs") are asylum seekers from Guatemala. (*See* Compl. (Dkt. 1) ¶ 1-2.) They fled their home country to find safe haven and escape persecution. (*Id.*) In November 2017, they arrived at the United States border where they were promptly separated by the United States Government under a precursor to the Trump Administration's zero-tolerance immigration policy. (*Id.* ¶¶ 15-22, 24, 29.) They remained separated for over two years until a court ordered their reunification. (*Id.* ¶ 23.)

On November 12, 2022, Plaintiffs brought an action against the United States of America under the Federal Tort Claims Act ("FTCA") seeking damages for this separation and its attendant harms. (*See generally* Compl.) Plaintiffs' claims are for (1) intentional infliction of emotional distress, (2) negligence, (3) abuse of process, (4) assault and battery, and (5) conversion. (*Id.* ¶¶ 106-128.) In August 2023, the Government moved to transfer the case, or, in the alternative, to dismiss the case for failure to demonstrate subject matter jurisdiction and for failure to state a claim. (*See generally* Not. of Mot. (Dkt. 32); Mot. (Dkt. 32-1).)

---

[1] Plaintiffs are using pseudonyms to protect their identities given the sensitivity of the case and Leticia's ongoing asylum proceedings. (Compl. at ¶ 2.)

For the reasons discussed in this memorandum and order, the motion to transfer is DENIED. The motions to dismiss are GRANTED in part and DENIED in part. The court grants the Government's motion to dismiss Plaintiffs' conversion claim. The Court also grants the Government's motion to dismiss certain claims insofar as they are based on a theory of vicarious liability for actions committed by independent contractors, as discussed in this memorandum and order. Plaintiffs' claims for intentional infliction of emotional distress, negligence, abuse of process, and assault and battery remain.

## I. BACKGROUND[2]

### A. Separation and Detention of Leticia and Yovany

Plaintiffs Leticia and Yovany immigrated from Guatemala to the United States seeking asylum. (Compl. ¶ 1.) On November 20, 2017, shortly after crossing the border into West Texas, U.S. Customs and Border Protection ("CBP") agents apprehended Plaintiffs and placed them in detention at a facility in Presidio, Texas. (*Id.* ¶¶ 3, 24, 29; Davies Decl. (Dkt. 32-3) ¶ 9.) In the early morning hours of November 21, 2017, Government officers separated Leticia and Yovany and placed them in gender-segregated rooms. (*Id.* ¶¶ 3, 29.). Later that morning, Leticia was awaken by a fellow detainee who told her that "immigration officers had taken her son." (*Id.* ¶ 32.) Government officers would not tell Leticia where her son was taken for approximately one month. (*Id.* ¶¶ 40-42.) She was also unable to communicate with him.

---

[2] Unless otherwise noted, factual allegations are drawn from the Complaint. The court accepts all uncontroverted facts raised in the complaint as true. *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). When considering claims relevant to the Government's motion to dismiss under Rule 12(b)(1), the court considers additional submissions from the parties, making factual determinations necessary to determine subject matter jurisdiction. *Amaya v. Ballyshear LLC*, 340 F. Supp. 3d 215, 219 (E.D.N.Y. 2018).

(*Id.*) The same day the officers separated Leticia and Yovany, CBP agents sent Leticia to the West Texas Detention facility in Sierra Blanca, Texas. (Davies Decl. ¶ 15). Unbeknownst to Leticia, CBP agents transferred Yovany the next day, on November 22, 2017, to Casa Kokopelli, an Office of Refugee Resettlement ("ORR") funded private facility for unaccompanied children in Mesa, Arizona. (Compl. ¶ 59; de la Cruz Decl. (Dkt. 32-4) ¶ 3.) Leticia was held in the West Texas facility until June 2018; Yovany was held at the Mesa, Arizona facility until August 2018. (Davies Decl. ¶¶ 7-8; de la Cruz Decl. ¶ 3.)

A week after the separation, on November 28, 2017, Leticia attended a criminal hearing relating to charges of improper entry. (Compl. ¶ 36.) These charges were dismissed the day of the hearing. (*Id.* ¶ 37.) Almost two months after this hearing, on or around January 17, 2018, Leticia had a credible fear interview ("CFI") at which she was found to have a credible fear of returning to her home country. (*Id.* ¶ 76.)[3] Over four months after the CFI, on or around May 23, 2018, Leticia attended a hearing before an Immigration Judge where she was told she could present her full asylum case in October 2018. (*Id.* ¶ 77.) Leticia "felt she could not wait until October for her next hearing or force herself

---

[3] The Government submitted a declaration by Mark Davies, a CBP agent, where Davies stated that Yovany expressed a credible fear in his initial processing, (Davies Decl. ¶ 12), but Leticia did not. (Davies Decl. ¶ 14). Thus, although Leticia's initial I-213 form indicated she did not have a fear of persecution, she was still provided with the later credible fear interview. (Compl. ¶ 76; *see also L. v. U.S. Immigr. & Customs En"t*, 403 F. Supp. 3d 853, 862 (S.D. Cal. 2019) ("Although [Leticia's] Form I-213 states she did not fear persecution or harm should she be returned to her country of origin, [] she in fact was later provided a credible fear interview.").) It is unclear to the court why the charges were dismissed or why Leticia was given a Credible Fear Interview almost two months later, despite the Government's claim that she did not initially have a credible fear of returning to Guatemala and her referral for prosecution. The Government does not discuss this or why, after the charges were dropped and Leticia was found to have a credible fear, the Government did not reunite Leticia and Yovany.

and her son to continue to suffer in detention for many more months" so she accepted deportation. (*Id.* ¶¶ 77-78.) A month later, in June 2018, immigration officers deported Leticia, without her son, to Guatemala. (*Id.* ¶ 78.) She remained in Guatemala until February 2020 after a federal district court granted a motion to allow her to return to the United States and reunite with her son after finding that the "withdrawal of her [asylum and withholding of removal] claims was not voluntary." (*Id.* ¶¶ 7, 79.) *See also Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 863 (S.D. Cal. 2019) ("*Ms. L. III*")[4] (granting the motion of a group of plaintiffs including Leticia, therein referred to as B.L.S.P., to return to the United States to pursue their asylum applications).

Following Leticia's deportation, in August 2018, officials transferred Yovany from the facility in Mesa, Arizona, to San Antonio, Texas, and placed him with a foster family. (*Id.* ¶ 80.) The Government gave Yovany the option to return to Guatemala with Leticia, but he chose to stay in the United States out of a fear of persecution that was the basis of his asylum claim. (*Id.* ¶¶ 80-81.)

Ultimately, Plaintiffs were separated for 818 days. (Opp. (Dkt. 33) at 6, n.1.) For the first month, Plaintiffs were unaware of each other's location and unable to communicate with one another. (Compl. ¶¶ 40-42.) Plaintiffs allege that while detained, they were denied medical care, given inadequate food, and kept in conditions that were cold or otherwise inhumane. (*Id.* ¶¶ 25, 27, 30, 44-48, 50, 52, 66.) Plaintiffs further allege that they suffered and continue to suffer from medical issues and trauma

---

[4] There are three orders from the *Ms. L.* court that are referenced throughout this opinion: *Ms. L. v. U.S Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1136 (S.D. Cal 2018) ("*Ms. L. I*"); *Ms. L. v. U.S Immigr. & Customs Enf't*, 330 F.R.D. 284, 288 (S.D. Cal. 2019) ("*Ms. L. II*"); *Ms. L. v. U.S. Immigr. & Customs Enf't*, 403 F. Supp. 3d 853, 863 (S.D. Cal. 2019) ("*Ms. L. III*").

resulting from their prolonged separation and the conditions of detention. (*Id.* ¶ 108, 113, 118, 122.)

## B. The Zero-Tolerance Policy and its Precursor

As early as July 2017, CBP officials began piloting a program of intentionally and forcibly separating asylum-seeking parents from their children to deter asylum seekers from entering the United States. (*See* Compl. ¶ 15, n.2 (citing U.S. Dep't of Health and Hum. Servs., Off. of Insp'r Gen., *Separated Children Placed in Office of Refugee Resettlement Care* (Jan. 2019)); *see also D.A. v. United States*, No. 22-CV-00295, 2023 WL 2619167, at *1 (W.D. Tex. Mar. 23, 2023); *Ms. L. v. U.S Immigr. & Customs Enf't*, 330 F.R.D. 284, 288 (S.D. Cal. 2019) ("*Ms. L. II*").) Plaintiffs allege that they were detained as part of this program. (*See* Opp. at 3.)

On May 7, 2018, then-Attorney General Jeff Sessions announced the expanded "zero-tolerance policy," directing prosecution of all adults entering the country. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1136 (S.D. Cal 2018) ("*Ms. L. I*") (citing U.S. Att'y. Gen., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions). In accordance with that policy, the Government separated parents from their children. (Compl. ¶ 18.) The Government deported many of these parents while their children remained in the United States to pursue their asylum claims. *Ms. L. III*, 403 F. Supp. 3d at 857. This policy continued through at least June 20, 2018, when then-President Trump issued an executive order directing the Secretary of Homeland Security to "maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members." *See* Executive Order 13,841, Affording Congress an Opportunity to Address Family Separation § 3, 2018 WL 3046068 (June 20, 2018).

## C. The *Ms. L.* Litigation

A week after the executive order, on June 26, 2018, the Federal District Court of Southern California ordered the federal government to reunite eligible families. *See Ms. L. I,* 310 F. Supp. 3d at 1145. The *Ms. L.* litigation involved multiple decisions relating to the zero-tolerance policy, three of which are most relevant to this case. In the first of these decisions, in June 2018, the court

> certified the *Ms. L* Class of parents and generally included in the Class those parents who were (1) separated from their minor children at the border pursuant to the Administration's immigration policies and (2) did not have criminal history (with limited exceptions), were not unfit and did not present a danger to their children. The Court also issued on the same day a preliminary injunction prohibiting Defendants from further separating parents and their children at the border as there was a likelihood that conduct violated the parents' Fifth Amendment due process rights to family integrity under the United States Constitution. The preliminary injunction also ordered Defendants to reunite the families that had already been separated.

> *Ms. L. III,* 403 F. Supp. 3d at 857 (referencing *Ms. L. I,* 310 F. Supp. 3d at 1139 & n.5).[5]

In the second of these cases, the court amended the class definition to include individuals detained as part of a family separation policy that began as early as July 2017, prior to its formal announcement in May 2018. *See Ms. L. II,* 330 F.R.D. at 286-87. Leticia was included in the amended *Ms. L.* class. In the third of these cases, the court ordered the return of Leticia (therein referred to under the pseudonym B.L.S.P., (*see* Compl. ¶ 79 n.13)) to the United States because the initial decision to withdraw her

---

[5] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

asylum application was found to be involuntary making her removal unlawful. *Ms. L. III,* 403 F. Supp. 3d at 863 ("The Court cannot say B.L.S.P.'s decision to withdraw her applications was the product of a free and deliberate choice, particularly when she made her decision as a result of the continued separation from her child. B.L.S.P.'s subsequent removal based on the alleged voluntary withdrawal of her claim was therefore unlawful.")

On October 16, 2023, the *Ms. L.* parties moved for preliminary approval of a proposed settlement agreement. *See Ms. L. v. ICE,* No. 18-CV-00428 (Dkt. 711) ("Settlement Motion"); *Ms. L. v. ICE,* No. 18-CV-00428 (Dkt. 711-1) ("*Ms. L.* Agreement"). The *Ms. L.* Agreement requires the United States to, among other things, reunify separated families, assist separated families with their asylum applications, and provide legal services to class members who may be unaware of their rights under the Agreement. *See* Settlement Motion at 3. The *Ms. L.* Agreement also includes forward looking provisions "(1) setting forth the limited permissible circumstances under which families may be separated, (2) requiring communication between separated parents and children; (3) establishing information-sharing systems and protocols among agencies; and (4) ensuring that Defendants provide separated parents with information sufficient to understand the reasons for their separations." *Id.* at 4; *see also Ms. L.* Agreement at 26-38.

### D. Background Law Relating to Immigration Procedures and Requirements

A review of Plaintiffs' FTCA claims requires a consideration of the immigration laws that apply to noncitizens seeking asylum in the United States. Some of these laws are reviewed as necessary background to understanding whether Plaintiffs' claims should be dismissed.

### 1. Leticia and Yovany's Status as Noncitizen Asylum Seekers

"[A] noncitizen arriving in the United States is considered an applicant for admission." *C.M. v. United States*, No. 21-CV-0234 (JKP), 2023 WL 3261612, at *4 (W.D. Tex. May 4, 2023) (citing 8 U.S.C. § 1225(a)). Applicants for admission are required to be inspected by immigration officers to determine their admissibility to the United States. *Id.* § 1225(a)(3), (b)(1). The inspection includes a general screening for admissibility as well as a screening where an officer determines whether the noncitizen indicates "either an intention to apply for asylum . . . or a fear of persecution." *Id.* § 1225(b)(1)(A)(ii). Noncitizens deemed inadmissible are generally subject to removal. *Id.* § 1182(a)(6)(A)(i).

Noncitizens are not removable, however, if they indicate an intent to apply for asylum or a fear of persecution. *Id.* § 1225(b)(1)(A)(i). If a noncitizen indicates such an intent or fear, the immigration "officer shall refer the alien for an interview by an asylum officer."[6] *Id.* § 1225(b)(1)(A)(ii). At that interview, the officer will determine whether a credible fear of persecution exists. *Id.* § 1225(b)(1)(B)(ii). If an asylum officer determines that the noncitizen has a "reasonable fear", the officer must refer the case to an immigration judge for full consideration of the request for withholding removal. *See* 8 C.F.R. § 208.31(e).[7]

---

[6] This opinion generally uses the term "noncitizen" as equivalent to the statutory term "alien" except when citing statutory language. *See* 8 U.S.C. §1101(a)(3).

[7] Leticia was ultimately given a credible fear interview in January 2018 where an asylum officer determined that she had a credible fear of returning to her home country. This led to her referral to an immigration judge for a full consideration of her claim to withhold removal. (Compl. ¶¶ 76-77.) The complaint and exhibits provided by the Government are not clear, however, as to why Leticia was provided this interview after the officer who initially apprehended Leticia found that she did not have a fear of

### 2. Leticia's and Yovany's Detention

While a noncitizen awaits removal or a decision regarding removal, the Government "shall arrange for appropriate places of detention. . .." 8 U.S.C. § 1231(g)(1). The apprehension and detention of noncitizens is governed by 8 U.S.C. § 1226 which authorizes detention "pending a decision on whether the alien is to be removed from the United States." *Id.* § 1226(a); *see also C.M. v. United States*, No. 21-CV-0234 (JKP), 2023 WL 3261612, at *4 (W.D. Tex. May 4, 2023). "Under [1226(a)], the Government may detain a noncitizen, although it may instead release him [or her] subject to parole or a bond." *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 579 (S.D.N.Y. 2022) (citing 8 U.S.C. § 1226).

The custody and release of an "unaccompanied alien child" ("UAC") is governed by two separate statutes.[8] Under the Homeland Security Act, the Office of Refugee Resettlement ("ORR") (a component of the Department of Health and Human Services ("HHS")) is responsible for "the care and placement of unaccompanied alien children who are in Federal custody by reason of their immigration status." 6 U.S.C. § 279(b)(1)(A). ORR must, among other responsibilities, ensure that "the interests of the child are considered in decisions and actions relating to the care and custody of an unaccompanied alien child." *Id.* § 279(b)(1)(B).

---

persecution. (Davies Decl. ¶¶ 14, 76); *see also L. v. U.S. Immigr. & Customs En't*, 403 F. Supp. 3d 853, 862 (S.D. Cal. 2019) ("Although [Leticia's] Form I-213 states she did not fear persecution or harm should she be returned to her country of origin, [] she in fact was later provided a credible fear interview.").

[8] The act defines a UAC as any child who (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) either has "no parent or legal guardian in the United States" or has "no parent or legal guardian in the United States" who is "available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

Under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [HHS] not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). Once transferred to HHS, ORR must place the UAC "in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). This generally means a non-secure facility because HHS cannot place a UAC in a secure facility unless it determines that the child "poses a danger to self or others or has been charged with having committed a criminal offense." *Id.* § 1232(c)(2)(A). ORR cannot release a UAC to an individual's custody unless HHS first "makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," including by verifying the proposed custodian's identity and making an "independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* § 1232(c)(3)(A).

### 3. The *Flores* Agreement

In addition to these statutes and regulations, the *Flores* Agreement, a 1997 consent decree, requires the United States to provide humane treatment to children held in immigration custody (whether accompanied or unaccompanied). *See* Stipulated Settlement Agreement, *Flores v. Reno,* No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997) ("1997 *Flores* Agreement"); *see also Flores v. Sessions* 862 F.3d 863, 869 (9th Cir. 2017) (recognizing that the agreement remained in effect). This consent decree imposes specific requirements on DHS and ORR, such as a requirement to release the minor, in the following order of preference, to a parent, legal guardian, adult relative, or other "capable and willing" designated adult, or transfer the minor to a non-secure licensed

facility within five days of being apprehended. 1997 *Flores* Agreement ¶ 14; *id.* at Ex. 2(h); *see also Flores v. Lynch*, 828 F.3d 898, 901, 902 (9th Cir. 2016). The United States must also "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor" pursuant to paragraph 14 of the Agreement. 1997 *Flores* Agreement ¶ 18; *see also Flores v. Rosen*, 984 F.3d 720, 738 (9th Cir. 2020); *see also Flores Benitez v. Miller*, No. 22-CV-00884 (JCH), 2023 WL 5290855, at *2 (D. Conn. Aug. 17, 2023).

### 4. CBP Policies on Detention

Finally, also relevant here are the National Standards on Transport, Escort, Detention and Search ("TEDS") issued by CBP in October 2015. (Compl. ¶ 91.)[9] Although not statutes or regulations, CBP officers "were required to abide by these standards during the period of Plaintiffs' separation and detention." (Compl. ¶ 22 n.14.)[10] The TEDS direct the CBP to "maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." TEDS, § 1.9. The TEDS also state that "[g]enerally, family units with juveniles should not be separated" and when they are separated to "follow their operational office's policies and procedures and appropriate legal requirements." *Id.* at § 4.3. Further, the TEDS direct CBP officers to maintain proper

---

[9] *See also* Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search 2015 *available at* https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-andsearch (last visited October 22, 2023).

[10] *See also* GAO, *Southwest Border: CBP Oversees Short-Term Custody Standards, but Border Patrol Could Better Monitor Care of At-Risk Individuals*, GAO-22-105321 (September 2022) (reviewing CBP monitoring of compliance with TEDS standards and noting that the standards were implemented in October 2015 and remain in effect), https://www.gao.gov/assets/gao-22-105321.pdf (last visited October 23, 2023).

temperatures at detention facilities, *id.* § 4.7; requires officers to act with integrity and dignity in their treatment of detainees, *id.* § 1.2; and requires detention facilities to provide medical care. (Compl. ¶ 97)

## II. DISCUSSION

The Government moves to transfer the case. In the alternative, the Government moves to dismiss the case under Rule 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim under the relevant tort laws of Texas and Arizona. Each of these motions is reviewed in turn.

### A. Motion to Transfer

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." "District courts have broad discretion in making determinations of convenience under Section 1404(a)." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006). "A plaintiff's choice of forum usually weighs heavily in considering a motion to transfer venue." *JetBlue Airways Corp. v. Helferich Pat. Licensing, LLC*, 960 F. Supp. 2d 383, 400 (E.D.N.Y. 2013). Therefore, the party seeking transfer must make a "clear and convincing showing that the balance of convenience strongly favors the alternate forum." *Xiu Feng Li v. Hock*, 371 Fed.Appx. 171, 175 (2d Cir.2010) (Summary Order) (citation omitted); *see also New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010).

To determine whether to grant a motion to transfer, courts in this district considering the following factors:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the

relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

> *W.P.V. v. United States*, No. 21-CV-4436 (JPC), 2023 WL 1991426, at *3 (S.D.N.Y. Feb. 14, 2023).

"No one factor is outcome determinative." *Flores v. United States*, 142 F. Supp. 3d 279, 287 (E.D.N.Y. 2015).

The Government moves to transfer venue to the Western District of Texas. (Mot. at 9.) When considering these factors, the court finds that transfer is not warranted and therefore denies the Government's motion.

The first factor, convenience of witnesses, does not favor transfer. While there are witnesses in the Western District of Texas, there are also key witnesses in this District. This includes Plaintiffs themselves as well as their doctors who may testify to the physical and mental harms caused by the alleged tortious conduct. (*See* Opp. at 11.) These witnesses are expected to provide highly relevant testimony regarding Plaintiffs' apprehension, separation and detention. *See Freeplay Music, LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 617 (S.D.N.Y. 2016) ("When weighing the convenience of the witnesses, courts must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district."). In addition, as noted below when discussing the fourth factor, the events here took place in districts across the United States, including Texas, Arizona, Washington, D.C., and New York. Transfer to the Western District of Texas would therefore not significantly increase the convenience of witnesses since many are not located in that district. For witnesses unable or unwilling to travel, the court may utilize video testimony to reduce any serious inconveniences. *See Flores*, 142 F.

Supp. 3d at 287. "The court, not a jury, will be trying the case so that credibility determinations will not be adversely affected." *Id.* at 288; *see also* 28 U.S.C. § 2402.

The second factor, the convenience of the parties, strongly weighs against transfer. Plaintiffs live in this district and have relatively few financial resources. (Opp. at 7.) Further, Leticia has a medical condition that would make travel difficult. (*Id.* at 10-11.) Plaintiffs would therefore be significantly inconvenienced litigating in the Western District of Texas. This strongly weighs against transfer. *See Flores*, 142 F. Supp. 3d at 288 ("Transferring this action to the Southern District of Texas would shift the burden of convenience from the government to a plaintiff of limited means who find's travel difficult because of her medical problems. In these circumstances, plaintiff's choice of venue should be left undisturbed.")

The third factor, the location of evidence, is neutral. "Documentary evidence is easily transportable and not voluminous" and its place "is not a compelling consideration." *Flores*, 142 F. Supp. 3d at 289; *see also Lavazza Premium Coffees Corp. v. Prime Line Distribs.*, 575 F. Supp. 3d 445, 466 (S.D.N.Y. 2021) ("[T]he conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.") (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002); *C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *9 (E.D. Pa. Mar. 28, 2023) ("[I]n this current electronic age, it is difficult to imagine that . . . files cannot be produced in either forum."). Further, given the events occurred across multiple districts, such evidence surely also exists outside of the Western District of Texas.

The fourth factor, locus of operative facts, is neutral because the relevant actions occurred across multiple jurisdictions. *See Kumar v. Opera Sols. OPCO, LLC*, No. 1:20-CV-6824 (GHW), 2021 WL 4442832, at *16 (S.D.N.Y. Sept. 28, 2021) ("Where the locus

of operative facts is split amongst several forums . . . courts have, at minimum, viewed this factor neutrally.") The actions alleged here arose from a policy developed and directed by officials in Washington, D.C. (Compl. ¶ 15.) Plaintiffs' alleged injuries arose from conduct that occurred in numerous states. The Government transferred Yovany from Texas to a private facility in Mesa, Arizona only two days after his initial detention. (Compl. ¶ 59; de la Cruz Decl. ¶ 3.) The Government deported Leticia to Guatemala after six months where she resided for over one and a half years until reuniting with her son in this district. (Compl. ¶¶ 77-79.) Plaintiffs were then reunited in New York. (Opp. at 1.) Because operative facts occurred in multiple jurisdictions, this factor is neutral.

The fifth factor, the ability to compel testimony, is also neutral as this factor is "generally relevant only with respect to third-party witnesses, because employee witnesses are subject to compulsory process in either forum by virtue of their employment relationship with a party." *Ruiz ex rel. E.R. v. United States*, No. 13-CV-1241 (KAM), 2014 WL 4662241, at *11 (E.D.N.Y. Sept. 18, 2014). This weakens the Government's argument that its identification of ten agents and supervisors involved in the apprehension and detention of Plaintiffs located in the Western District of Texas warrants transfer. Further, video testimony may be used to gather evidence from those unwilling to travel. *See Flores*, 142 F. Supp. 3d at 289. Thus, this factor is neutral.

The sixth factor, means of the parties, strongly weighs in favor of denying transfer. Plaintiffs live in this district and have limited financial means to travel. Leticia is unable to work, and Yovany works part-time in an hourly position while attending college.

(Opp. at 6-7.) The Government, by contrast, is presumed to have the means to litigate in any forum.[11]

As to the seventh factor, the forum's familiarity with the governing law, "[w]here an action does not involve complex questions of another state's laws, courts in this district accord little weight to this factor on a motion to transfer." *Merkur v. Wyndham Int'l, Inc.*, No. 00-CV-5843 (ILG), 2001 WL 477268, at *5 (E.D.N.Y. Mar. 30, 2001). The application of Texas and Arizona state tort law, where relevant to Plaintiffs' claims, can be ascertained by this court. *See Flores*, 142 F. Supp. 3d at 290. Thus, this factor does not favor transfer.

The eighth factor, Plaintiffs' choice of forum "weighs heavily" against transfer. *See JetBlue Airways*, 960 F. Supp. 2d at 400.

Finally, the ninth factor, trial efficiency, does not favor either jurisdiction. The case is in its earliest stages and there are no efficiency gains from transferring the case to the Western District of Texas. This factor is therefore also neutral.

When considering the factors together, the court finds that the Government is unable to demonstrate that transfer is warranted. *See Bryant v. Potbelly Sandwich Works, LLC*, No. 17-CV-7638 (CM), 2018 WL 898230, at *4 (S.D.N.Y. Feb. 5, 2018) ("Traditionally, Plaintiffs' choice of forum is given great weight in the Court's analysis, and should not be disturbed unless the factors clearly tip in favor of transfer.").

---

[11] The Government asks the court to consider Plaintiffs' pro bono representation by an international law firm which has two offices in Texas as part of its analysis for this factor. The court declines to hold the office locations of the firm representing Plaintiffs pro bono against them. Even if considering the offices relevant to the court's transfer analysis, the court would still find that the means of the parties favors Plaintiffs, a mother and her son with limited means, in this action against the United States.

Other courts have generally denied transfer motions in cases brought under the FTCA arising from the Government's zero-tolerance policy. *See, e.g., K.O. v. United States*, No. 20-CV-12015 (TSH), 2023 WL 131411, at *4 (D. Mass. Jan. 9, 2023); *C.D.A.*, 2023 WL 2666064, at *7. One exception to this general rule is *W.P.V. v. United States*, No. 21-CV-4436 (JPC), 2023 WL 1991426 (S.D.N.Y. Feb. 14, 2023), which the Government cites several times in its briefing. (*See* Mot. at 13, 15-16.) However, unlike here, the *W.P.V.* plaintiffs resided in Honduras rather than the Southern District of New York, where that case was initially brought. *Id.* at *4-5. This impacts numerous factors highly relevant to the *W.P.V.* court's transfer analysis, including convenience of the witnesses and convenience of the parties, because although litigating in either venue "would require significant travel . . . [Honduras] is closer to Texas than New York." *Id.* at *4-5. Further, the plaintiffs in *W.P.V.* were unable to identify *any* specific witnesses that lived in the Southern District of New York while the Government in *W.P.V.* identified multiple witnesses (including non-Governmental employees) who lived in the district where the Government sought to litigate. *Id.* at *4. Here, by contrast, Plaintiffs point to numerous witnesses residing in this district, including the Plaintiffs themselves as well as their healthcare providers. (Opp. at 11.) The Government notes that it has identified ten witnesses in the Western District of Texas, but only points to CBP agents and supervisors—who, as Governmental employees, may be compelled to testify in this district. (*See generally* Mot. at 12; *see also* Davies Decl. ¶ 17). In sum, the court finds *W.P.V.* distinguishable.

The Government's motion to transfer is denied. The court now moves on to the Government's motions to dismiss under Rules 12(b)(1) and 12(b)(6).

## B. Motion to Dismiss Under Rule 12(b)(1)

The Government moves to dismiss Leticia and Yovany's claims under Fed R. Civ. P. 12(b)(1), arguing that the court lacks subject matter jurisdiction.

### 1. Legal Standard

The party "asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016). "In resolving a motion to dismiss under Rule 12(b)(1), the court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). When the defendant challenges factual allegations in the complaint to argue that subject matter jurisdiction does not exist (i.e., makes a fact-based challenge), the plaintiff needs to respond by "com[ing] forward with evidence of his own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems in the assertion of jurisdiction." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016); *see also Amaya v. Ballyshear LLC*, 340 F. Supp. 3d 215, 219 (E.D.N.Y. 2018) (describing the process for a fact-based challenge). A plaintiff may "rely on the allegations in their pleading if the evidence proffered by the defendant is immaterial" to demonstrate the court's jurisdiction. *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings[.]" *Tandon*, 752 F.3d at 243.

### 2. Overview of the Federal Tort Claims Act

Leticia and Yovany bring this action against the United States under the Federal Tort Claims Act ("FTCA"). The FTCA does not

create a cause of action. Instead, it acts as a limited waiver of the United States' sovereign immunity, authorizing plaintiffs to seek compensation from the United States for harms caused by its employees under state tort law. *See Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007). Under the Act, Plaintiffs must allege that the United States is subject to state tort liability "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *see also id.* § 1346(b)(1); *McGowan v. United States*, 825 F.3d 118, 125 (2d Cir. 2016) (noting that the need for "like circumstances" imposes a "private analogue" requirement for plaintiffs' FTCA claims).

The FTCA has a number of exceptions where the United States effectively retains its immunity from suit for certain actions. *See In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008). Four exceptions are relevant here. First, the discretionary function exception, which limits claims arising from an official's actions "in the exercise or performance or the failure to exercise or perform a discretionary function." 28 U.S.C. § 2680(a). Second, the due care exception, which limits liability for actions done with "due care, in the execution of a statute or regulation[.]" *Id.* Third, the detention of goods exception, which limits liability for officials' "detention of any goods, merchandise, or other property." 28 U.S.C. § 2680(c). Fourth, the "independent contract exception," which limits the United States's liability for actions of independent contractors when the United States does not exercise the requisite degree of control over the relevant contractor's actions. *See United States v. Orleans*, 425 U.S. 807, 814 (1976); *see also Zimmerman ex rel. Zimmerman v. United*

*States*, 171 F. Supp. 2d 281, 290 (S.D.N.Y. 2001) (reviewing factors to consider when determining whether the United States exercises control over an independent contractor).[12]

The Government argues that the discretionary function exception bars all of Plaintiffs' claims; that the due care and independent contractor exceptions bar specific claims relating to private actions; that the private analogue requirement bars Plaintiffs' negligence and abuse of process claims; and that the detention of goods exception bars Plaintiffs' conversion claim. (Mot. at 3.) These arguments are reviewed in turn.

### 3. Discretionary Function Exception

The FTCA's "discretionary function" exception bars liability for "any claim . . . based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception applies to actions by federal employees that (1) involve an element of judgment or choice *and* (2) are based on public policy considerations (the *"Berkovitz-Gaubert"* test). *See United States v. Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988).

This exception does not apply, however, to actions that violate federal law. *See Berkovitz*, 486 U.S. at 536. This includes actions that violate the Constitution. *See Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally . . . "); *see also Huntress v. United States*, 810

---

[12] Unlike the first three exceptions, this exception is not listed as an explicit exception in 28 U.S.C. § 2680. Instead, it is derived from the FTCA's requirement that Government "employee[s]" engaged in the relevant conduct, 28 U.S.C. § 1346(b)(1), and the definition of "employee" specifically excluding "any contractor with the United States." *Id.* § 2674.

F. App'x 74, 76-77 (2d Cir. 2020) (Summary Order) ("[A] federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority."); *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 588 (S.D.N.Y. 2022) (applying this exception to claims that arose from the zero-tolerance policy).[13]

---

[13] The Government asks the court to find that the discretionary function exception applies to unconstitutional actions unless the actions are specifically prohibited. (*See* Mot. at 26-28.) This is not the law in the Second Circuit, however. *See Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975). Nor is it the law in the majority of other circuits. *See, e.g., Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001); *Nieves Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021). Despite this controlling precedent, the Government argues that the court should adopt the Eleventh Circuit's minority view of the discretionary function exception. (Mot. at 26 (citing *Shivers v. United States*, 1 F.4th 924, 931 (11th Cir. 2021)). Under this approach, when federal statutes or regulations do not specifically require or prohibit conduct at the time when the conduct occurred, the exception does not apply. *Shivers*, 1 F.4th at 931 (citing *Gaubert*, 499 U.S. at 322). Even if not required to do so by controlling precedent, the court would decline the Government's request to adopt the Eleventh Circuit's restrictive reading of the discretionary function exception. The exception at issue here applies to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). A plain reading of "discretionary function" would not include actions by federal agencies or their employees that violate the Constitution. *See Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021) ("When interpreting a statute, the court seeks to afford the law's terms their ordinary meaning at the time Congress adopted them"); *see also Myers & Myers, Inc.*, 527 F.2d at 1261 ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.") In addition, the policy reasons that justify qualified immunity, a standard the Government essentially argues should apply when considering the application of the discretionary function exception, are not applicable to the FTCA context. The court agrees with the Third Circuit's recent review of this issue:

According to the Government, the discretionary function exception applies to the Government's decision to prosecute Leticia, its decision to label Yovany "unaccompanied" under the TVPRA and decisions relating to Plaintiffs' detention. (Mot. at 20-25.) In framing the discretionary decisions in this way, the Government attempts to splice its zero-tolerance policy into a series of discrete, noncontroversial decisions. But this litigation did not arise from an isolated decision to refer Leticia for prosecution nor from an isolated decision to label Yovany an "unaccompanied alien child." Instead, the relevant actions arose from the zero-tolerance policy in which the Government used family separation to deter migration to the United States. When an agency has a policy that in practice determines how agents will enforce immigration laws, the agents are not making discrete discretionary decisions. *See Texas v. United States*, 809 F.3d 134, 176 (5th Cir. 2015), *affirmed by an equally divided Court in United States v. Texas*, 579

---

The Supreme Court excluded clearly established constitutional violations from the protections of qualified immunity because it would be unfair to hold individual officers liable for 'conduct not previously identified as unlawful, and the Court was mindful of the chilling effect and 'social costs' of that liability. But these concerns are absent in the FTCA context, where only the federal government—not individual officers—can be liable.

*Xi v. Haugen*, 68 F.4th 824, 839 (3d Cir. 2023) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 813-15, 818 (1982)).

Other circuits have also rejected that the policy arguments supporting qualified immunity apply in the FTCA context. *See, e.g., Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994) ("In a suit against the United States under the FTCA, the United States is not entitled to defend on the basis of any official immunity that its executive employees individually might possess. To the contrary, the United States may be held liable to the same extent as a private individual under like circumstances."); *Loumiet v. United States*, 828 F.3d 935, 946 (D.C. Cir. 2016) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

In sum, even if there was not controlling precedent in this circuit, the court would decline to adopt the Government's view of the discretionary function exception.

U.S. 547, 548 (2016); *C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *14 (E.D. Pa. Mar. 28, 2023) ("While prosecutors are typically afforded an abundance of choice in their decisions, the Attorney General had explicitly directed the United States Attorney's Offices at the United States–Mexico border [under the zero-tolerance policy] to prosecute all instances of illegal entry."). The Government cannot claim that the decision to refer Leticia for prosecution was discretionary and that Yovany's subsequent transfer to a different state was a separate, isolated discretionary decision. The separation of families was central to the zero-tolerance policy. (Compl. ¶¶ 15-21) As discussed further herein, when an agency has a policy for its officers to make decisions that set off a series of legally required actions that necessarily lead to constitutional violations, the agency and its officers do not have discretion to make the first decision.

The court therefore considers the Government's actions in the context of the zero-tolerance policy, rather than as isolated decisions. With this in mind, the court now considers how the discretionary function applies to Government employees' actions taken to (1) separate the Plaintiffs and maintain this separation; (2) transfer Yovany to the facility in Mesa, Arizona; and (3) determine the conditions of Plaintiffs' detention.

### a. The Separation of Plaintiffs

The Government's separation of Leticia and Yovany violated their constitutional rights to procedural due process and substantive due process under the Fifth Amendment. *See* U.S. Const. amend. V. It also violated the *Flores* Agreement, which sets requirements for the treatment of minors in immigration custody. The discretionary function exception, therefore, was unlawful and does not bar Plaintiffs' FTCA claims that arise from this separation.

### i.  Procedural Due Process

Procedural due process requires that, when the government deprives an individual of a "constitutionally protected interest in life, liberty, or property," sufficient procedures are "attendant upon that deprivation." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).[14] These protections apply to both citizens and noncitizens, *see Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (applying the *Mathews* factors), and among protected liberty interests are a parents' interests in the "care, custody and management of their children," *see Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999).

For the Government to separate a child from his or her parent, the Government must therefore provide, at a minimum, notice and an "opportunity to be heard at a meaningful time and in a meaningful manner." *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Here, the officers that separated Leticia and Yovany provided neither.

First, the Government did not provide notice. Leticia awoke to find that Government officials had taken her son and she was not told where he was for about a month following their separation. (Compl. ¶ 32, 40-42.) The Government may not remove a child from a parent without prior notice, unless there is an emergency that justifies such a removal. *See Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991). The Government does not argue that there

---

[14] In considering the process required for the Plaintiffs' separation, the court cites to cases considering due process requirements for the separation of children from their parents under both the Fifth and Fourteenth Amendments of the Constitution. There is not a substantive difference between the two for the purpose of this analysis. See *Zynger v. Dep't of Homeland Sec.*, 615 F. Supp. 2d 50, 56 n.5 (E.D.N.Y. 2009), *aff'd*, 370 F. App'x 253 (2d Cir. 2010).

was any such emergency here. (*See generally* Mot. at 21-22 (reviewing the initial separation).) Thus, because there was not notice, the separation violated Plaintiffs' procedural due process rights.

The Government also did not provide Plaintiffs an "opportunity to be heard at a meaningful time and in a meaningful manner" that would allow them to challenge their separation. *See Mathews*, 424 U.S. at 333. To determine whether there has been a meaningful opportunity to be heard, the court considers the three *Matthews* factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

When considering the private interest at issue, Leticia and Yovany's interest in maintaining family integrity is unquestionably substantial. *See Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N. C.*, 452 U.S. 18, 27 (1981); *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) ("*Lassiter* declared it plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right."); *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) ("Parents . . . have a constitutionally protected liberty interest in the care, custody and management of their children."); *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) ("This right to the preservation of family integrity encompasses the reciprocal rights of both parent and children. It is the interest of the parent in the companionship, care, custody and management of his or her children[.]") (quoting *Stanley v. Illinois*, 405 U.S. 645,

651 (1972)). To satisfy due process, *Matthews* therefore requires that the procedures attendant on the separation include significant safeguards and that the Government's interests be substantial.

In considering the second *Matthews* factor, the analysis is, unfortunately, easy. At no point prior to or after the separation did the Government hold a hearing concerning the separation, Leticia's fitness as a parent or whether Leticia posed a risk to Yovany.[15] Leticia had no opportunity to reunite with Yovany while the Plaintiffs pursued their asylum claims. She was then deported in June 2018, prolonging the separation until a court ordered the reunification over two years later.

In considering the public interest under *Matthews*, the court recognizes the Government's and public's interest in border security and the enforcement of valid immigration laws. These interests, however, cannot justify a blanket policy of family separation without regard for parental fitness or the child's welfare. "[I]f officers of the State come to believe that they can never be questioned in a court of law for the manner in which they remove a child from [his or] her ordinary care, custody and management, it is inevitable that they will eventually inflict harm on the parents, the State, and the child." *Tenenbaum v. Williams*, 193 F.3d 581, 595 (2d Cir. 1999).

The Government also shares an interest in the welfare of the child, an interest that is only served when there is an "accurate and just" decision concerning whether separation is appropriate. *See Lassiter*, 452 U.S. at 27. The decision to separate the Plaintiffs here, as alleged, was neither. It was carried out without regard

---

[15] It was also not clear whether holding such a hearing could be "meaningful" because the Government does not explain whether their refusal to tell Leticia where they took her son was deliberate or whether they were unable to do so due to inadequate tracking of the children and parents in their custody. (*See generally* Compl. at ¶¶ 40-42; Mot at 7-8.)

to Leticia's fitness as a parent or the welfare of Yovany. Instead, it was carried out for the collateral purpose of deterring immigration to the United States.

Lastly, the Government recommends that the court follow Judge Engelmeyer's August 2023 decision in *D.J.C.V.*, a case where plaintiffs brought FTCA claims that also arose from the zero-tolerance policy. (*See* Letter re: Notice of Supplemental Authority (Dkt. 39).) This case provides the Government little support, however. In *D.J.C.V.*, the court considered FTCA claims by a parent and child separated shortly after crossing the border in May 2018. *D.J.C.V. v. United States*, No. 20-CV-5747 (PAE), 2023 WL 5334367, at *1 (S.D.N.Y. Aug. 18, 2023). After ordering jurisdictional discovery, the court found that it did not have jurisdiction to hear claims arising from the first of two periods of separation, which took place between May 2018 and October 2018, because the discretionary function and due care exceptions applied. *Id.* at *2, 12-14. The court was clear, however, why the exceptions applied in that case. The exceptions applied because of the substantial contemporary evidence that the father's prior state-court criminal conviction for aggravated assault based on the plaintiff swinging a machete at his wife led the officers to place the parent in a secure facility, which necessitated the separation. 2023 WL 5334367, at *1, 12-14. Contemporary emails and reports included many references to that criminal history. *Id.* at *13-14. Notably, the contemporary evidence also had no references to the zero-tolerance policy, despite explicit references to the policy in other separation cases. *Id.* For example, agents tracked "family separations between October 2017 and August 2018" in the Rio Grande Valley sector in a spreadsheet that listed "zero tolerance" or "zero T" as the reason for other noncitizens' separations. *Id.* at *13.

In this case, the Government does not argue or present *any* evidence that Leticia had a criminal history. Nor does the

Government provide any evidence that the separation was driven by any consideration of her fitness as a parent or that she posed danger to herself or others. Instead, Plaintiffs allege that Leticia and Yovany's separation, like many others crossing the border at that time, resulted from the zero-tolerance policy. This is an essential difference between the parent in *D.J.C.V.* and Leticia. Other courts have made similar distinctions for parents separated from their children at the border during this period—treating parents with criminal histories differently from those without criminal histories. *See Ms. L. v. ICE*, 415 F. Supp. 3d 980, 992-93 (S.D. Cal. 2020).

In sum, the court finds that the Government's separation of Leticia and Yovany, without notice and an opportunity to be heard, violated Plaintiffs' procedural due process rights. The officers that acted to effectuate and maintain this separation did not have the discretion to do so. The claims arising from these actions are therefore not barred by the FTCA's discretionary function exception.

### ii.    Substantive Due Process

"Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012). The Government may not infringe on "fundamental liberty interests" protected by substantive due process "at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

To determine whether the liberty interest is one protected by substantive due process, courts must consider whether the right is "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). Among the oldest

fundamental rights are the rights of parents to make decisions concerning "the care, custody and management of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923)). This right extends to citizens and non-citizens alike, *see Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018), and belongs to both the parent and the child, *Duchesne*, 566 F.2d at 825.

Removing a child from his or her parent may violate substantive due process when the separation was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *See Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012). Whether this standard is met is context-dependent, considering factors such as the length of the separation, the procedures attendant on the removal and whether there was a reasonable basis for concluding that the removal was in the best interests of the child. *Id.* at 152-54.[16]

The court finds that the officers that separated Leticia and Yovany violated Plaintiffs' substantive due process rights to family integrity. As the *Ms. L.* court wrote when ordering the reunification of parents and children separated under this policy:

> For Plaintiffs, the government actors responsible for the care and custody of migrant children have, in fact, become their persecutors . . . These allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond

---

[16] "There are two strands of the substantive due process doctrine. The first strand protects rights that are fundamental, whereas the second protects against the exercise of governmental power that shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018). The court does not rely on this second strand in finding that the actions here violated substantive due process. It does, however, consider the shocking nature of the actions as support for the court's finding that the infringement on Plaintiff's deeply rooted rights is substantial and does not serve a compelling government interest.

between parent and child, and is emblematic of the exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective[.] Such conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency.

*Ms. L. I,* 302 F. Supp. 3d at 1166-67.

The Government separated Plaintiffs for over two years without initially providing a means for Plaintiffs to communicate and without an apparent way to ensure that the Plaintiffs would ultimately be reunified. As already discussed, the Government did not provide any evidence that the separation served the best interests of the child or arose from a determination that Leticia was unfit to care for her child. *See Wilkinson ex rel. Wilkinson v. Russell,* 182 F.3d 89, 104 (2d Cir. 1999) (discussing the potential for a compelling state interest in the protection of minor children to outweigh the deprivation of the fundamental interest in family integrity.).

The Government is also unable to show that Plaintiffs' separation served a compelling interest in "securing the Nation's borders and enforcing the Nation's criminal and immigration laws." *Ms. L. v. ICE,* 415 F. Supp. 3d 980, 988 (S.D. Cal. 2020) (*"Ms. L. III"*). The CBP's own detention guidelines, noting the interests in keeping families together, indicate an interest in family unity. (*See* Compl. ¶ 91 (citing National Standards on Transport, Escort, Detention and Search ("TEDS"), § 1.9).) And the Government does not attempt to argue that the alleged reason for separating the Plaintiffs—to deter individuals from exercising a right to seek asylum—is valid, let alone compelling. Instead, the Government just raises a general interest in its exercise of discretion when enforcing immigration laws. (*See* Mot. at 21-22.) But the Government does not explain how the Plaintiffs' separation, which was not mandated by statute, serves this interest.

Thus, because the separation violated Plaintiffs' fundamental rights to family integrity and did not serve a compelling interest, the court finds that the separation violated Leticia and Yovany's substantive due process rights.

### iii. *Flores* Agreement

Plaintiffs also raise the violation of the *Flores* consent decree and CBP detention policies as independently removing officers' discretion to separate Plaintiffs.

"A settlement agreement is a contract that is interpreted according to general principles of contract law." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005). "[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971). "[T]he instrument must be construed as it is written." *Id.*

The Agreement includes provisions recognizing the importance of family reunification to ensure the humane treatment of children held in immigration custody. *See* 1997 *Flores* Agreement ¶ 14. Further, under the *Flores* Agreement, the Government "shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor." *Flores* Agreement ¶ 18. Thus, while the Agreement does not grant parents affirmative rights to facilitate reunification, *see Flores v. Lynch*, 828 F.3d at 907-08, its provisions recognize the obvious benefits of family unity to the welfare of children in the Government's custody.

In considering the *Flores* Agreement's impact on the officers' discretion here, the court finds that the Agreement limited the discretion to separate the Plaintiffs due to the violation of provisions guaranteed to Yovany. The obligations the Government owed to Yovany under the *Flores* Agreement began as soon as Yovany was in the Government's custody—i.e., upon his arrest

during the evening of November 20, 2017. *See* 1997 *Flores Agreement*, ¶ 11.

That very night, however, almost as soon as the Plaintiffs were detained, the Government labeled Yovany an "unaccompanied alien child" despite being housed in the same facility as his mother, which officers knew or should have known would lead to his separation and transfer to a different facility. (Davies Decl. ¶ 11) This undercuts an essential aspect of the Government's argument, which is that after the Government's decision to arrest Leticia and refer her for prosecution, the TVPRA required the Government to label Yovany a UAC and move him to a non-secure facility. (Mot. at 24 ("The DFE accordingly protects the government's determination after Leticia was referred for prosecution that Yovany be designated unaccompanied such that, as a UAC, he was required to be transferred to ORR custody").) But Leticia was not flagged for expedited removal and made unavailable based on the decision to prosecute until November 21, 2017, a day *after* Yovany was labeled "unaccompanied." (Davies Decl. ¶ 14). When "the evidence tells a story that does not match the explanation the [Government] gave," courts have held that the rationale is contrived. *Dep't of Com. v. New York,* 139 S. Ct. 2551, 2575 (2019). It should go without saying, but the Government is forcing the court to say it, that the Government cannot claim good faith compliance with their obligation to make "continuous efforts . . . toward family reunification" when it pretextually separates families. *Flores* Agreement ¶ 18.

The *Flores* Agreement also requires the Government to "make and record" its efforts to reunify families. *Id.* Yet there is no record of any efforts to reunify Yovany with Leticia after their apprehension on November 20, 2017, when their obligations under the *Flores* Agreement began. There is no record of any efforts to reunify Yovany with Leticia after her criminal charges were dismissed one week later on November 28, 2017. (Davies Decl.

¶ 15.) And there is no record of any efforts to reunify Yovany with Leticia when Leticia expressed a credible fear of persecution if forced to return to Guatemala. (Compl. ¶ 76.). Faced with a consent decree requiring the Government to make and record continuous efforts to reunify families, the only evidence here is of a bad faith pretextual separation of a family.

The Government argues that while the *Flores* Agreement gives preference to the release of minors to a parent, it does not *require* reunification nor that the Government make a parent available for reunification. (*See* Mot. at 5.) However, the Government's obligations to treat minors with "dignity, respect and special concern for their particular vulnerability" begins once they are detained. *Flores* Agreement ¶ 11; *see also Flores v. Lynch*, 828 F.3d 898, 907-08 (9th Cir. 2016). The Government cannot claim that they have limited obligations to a separately detained parent under the Agreement when their limited obligations are a result of their initial breach of the same Agreement. Just as the discretionary function exception does not protect the Government from liability for conduct that violates the Constitution, it does not protect the Government from liability for conduct that violates court orders.

In sum, the court finds that the Government's separation of Leticia and Yovany violated the Constitution and the *Flores* Agreement. The Government's actions effectuating and maintaining this separation, therefore, are not covered by the FTCA's discretionary function exception. These include actions taken to maintain Plaintiffs' separation after Leticia's charges were dismissed and after she was found to have a credible fear of returning to Guatemala. It also includes officers' coercing Leticia into withdrawing her asylum claim and deporting her to Guatemala, where she remained until the *Ms L.* court ordered her return to the United States. In sum, the discretionary function

exception does not bar Plaintiffs' claims stemming from the Government's actions that facilitated Plaintiffs' separation during the entirety of the period of separation.[17]

### b. Labeling Yovany "Unaccompanied"

The Government also argues that immigration officers acted within their discretion to label Yovany an unaccompanied minor, leading to his transfer to a facility in Mesa, Arizona. (Mot. at 30.) A UAC is defined as any child who (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) either has no parent or legal guardian in the United States or has "no parent or legal guardian in the United States" who is "available to provide care and physical custody." *Id.* § 279(g)(2).

The TVPRA applies to "unaccompanied" children—it does not apply to children who enter the United States with their parents. *See Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't,* 319 F. Supp. 3d 491, 495 n.2 (D.D.C. 2018). Thus, the court rejects that the officers acted within their discretion when labeling Yovany "unaccompanied" and transferring him to the facility in Mesa, Arizona. As discussed, the officers labeled Yovany "unaccompanied" based on a blanket policy of separation even before referring Leticia for prosecution. Because Leticia and Yovany entered the United States together, and the initial decision to prosecute Leticia violated the Constitution, the subsequent decision to label Yovany "unaccompanied" under the TVPRA was not a valid exercise of discretion. The Government cannot unconstitutionally separate children from their parents and then claim that decisions that were intertwined with these decisions are

---

[17] Note that while the discretionary function exception does not apply to decisions relating to the separation, other exceptions, such as the independent contractor exception, may, as discussed herein.

themselves discretionary. Thus, the discretionary function exception does not apply to the decision to label Yovany "unaccompanied" and the resulting harms.

### c. The Conditions of Detention

Plaintiffs allege that while detained, they were denied medical care and placed in unsafe and squalid conditions. (Opp. at 19.) These alleged conditions would violate the Government's obligations to children in their custody under the *Flores* Agreement and therefore the exception would not cover Yovany's claims. *See Flores* Agreement, Ex. 2 (noting that processing "facilities will have access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor.")

The second prong of the *Berkovitz-Gaubert* test, which requires that the relevant decisions are based on public policy considerations, also makes the discretionary function exception inapplicable to Leticia's claims. *See C.D.A. v. United States*, No. CV 21-469, 2023 WL 2666064, at *15 n.17 (E.D. Pa. Mar. 28, 2023) (finding that similar claims would fail the second prong of the *Berkovitz-Gaubert* test); *K.O. by & through E.O. v. United States*, No. 20-CV-12015 (TSH), 2023 WL 131411, at *8 (D. Mass. Jan. 9, 2023) (same). Under the second prong of the *Berkovitz-Gaubert* test, discretionary decisions must be "grounded in social, economic and political policy." *United States v. Gaubert*, 499 U.S. 315, 323 (1991). The conditions of detention alleged here are not "of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23. This is supported by allegations that a number of detention conditions would violate CBP manual guidelines relating to placing detainees in facilities with unreasonably cold temperatures or denying detainees medical care. (*See* Compl. ¶¶ 94, 96-97.) An officer's violation of

these policies would indicate that the officer was not exercising discretion of the type *Gaubert* is meant to protect. *See Scott v. Quay*, No. 19-CV-1075 (MKB) (SMG), 2020 WL 8611292, at *14 (E.D.N.Y. Nov. 16, 2020) ("An official's lazy or careless failure to perform his or her discretionary duties are negligent acts that neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy."); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475–76 (2d Cir. 2006) ("The negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction."). As such, they are not the result of discretionary choices grounded in policy and are therefore not of the kind protected by the discretionary function exception.

Thus, the court rejects the Government's argument that the discretionary function exception applies to Government actions that led to the alleged harms caused by the Plaintiffs' conditions of detention.

### 4. Due Care Exception

Under the due care exception, the FTCA does not apply to "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid[.]" 28 U.S.C. § 2680(a). To determine whether this exception applies, District courts in this Circuit use the analysis set forth in *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005). *See D.J.C.V. v. United States*, No. 20-CV-5747 (PAE), 2023 WL 5334367, at *12 (S.D.N.Y. Aug. 18, 2023) (collecting cases). Under this analysis, the court first "determine[s] whether the statute or regulation in question specifically [prescribes] a course of action for an officer to follow" and, if so, determines second "whether the officer exercised due care in following the dictates of that statute or regulation" (the "*Welch* test"). *Welch*, 409 F.3d at 652.

The Government argues that this exception applies to Yovany's intentional infliction of emotional distress ("IIED"), negligence, and abuse of process claims arising from his transfer to the facility in Mesa, Arizona. According to the Government, officers faithfully followed the law because once officers labeled him a UAC, the TVPRA required his transfer to ORR custody. (Mot. at 30.)[18]

The court finds that this exception does not apply. The Government labeled Yovany "unaccompanied" before the Government even placed Leticia in a secured facility, which no statute or regulation required. The Government cannot unconstitutionally separate children from their parents and then claim to exercise due care when it processes the now unaccompanied children according to the TVPRA. *See K.O. v. United States*, No. 20-CV-12015 (TSH), 2023 WL 131411, at *6 (D. Mass. Jan. 9, 2023). Because no statute specifically prescribed the separation and the transfer of Yovany, the due care exception does not apply under the first prong of the *Welch* test. 409 F.3d at 652. Other courts have found the same when considering similar claims. *See Flores Benitez v. Miller*, No. 22-CV-00884 (JCH), 2023 WL 5290855, at *15 (D. Conn. Aug. 17, 2023) ("[T]his argument has been considered and rejected by other courts.")).

This argument also fails under the second prong of the *Welch* test because Plaintiffs adequately allege that the Government did not

---

[18] Under the TVPRA, an "unaccompanied alien child" is defined as any child who (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) either has no parent or legal guardian in the United States or has "no parent or legal guardian in the United States" who is "available to provide care and physical custody." 8 U.S.C. § 279(g)(2). The TVPRA requires that officers transfer an unaccompanied child to ORR custody, who in turn must place the child in the "least restrictive setting" in the best interests of the child. 8 U.S.C. § 1232(b)(3). This generally requires placement in a non-secured facility. (Mot. at 30-31.)

exercise due care when labeling Yovany "unaccompanied" and transferring him to ORR custody. *See Welch*, 409 F.3d at 652. Exercising due care "implies at least some minimal concern for the rights of others." *Myers & Myers*, 527 F.2d at 1262. As discussed *supra*, the zero-tolerance policy, which led to the separation and subsequent transfer of Yovany without an apparent concern for his welfare and without giving him the ability to maintain contact with his mother, violated Plaintiffs' rights. In addition, Plaintiffs allege that officers transferred Yovany to a facility that exposed him to harsh conditions and where he was not given adequate care. (*See* Compl. ¶¶ 59-73.) Such conditions would not demonstrate adequate concern for Yovany's welfare given the Government's obligations to minors in its custody under the *Flores* Agreement. *Flores v. Sessions* 862 F.3d 863, 869 (9th Cir. 2017).[19]

In sum, the court finds that the due care exception does not apply to actions that arose from Yovany's transfer to ORR custody.

### 5. Independent Contractor Exception[20]

Under the FTCA, the United States has waived its sovereign immunity for suits arising from any injury "caused by the negligent or wrongful act or omission of any *employee* of the Government while acting within the scope of his office or employment[.]" 28 U.S.C. § 1346(b)(1) (emphasis added). Because the definition of "employee" specifically excludes "any contractor with the United States[,]" the United States cannot be held liable under the FTCA for the actions or negligence of independent contractors. *United*

---

[19] Whether certain claims arising from the conditions at these facilities are barred by the independent contractor exception is a separation issue, as discussed in the following section.

[20] The Government only argues that this doctrine limits those claims that relate to the conditions of Leticia and Yovany's confinement at the facilities in Mesa, Arizona and the West Texas Detention facility. (*See* Mot. at 31-32.)

*States v. Orleans*, 425 U.S. 807, 814 (1976) (citing 28 U.S.C. § 2671). Critical in determining whether an actor is an independent contractor, as opposed to an employee or agency, is the level of control the Government exercises over the contractor's performance. *See id.; Zimmerman ex rel. Zimmerman v. United States*, 171 F. Supp. 2d 281, 290 (S.D.N.Y. 2001). "The Government is immune to liability even where it retains the right to inspect a contractor's work or its compliance with regulations." *Fraser v. United States*, 490 F. Supp. 2d 302, 311 (E.D.N.Y. 2007). However, "[s]o long as a plaintiff alleges direct negligence on the part of government employees, sovereign immunity does not shield the Government from such claims." *Haskin v. United States*, 569 F. App'x 12, 16 (2d Cir. 2014) (Summary Order) (citing *Logue v. United States*, 412 U.S. 521, 532 (1973)).

Plaintiffs concede that they were detained at private facilities following their separation. (Compl. ¶¶ 34, 59; Opp. at 31-32.) To the extent that Plaintiffs' claims are derived from the actions of independent contractors operating at these facilities, these claims are foreclosed by the independent contract exception and the court would not have jurisdiction to consider them. In other words, Plaintiffs may not find the Government vicariously liable for torts independently committed by private parties at the private detention facilities. *See A.F.P. v. United States*, No. 21-CV-00780 (DAD), 2022 WL 2704570, at *19 (E.D. Cal. July 12, 2022) ("To the extent plaintiffs' fourth cause of action for negligence is based on a vicarious liability theory [. . .], that claim is barred by the independent contractor exclusion to the FTCA and is dismissed without leave to amend."). This bars such claims as those arising from private employees' negligence in creating inhumane conditions of confinement when Government officers had no residual duty of care owed to Plaintiffs when they were detained at these facilities. *See Acosta v. U.S. Marshals Service*, 445 F.3d 509, 514 (1st Cir. 2006) ("This [independent contractor] exemption excludes liability where the negligent treatment

of a federal prisoner is the fault only of a non-federal facility holding the prisoner under contract[.]")

The Government appears to argue, however, that the independent contractor exception should bar *any* FTCA claim that arose from the time period when Plaintiffs were detained at private facilities, without limiting the exception to apply to actions by independent contractors. (Mot. at 32.) This interpretation of the exception is too broad. The United States may be liable for tort violations committed by Government employees even when plaintiffs are detained at a private facility. *See Harvey v. United States*, No. 14-CV-1787 (PAC), 2017 WL 2954399, at *6 (S.D.N.Y. July 10, 2017) (rejecting that the independent contractor exception applied to FTCA claims based on negligence by ICE officers while plaintiffs were detained in a private prison). The complaint includes numerous allegations that while Leticia and Yovany were held in private detention facilities, they interacted with Government officers who engaged in tortious conduct independent of private contractors' conduct. This includes instances where officers deliberately withheld information relating to the whereabouts of the Plaintiffs; ignored Plaintiffs' medical needs; refused care to the Plaintiffs, and coerced Leticia into accepting deportation. (Compl. ¶¶ 40, 48, 74-79, 97.)[21] The allegations here therefore differ from FTCA cases where the exception applied because independent contractors were wholly in control of the relevant conduct and United States employees were wholly without fault. *Compare Roditis v. United States*, 122 F.3d 108, 110-12 (2d Cir. 1997) (finding that the independent contractor exception applied to bar the Government's liability for plaintiff's

---

[21] The Government does not provide evidence to rebut the allegations that Plaintiffs interacted with Government officers during their detention at the private facilities. Thus, for the purpose of this motion, the court accepts the allegations as true, drawing reasonable inferences in favor of Plaintiffs. *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).

fall outside a post office in an area entirely controlled by an independent contractor) *with Haskin*, 569 F. App'x at 16 (finding that the exception did not apply to similar facts but where plaintiffs also alleged negligence by Government employees and that the Government did not delegate all of the relevant responsibilities, so a material question existed as to whether the injury was solely based on the independent contractor's tortious acts). Leticia and Yovany, although in private facilities, continued to interact with immigration officers. If Plaintiffs can demonstrate that these officers engaged in tortious conduct that caused them harm, the Government may be liable despite their detention in private facilities.

In sum, the independent contractor exception does not categorically bar the Government's liability for harms Plaintiffs suffered in the time when they were detained at Casa Kokopelli or the West Texas Detention Facility. However, the independent contractor exception does bar claims arising from actions for which private contractors are wholly responsible and for which Plaintiffs' claims rely on a theory of vicarious liability. *See A.F.P. v. United States*, No. 21-CV-000780 (DAD), 2022 WL 2704570, at *17-18 (E.D. Cal. July 12, 2022).

> 6. Private Analogues: Negligence and Abuse of Process

Under the FTCA, "a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred." *McGowan v. United States*, 825 F.3d 118, 125 (2d Cir. 2016). This requires that the claims have "private-sector analogue[s]" in the relevant state's tort law. *United States v. Olson*, 546 U.S. 43, 45 (2005); *accord Liranzo v. United States*, 690 F.3d 78, 87 (2d Cir. 2012). This does not require a cause of action that encompasses identical conduct, however; the court may look "further afield" to find such a private analogue. *Id.* A private analogue may exist even when

"uniquely governmental functions" are at issue. *Olson*, 546 U.S. at 46.

The Government argues that there are no private analogues to Plaintiffs' negligence and abuse of process claims under Texas state tort law. The court rejects this argument and finds that these claims have private analogues.

### a. Negligence

Under Texas law, a plaintiff bringing a negligence claim must show: (1) a legal duty; (2) a breach of that duty; and (3) damage proximately caused by the breach. *Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. App. 2012). Plaintiffs may pursue negligence claims against individuals tasked with their custody. *See A.F.P.*, 2022 WL 2704570, at *10 (citing *Salazar v. Collins*, 255 S.W.3d 191, 198 (Tex. App. 2008)). For instance, Texas courts have allowed claims based on negligent care at nursing facilities that allegedly caused dehydration and malnutrition. *See HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 870-71 (Tex. App. 2005). Arizona law allows for similar claims. *C.M. v. United States*, No. CV-19-05217, 2020 WL 1698191, at *2 (D. Ariz. Mar. 30, 2020).

These causes of action, alleging negligence when there is a duty of care owed by private actors to those in their custody, provide private analogues for Plaintiffs' negligence claims alleging a breach of the duty of care owed by virtue of Plaintiffs being held in Government custody. Other district courts have found private analogues in Texas and Arizona state tort law for similar negligence claims based on the zero-tolerance policy. *See id.*; *C.M. v. United States*, No. 21-CV-0234, 2023 WL 3261612, at *19 (W.D. Tex. May 4, 2023).

### b. Abuse of Process

"The elements of abuse of process under Texas law are: (1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2)

the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage resulted to the plaintiff." *Moore v. Bushman*, 559 S.W.3d 645, 653 (Tex. App. 2018). "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself[.]" *See Detenbeck v. Koester*, 886 S.W.2d 477, 480 (Tex. App. 1994) (quoting *Prosser on Torts*, 3rd Ed., Section 115). Plaintiffs here allege that the Government used legal process to coerce them into withdrawing valid asylum claims and deter them and future asylum seekers from claiming asylum. (Opp. at 38-39.) This provides a private analogue under Texas state tort law for Plaintiffs' abuse of process claim. *See Olson*, 546 U.S. at 46 (noting that private analogues may exist even for "uniquely governmental functions.")

7.     Detention of Goods Exception: Conversion Claim

Under the detention of goods exception, 28 U.S.C. § 2680(c), the United States retains immunity from "any claim arising out of the detention of goods" including "a claim resulting from negligent handling or storage of detained property." *Kosak v. United States*, 465 U.S. 848, 854 (1984). This includes goods detained by immigration officers. *Ford v. United States*, 85 F. Supp. 3d 667, 670-71 (E.D.N.Y. 2015). Based on this exception, courts generally decline to exercise subject matter jurisdiction over conversion claims brought under the FTCA. *Id.* at 671.

The court finds that this exception applies. Plaintiffs do not cite to any controlling authority to support their argument that the exception should not apply because the court should consider the property taken by immigration officers when apprehending Leticia and Yovany to be "held in trust" as opposed to "detained." (Opp. at 33-34.) The Government's motion to dismiss Plaintiffs'

conversion claim for lack of subject matter jurisdiction is therefore granted.

In sum, the court grants the Government's motion to dismiss under Rule 12(b)(1) as it relates to Plaintiffs' claims that are based on vicarious liability for the actions of independent contractors and Plaintiffs' conversion claims. The court denies the Government's motion as it relates to all other claims.

## C. Motion to Dismiss: Failure to State Claim Under State Tort Law

The Government also moves to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, drawing all reasonable inferences in favor of the plaintiff. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

The court considers each of Plaintiffs' claims in turn. Texas state tort law applies to most claims. Arizona state tort law applies, however, to claims arising from Yovany's detention in Mesa, Arizona between August 2018 and February 2020.

### 1.    Intentional Infliction of Emotional Distress

The elements of an intentional infliction of emotional distress ("IIED") claim under Texas law are "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme or outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the plaintiff's resulting emotional distress was severe." *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993). Whether a defendant's conduct is "extreme and outrageous" is a matter of law. *Brewerton v. Dalrymple*, 997 S.W.2d 212, 216 (Tex.1999). The standard for whether conduct qualifies as "extreme and outrageous" is high; the relevant conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017).

The court finds that Plaintiffs meet this high bar and plausibly state a claim for intentional infliction of emotional distress under Texas law. Plaintiffs allege that Government officers separated Plaintiffs, a mother and her child, without warning and without telling them of the others' whereabouts. (Compl. ¶¶ 1, 23-33.) They did so to inflict emotional trauma to deter asylum seekers—people who fled their home because of persecution and often have already faced considerable trauma—from seeking refuge in the United States as required by U.S. treaty obligations. (*Id.* ¶¶ 18, 102, 107, 117); *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 427-29 (1987) (discussing implementation of the Refugee Act of 1980); United States Citizenship and Immigration Services – Refugee, Asylum and International Operations, Asylum Officer Basic Training Course, One-Year Filing Deadline (May 6, 2013) (noting that asylum seekers are often traumatized).[22] These actions had their desired effect, causing Plaintiffs severe mental

---

[22] Available at https://www.uscis.gov/sites/default/files/document/lesson-plans/One_Year_Filing_Deadline_Asylum_Lesson_Plan.pdf.

and physical symptoms. (Opp. at 35-36.) Such conduct may reasonably be considered sufficiently extreme or outrageous under Texas law. *See Flores Benitez*, 2023 WL 5290855, at *18 ("[T]he State of Texas—for more than a century—has recognized that a father has a tort cause of action when someone entices away or harbors his minor child.") (quoting *Silcott v. Oglesby*, 721 S.W.2d 290, 292 (Tex. 1986)).[23] Other courts considering similar family separation claims have found the same. *See, e.g., id.* at *18-19; *C.M. v. United States*, No. 21-CV-0234, 2023 WL 3261612, at *47 (W.D. Tex. May 4, 2023); *C.D.A. v. United States*, No. 21-CV-469, 2023 WL 2666064, at *22 (E.D. Pa. Mar. 28, 2023).

Plaintiffs also plausibly allege that Government officers acted intentionally or recklessly, that such actions caused Plaintiffs emotional distress, and that this distress was severe. See *Wornick Co.*, 856 S.W.2d at 734 (Tex. 1993). Thus, the court denies the Government's motion to dismiss Plaintiffs' IIED claims.[24]

---

[23] While the Texas Supreme Court in *Silcott* did not label the tort arising from the abduction or enticement of one's child IIED, federal courts have cited to the case to support allowing IIED claims to go forward when based on the zero-tolerance policy. *See Flores Benitez*, 2023 WL 5290855, at *19. The court agrees that the case offers support for these claims. The Supreme Court of Texas's discussion of common law in this case is instructive, with the court noting that "allowing damages for mental suffering without the necessity for showing actual physical injury when the tort is willful or intentional is well established" and that "[t]he parent can recover for the loss of society of his child and for his *emotional distress* resulting from [the child's] abduction or enticement." *Silcott*, 721 S.W.2d at 292 (quoting Restatement (Second) of Torts, § 700, cmt. g (1977)) (emphasis added). These statements indicate that under Texas state tort law, the separation of a child from their parent may give rise to a valid IIED claim.

[24] The Government argues that IIED claims are meant to be a gap-filler and that Plaintiffs plead tort claims with underlying facts that are "coterminous" with the IIED claim (i.e., covering the same conduct)). (Mot. at 37-38.) However, the Government simply notes that Plaintiffs raised multiple

## 2. Negligence

Negligence under Texas law requires showing: (1) a legal duty; (2) a breach of that duty; and (3) damage proximately caused by the breach. *Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. App. 2012). The threshold issue is determining the existence, scope and elements of a duty. *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022). District courts considering similar claims have thus generally focused on whether Plaintiffs adequately pled the existence of a duty under the relevant state's tort law. *See, e.g.*, *C.M.*, 2023 WL 3261612, at *47 (recognizing that Plaintiffs properly alleged that the Government owed them a duty while they were in the Government's custody); *A.F.P.*, 2022 WL 2704570, at *10 (same). As discussed when considering whether there is a private analogue under the FTCA for Plaintiffs' negligence claims, courts in both Texas and Arizona have recognized that private parties owe duties of care to those in their custody. *See HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 870 (Tex. App. 2005); *Estate of Smith v. Shartle*, No. CV-18-00323, 2020 WL 1158552, at *1 (D. Ariz. Mar. 10, 2020); *Salazar v. Collins*, 255 S.W.3d 191, 198 (Tex. App. 2008).

The court finds that Plaintiffs plausibly state a claim for negligence. Specifically, the complaint plausibly alleges a duty of reasonable care owed to those in immigration custody; that the *Flores* Agreement created a duty to provide care to Yovany as a child in immigration custody;[25] that the CBP guidelines created

---

tort claims related to the Government's "actions" without noting which actions are allegedly covered by the same ground as Plaintiffs' IIED claims. (*Id.*) The court agrees with the Plaintiffs that these claims cover distinct actions concerning the Government's separation of Plaintiffs. (*See* Opp. at 37.)

[25] As discussed, the independent contractor exception bars claims as they relate to actions committed by independent contractors where Plaintiffs'

a duty for officers to provide humane treatment to both Leticia and Yovany; and that Government officers breached these duties. (*See* Compl. ¶ 111-12.); *see also* 1997 *Flores* Agreement; Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search 2015 *available at* https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-andsearch. Plaintiffs further allege that the Government's breach of this duty injured the Plaintiffs, including by failing to treat Leticia's facial paralysis and psychological conditions. (*Id.* ¶ 113.) Thus, the court finds that Plaintiffs plausibly plead their negligence claims and denies the Government's motion to dismiss these claims. *See also A.F.P.*, 2022 WL 2704570, at *10.

### 3. Abuse of Process

"The elements of abuse of process under Texas law are: (1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage resulted to the plaintiff." *Moore v. Bushman*, 559 S.W.3d 645, 653 (Tex. App. 2018). In Texas, a plaintiff's abuse of process claim will only survive if "the original issuance of [the] legal process was justified, but the process itself [was] subsequently used for a purpose for which it was not intended." *Id.*; *see also Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App. 2001). Thus, the "critical aspect of this tort is the improper use of the process after it has been issued." *Graham v. Mary Kay Inc.*, 25 S.W.3d 749, 756

---

claims are premised on vicarious liability. Thus, actions committed by private contractors concerning the detention of Leticia and Yovany are barred by this exception. The United States may, however, still be liable for breaches of duties retained by Government officers, as discussed *supra*.

(Tex. App. 2000). "If wrongful intent or malice caused the process to be issued initially, the claim is instead one for malicious prosecution." *Hunt*, 68 S.W.3d at 129.

Whether Plaintiffs state a claim for abuse of process is a closer question than whether Plaintiffs state a claim for IIED and negligence. Courts considering abuse of process claims based on actions related to the zero-tolerance policy have allowed such claims, but not uniformly. *See A.F.P.*, 2022 WL 2704570, at *1 (allowing similar claims to proceed); *but see C.D.A.*, 2023 WL 2666064, at *1 (rejecting claim where plaintiffs invalidly pled abuse of process because they alleged that the initial process was improper).

Plaintiffs allege that Government employees illegally or improperly used otherwise valid immigration laws for improper purposes. Specifically, that after apprehending Leticia and Yovany, immigration officers traumatized Plaintiffs by illegally separating them, transferring Yovany to a separate facility, and refusing to reunite Leticia and Yovany while they were detained. (Opp. at 38-39.) They further allege that the Government did this with the improper motive of deterring future asylum seekers from pursuing valid asylum claims and coercing Plaintiffs into withdrawing valid asylum claims, which criminal and immigration processes were not designed to achieve. (Opp. at 39.) The court finds such conduct sufficiently improper, indicating that Plaintiffs' claims are of the type that this tort covers under Texas law. *See Detenbeck v. Koester*, 886 S.W.2d 477, 480 (Tex. App. 1994) (quoting *Prosser on Torts,* 3rd Ed., Section 115) ("The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself[.]"); *see also A.F.P. v. United States*, No. 21-CV-00780, 2022 WL 2704570, at *10 (E.D. Cal. July 12, 2022) ("[P]laintiffs have alleged that defendant maliciously used plaintiff A.F.P's prosecution for illegal entry as a pretext for separating him from his

minor son in pursuit of an ulterior purpose of deterring other asylum seekers from entering the United States.")

In considering the critical question of whether the initial process was justified, as required under Texas state tort law, the court finds that the process began when the Government apprehended Plaintiffs shortly after they crossed the border. (*See* Davies Decl. ¶ 9.) The Government may validly apprehend and begin immigration proceedings for noncitizens crossing the border, as Plaintiffs acknowledge. (Opp. at 38-39.) Thus, the process, initiated in the name of lawful enforcement of immigration laws, was proper. The impropriety began, according to Plaintiffs, shortly after the initial apprehension when the officers abused the immigration process to achieve the collateral purposes of coercing Plaintiffs into withdrawing their claims and deterring future asylum seekers from migrating to the United States. Because the initial apprehension initiating process was valid, and the process was subsequently misused, Plaintiffs plausibly state a claim for abuse of process. *See Hunt*, 68 S.W.3d at 130.

### 4. Assault and Battery

Under Texas law, "[a]n assault occurs when a person is in apprehension of imminent bodily contact, whereas a battery is committed when an individual actually sustains a harmful or offensive contact to his or her person." *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014). The defendant is liable for contacts that are offensive and provocative, regardless of whether they caused physical harm. *Id.* at 590. In *City of Watauga v. Gordon*, the court reviewed the standard under Texas law for offensive conduct, noting that it is the "nature of the contact, not its extent" that is important:

> In *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627 (Tex.1967), we recognized this type of battery. In that case, the manager of a motel restaurant snatched a plate from the hands of a black man as he stood in a buffet line, shouting

that he would not be served. *Fisher*, 424 S.W.2d at 628–29. We held the manager's conduct to be actionable as a battery. *Id.* at 630. Relying on the Restatement, we noted that it was the offensive nature of the contact, not its extent, that made the contact actionable: "Personal indignity is the essence of an action for battery; and consequently the defendant is liable not only for contacts which do actual physical harm, but also for those which are offensive and insulting." *Id.* (citing Restatement (Second) of Torts § 18).

*Gordon*, 434 S.W.3d at 590.

The offensive conduct need not directly cause injury; it may be indirect so long as it was caused by the tortfeasor and in a "manner which the other will reasonably regard as offensive." Restatement (Second) of Torts § 18, cmt. c (1965).[26]

Plaintiffs argue that the Government is liable for assault and battery based on their being placed in a facility with "freezing cold temperatures" while they were still wearing wet clothes after their initial apprehension. (*See* Compl. ¶ 121; Opp. at 39-40.) The Government, in response, argues that Plaintiffs' exposure to "cold temperatures" is insufficient to demonstrate the "harmful or offensive contact" necessary to state a claim for assault and battery under Texas law. (Mot. at 38-39 (citing *Aguilar v. United States*, No. 16-CV-048, 2017 WL 6034652, at *5 (S.D. Tex. June 7, 2017)).)

While Texas law is unclear on whether intentionally exposing Plaintiffs to unreasonably cold temperature while wearing wet clothes is sufficient to state a claim for assault and battery, the

---

[26] Texas courts have cited to the Restatement to provide guidance on assault and battery claims under Texas State law. *See, e.g., Gordon*, 434 S.W.3d at 590-91 (citing Restatement (Second) of Torts § 18 (1965)).

court finds Plaintiffs' arguments more persuasive.[27] As the Texas Supreme Court has noted, it is the "nature of the contact" that is at issue and that "[p]ersonal indignity is the essence of an action for battery." *Gordon*, 434 S.W.3d at 590. The initial holding pen is colloquially known as the "hielera" or "ice box," indicating to the court that the Government's conduct towards Leticia and Yovany was not aberrational and that exposing them to these harmful conditions was intentional. (Compl. ¶ 25.) Plaintiffs' allegations that Government officers knowingly placed them in a facility with freezing cold temperatures while they were wet and shivering and taking away their sweaters to keep warm, (*see id.*; Opp. at 40), implicated Plaintiffs' personal dignity, the "essence of an action for battery," *Gordon*, 434 S.W.3d at 590, to such a degree as to constitute offensive contact under Texas tort law. Thus, Plaintiffs sufficiently state a claim for assault and battery under Texas state law.

### 5. Conversion

Because Plaintiffs' conversion claim was dismissed for lack of jurisdiction under the detention of goods exception, *see supra*, the court need not consider whether the claim is properly pled under Texas state tort law.

---

[27] To support its argument, the Government cites a federal court in the Southern District of Texas that dismissed assault and battery claims arising from plaintiffs' exposure to "cold air, sound waves" and "constant light." (Mot. at 38-39 (citing *Aguilar*, 2017 WL 6034652, at *5).) This case is not controlling as to Texas state tort law, however, and the court declines to follow it as applied to Plaintiffs' claims. Based on the Texas Supreme Court's decisions in *Gordon* and *Fisher* as well as the Restatement (Second of Torts), the court finds that Plaintiffs plausibly state a claim for assault and battery.

## III. CONCLUSION

For the reasons reviewed above, the Government's motion to transfer is DENIED. The Government's motions to dismiss are GRANTED in part and DENIED in part. The court grants the Government's motion to dismiss Plaintiffs' claim for conversion. The Court also grants the Government's motion to dismiss certain claims insofar as they are based on a theory of vicarious liability for actions committed by independent contractors. The court otherwise denies the Government's motions to dismiss Plaintiffs' claims for intentional infliction of emotional distress, negligence, abuse of process, and assault and battery.

The parties are DIRECTED to contact Magistrate Judge Robert M. Levy and proceed to discovery.

SO ORDERED.

Dated:    Brooklyn, New York
           October 27, 2023

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge
